1

1        IN THE DISTRICT COURT OF THE UNITED STATES
2              DISTRICT OF SOUTH CAROLINA
               CHARLESTON DIVISION
3
   UNITED STATES OF AMERICA,    )        2:11-CR-511
4                               )
                 Plaintiff      )        Charleston,
5                               )        South Carolina
   VS                           )        November 10, 2014
6                               )
   JIAN-YUN DONG, et al,        )
7                               )
                 Defendants     )
8
                TRANSCRIPT OF TESTIMONY OF
9                  AGENT LARRY LEONARD
        BEFORE THE HONORABLE C. WESTON HOUCK,
10         SENIOR UNITED STATES DISTRICT JUDGE

11  APPEARANCES:

12  For the Plaintiff:    MR. ERIC KLUMB
                          MR. NATHAN WILLIAMS
13                        Office of the United States Attorney
                          P.O. Box 978
14                        Charleston, SC 29402

15  For the Defendant:    MS. ROSE MARY PARHAM
    Jian-Yun Dong         Parham Law Office
16                        P.O. Box 1514
                          Charleston, SC 29503
17
                          MR. RUSSELL W. MACE, III
18                        Russell Mace and Associates
                          1341 44th Avenue North
19                        Suite 205
                          Myrtle Beach, SC 29577
20
    Vaxima, Inc.          G. WELLS DICKSON, JR.
21  GenPhar Inc.          Wells Dickson
                          124 S. Academy Street
22                        Kingstree, SC 29556

23  Court Reporter:       Amy C. Diaz, RPR, CRR
                          P.O. Box 835
24                        Charleston, SC 29402

25        Proceedings recorded by mechanical shorthand,
    Transcript produced by computer-aided transcription.


              AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1                               *   *   *   *

2          THE COURT:  All right.  Call your next witness.

3          MR. WILLIAMS:   Thank you, Your Honor.  The

4    Government calls Agent Larry Leonard.

5          THE CLERK:  Please raise your right hand and left

6    hand on the Bible.

7          State your name for the record.

8          THE WITNESS:  Larry Leonard.

9    THEREUPON:

10                         AGENT LARRY LEONARD,

11   Called in these proceedings and after having been first duly

12   sworn testifies as follows:

13          MR. WILLIAMS:   And, Your Honor, if it pleases the

14   Court?  I have three exhibits that I had wished to publish to

15   the jury.  I intend to do that at this time under the three

16   shareholder letters that had been previously admitted through

17   both Ron Paquette and Elaine Van Voris today.  I have

18   reserved publication.  And if it pleases the Court, I will

19   read the proper excerpts from those at this time.

20          THE COURT:  Well, let's go ahead and examine this

21   witness.  He's here, we can handle those documents any time

22   we need to.

23          MR. WILLIAMS:   Thank you, Your Honor.

24          THE COURT:  He has no connection to them.  He's on

25   the stand.  Let's get rid of his testimony and move forward.

1          MR. WILLIAMS:   Thank you, Your Honor.

2                      DIRECT EXAMINATION

3    BY MR. WILLIAMS:

4    Q. Sir, tell the jury where you work.

5    A. I work for the Defense Criminal Investigative Services in

6    Charleston, South Carolina.

7    Q. What is the Defense Criminal Investigative Services?

8    A. It is the investigative arm of the Department of Defense

9    Inspector General's Office.

10   Q. How long have you been with DCIS?

11   A. It's called DCIS.

12   Q. How long have you been with DCIS?

13   A. I think it's 33 years.  Since 1985.

14   Q. What did you do before you worked at DCIS, if anything?

15   A. I was a Special Agent with the Naval Investigative

16   Service, now known as NCIS, in Washington D.C., and I was a

17   Special Agent with them for approximately four years.

18   Q. Did you do anything before that, educational background

19   that qualified you to work for NCIS?

20   A. 1976 I graduated from the Citadel with a Bachelor of

21   Science Degree in electrical engineering.  I went into -- two

22   weeks after I graduated, I joined the United States Navy as

23   an officer.  My last two years on active duty in 1979 through

24   1981 was as an intelligence analyst at the Naval

25   Investigative Service Headquarters.

1    Q. How did you end up back in Charleston?

2    A. Approximately 10 years ago -- I spent most of my career

3    in the Washington D.C. area.  Just about everybody in my

4    organization, since it's relatively small, knew that I was

5    originally from Charleston, but we didn't have an office in

6    South Carolina.  In 2003 I was asked to come down here to

7    open an office.  In June of 2004 I came down here to join a

8    government task force run by the Department of Justice

9    involving court security and counterterrorism.

10   Q. And how long were you with that group before you went to

11   your own office?

12   A. Well, part of the agreement when I came down here was

13   that I would be a part of that task force.  But in my spare

14   time I was to work DCIS cases, which are traditionally

15   contract fraud, corruption and the like.  So I had a caseload

16   of DCIS-related cases.  And I also worked on the task force.

17   Q. Are there other agents now since you started that office,

18   other DCIS agents, as well?

19   A. Since the office started here, two other agents have been

20   added.  And I am not officially -- two years ago I was

21   reassigned to our headquarters in Arlington, Virginia.

22   Q. Did you --

23   A. But I actually work out of here.

24   Q. Did you sort of retire?

25   A. I did sort of retire.

1    Q. You signed back up and are now working cases?

2    A. I don't -- these cases are still the ones that were left

3    over before I was reassigned to headquarters.

4    Q. So what type of cases, at least most recently, have you

5    been an investigator on?  What type of work do you do?

6    A. Primarily throughout my career has been involved in

7    contract fraud, public corruption, including bribery,

8    kickbacks in contracts, but all contracts involving the

9    Department of Defense, either the Department of Defense as a

10    whole or one of the military agencies.

11    Q. And you are familiar, obviously with the case you are

12    here for in court today, involving Dr. Dong, GenPhar and

13    Vaxxima?

14    A. Yes, I am.

15    Q. At some point in time did you interview -- I don't want

16    to go through your entire investigation -- but at some point

17    in time did you interview John Dong in this case?

18    A. Yes, I did.

19    Q. When was the first time you interviewed him?

20    A. August 23rd, 2009.

21    Q. Where did that interview occur?

22    A. It occurred at the FBI office in Mount Pleasant, South

23    Carolina.

24    Q. Was that after -- there had been some talk earlier about

25    a search warrant -- was that after a search warrant had been

1    executed?

2    A. It was after.

3    Q. And when you interviewed Dr. Dong, was he free to leave?

4    A. Yes, he was.

5    Q. He came in voluntarily or he wasn't under any kind of

6    arrest?

7    A. He actually called me and asked for an interview.

8    Q. And did you read him his rights, at least those that may

9    have applied in that situation?

10    A. I advised him he was free to go and he did not have to

11    answer any of our questions and he could leave at any time.

12    Q. And did you talk to him about the subject of this case,

13    about the grants that were involved in GenPhar?

14    A. Yes, I did.

15    Q. What did he tell you about the grants?

16    A. He described it all the grants were fixed price.

17    Q. Did he explain where they got money from, investment

18    money or anything like that for GenPhar?

19    A. As part of the, you know, the inquiry, we --

20        THE COURT:  Now, do you have a written statement?

21        MR. WILLIAMS:  Yes, Your Honor.

22        THE COURT:  Do you plan to offer that in evidence?

23        MR. WILLIAMS:  I wasn't planning on it, Your Honor.

24        THE COURT:  Okay.

25        MR. WILLIAMS:  I shouldn't say it's a written

1    statement; it's a typewritten report of the interview.

2              THE COURT:  I just didn't want to go through all the

3    details if you were ultimately going to offer the statement.

4              MR. WILLIAMS:   That's why I was trying to cut to

5    the chase.

6              THE COURT:  That's good.  I'm all for that.

7    Q. So without getting into all those background details, I

8    think you talked about the grants specifically.  Did he

9    indicate in that statement to you what type of investment or

10   investor funds they had?

11   A. He indicated that when the company first started, that it

12   started with about $1 million and then --

13             THE COURT:  Let me interrupt.  Let me see the

14   lawyers up here just a moment.

15             (At the bench.)

16             THE COURT:  I've had criminal cases for a long time,

17   I've tried a lot of criminal cases, but my recollection is

18   that in every one I've had in the past, I've had a

19   voluntariness hearing before the statement was introduced.

20             This is a little bit unique because I knew

21   beforehand that he had voluntarily went in, and I know that

22   he's testified that there is no intention, he was in custody

23   or anything like that, but I do feel like if there is any

24   question about the voluntariness, put it on the record, then

25   I can have that hearing now outside of the presence of the

1    jury.

2            I don't know what useful purpose it would serve, but

3    it seems to me -- I don't think the rule was now, but I think

4    way back when I first started, you did have to have a hearing

5    before the statement came in.  I think now -- I don't know.

6    I didn't anticipate this will happen.  I hadn't even thought

7    about it, but I just wanted to open the door and see what

8    anybody thought whether I can do it, alleviate anybody's

9    doubts or fears or concerns about it, the confession in broad

10    terms, and let me know.

11            What about you?

12            MR. MACE:   Judge, our concern would be we want to

13    make sure that any grant  --

14            MR. WILLIAMS:   I don't intend to ask about grant

15    stuff.  And it's not going to go into the things I think you

16    are worried about.

17            MR. MACE:   Okay.

18            THE COURT:  I'm not sure I understood you.

19            MR. WILLIAMS:   I think there is some other

20    information in the statements.  I'm not going to ask about

21    the -- ask about the -- I mean, I think that's what they are

22    worried about.  I'm not going to get into personal things,

23    things like that.

24            MR. MACE:   Okay.

25            MR. WILLIAMS:   I may ask about lobbying.

```
 1                    THE COURT:  You ask him about that after five days
 2        of trial, I think.
 3                    MR. WILLIAMS:   I think it would be a mistrial at
 4        the --
 5                    MR. DICKSON:  He didn't sign these documents, or
 6        these memorandums.
 7                    MR. WILLIAMS:   They are reports of an interview.
 8                    THE COURT:  How many more witnesses do you have?
 9        You are up to 20 now.
10                    MR. WILLIAMS:   We've got three more.
11                    THE COURT:  What is Bob Bickerton doing here?
12                    MS. PARHAM:   Watching.
13                    MR. DICKSON:   I don't see where he signed them.
14                    MR. WILLIAMS:   I didn't say he did.  I said we have
15        reports of an interview.
16                    MR. DICKSON:   Okay.  We just call them statements.
17        I'm kind of concerned.
18                    (In open court.)
19         Q. Agent Leonard, I believe you were starting to talk about
20        what this defendant told you about private investment money
21        when you interviewed him.
22         A. Yes.
23         Q. What did he say?
24         A. The initial investment was approximately $1 million.  And
25        then subsequent to that, they received an additional
```

1    investment, another $12 million.

2    Q. Did he explain more recent investments, as well?

3    A. Yes.

4    Q. What did he explain about recent investments?

5    A. He indicated that he had gotten, I believe $4 million

6    from Reinhard Hubner, a German investor.

7    Q. And did he explain what the status of the investment

8    funds were at the time of the interview in 2009?

9    A. He said at the time of the interview that they had no

10   more, he called it a buffer, with investor funds for the

11   company.

12   Q. Did he explain to you the organization of GenPhar, his

13   role at GenPhar?

14   A. Yes.  He said he was the President and Chief Executive

15   Officer of the company.

16   Q. Did he explain how he was compensated through GenPhar?

17   A. He did.

18   Q. What did he tell you?

19   A. In the first interview, he said that he was paid as a

20   consultant $150,000 a year.

21   Q. Did he explain at all how grant expenses could be used or

22   not used for the building?

23   A. We did ask how he -- what money the company had available

24   to it.  And he indicated there were investor funds, and then

25   he used the term called money earned, which was unfamiliar to

1    me, and grant funds was funds that were coming into the

2    company.

3        Q. So did he explain any further, at least at that time,

4    what this money earned concept was?

5        A. He basically said that these were milestone-driven

6    contracts, and most of the milestones were reached.  And any

7    money leftover was no longer grant money and that it could be

8    used for anything.

9        Q. And did you ask him if that money was used for the

10    building?

11        A. I did.

12        Q. What was his response?

13        A. He said that money earned was used.

14        Q. Did he indicate whether he thought the grant money could

15    be used for lobbying?

16        A. He indicated that he could not use indirect costs for

17    lobbying, but that he could use the money earned for

18    lobbying.

19        Q. So that was on August 26th of 2009, correct?

20        A. That's correct.

21        Q. Did you have a second followup interview with him?

22        A. Yes, I did.

23        Q. And about what day was that, approximately?

24        A. It was December the 23rd, same year, 2009.

25        Q. Were the circumstances of that interview any different?

A. Very similar.  He called and asked to come in and talk.

The first interview was when it was -- when it was set up, we only -- we knew we only had two hours.  He had a conference call that he needed to make, and so we didn't exactly get finished, but we got through most of everything.

But then in December he asked to come back in and to discuss this with us.  And so it was basically the same.  We met in the -- at the Mount Pleasant FBI Office.  Special Agent Olsen from the FBI and myself conducted both interviews.  And he went back through that he did not have to answer any questions and he was free to leave.

Q. And did you ask him any followup questions regarding the corporate structure again of GenPhar and Vaxxima?

A. I did.

Q. And did he explain on December 24th --

A. He explained that he was the Chief Executive Officer and President.  He identified his wife at the time, Dr. Danher Wang, as the Vice President for Research and Chief Scientific Officer.  He identified Stephanie Rabon as the bookkeeper. He also said that Linda Richards was employed, I don't know that he meant in that particular sense, but he said she was employed as their accountant.  And he also identified an outside auditing firm.

Q. Did you re-discuss or did you have another discussion about this money earned concept and how the building was paid

1    for?

2    A. We did.  I wanted to have him clarify a little better

3    what money earned meant.

4    Q. What did he say?

5    A. Pretty much that it was when they reached a milestone and

6    they were paid by the Government, that that money was earned;

7    and as a result, it could be used for other things.

8    Q. Did he ever say that he talked with anybody about that or

9    discussed it with grantors?

10   A. We asked him if he had talked to anybody in the United

11   States Government who had told him that.  Initially he said

12   that he had not.  And the second time, the second interview,

13   he said that he recalled that he talked to somebody but he

14   didn't know who it was.

15   Q. As far as future interviews, did you have a third

16   interview with him?

17   A. Yes.  I interviewed him in August of 2010.

18   Q. And was that a similar circumstance where he was free to

19   leave; wasn't forced to be there; was given his rights?

20   A. Yes.

21   Q. And in that interview, was there some discussion about

22   grants and possible loans?  If you need to refer to your

23   notes, certainly do.

24   A. In August 2010, by that time we knew that the company

25   basically had ceased operation.  So he came in and indicated

1    that they did not have any funds left.

2     Q. Did he have any plan to try to complete the building at

3    that time?

4     A. He did.  The company had obtained a first mortgage, a

5    loan for the building, in November 2009 after the search

6    warrant.  And during this meeting, he said that they were not

7    able to pay the mortgage or get an additional loan to pay for

8    the completion of the building.

9     Q. Was there any -- did you have an understanding based on

10    your conversations with him that he was able to obtain

11    additional investor funds at that point in time?

12     A. At that time, no.

13     Q. Did that come up in a later interview?

14     A. Yes.

15     Q. As far as from that interview, did he give any opinion as

16    to whether grant funds could be spent on other projects?

17     A. Yes.  He has maintained that all along.

18     Q. That it could or that it couldn't be?

19     A. Well, if the questioning was put to him as, Could you use

20    grant funds to do this?  His answer would be no.  But then he

21    would turn around and say that money earned from the grants

22    could be.

23     Q. And did -- I believe he told you something to the effect

24    of earning that money?

25          MR. MACE:   Objection, leading, Your Honor.

```
1            THE COURT:  I'm going to permit it.  We are trying
2    to shorten the time, and I think sometimes leading questions
3    help.  And I don't think the question here is helping the
4    witness answer.  I think his answer is going to be the same
5    whether it's leading or not.
6            So go ahead.
7    Q. Did he discuss with you whether he thought the money
8    diverted to the GenPhar building was justifiable?
9    A. Well, he kind of rejected the idea of diverting money.
10   He thought that was illegal to divert money.  But he did
11   think that the money being used in this building was
12   justifiable even in the proposals that were submitted.
13   Q. And then I believe you said you had one other interview
14   with him.
15   A. That's correct.
16   Q. Let me go back -- there was one other thing in that
17   August 13th interview.  Did he talk to you about his -- well,
18   let me ask you:  In any of these interviews, did he talk with
19   you about his understanding of how grants work?
20   A. Yes, he did.
21   Q. What was his explanation of his understanding of grants?
22   A. I'm not sure I understand your question.
23   Q. Did he ever tell you how he knew about grants or what his
24   rule was in grants?
25   A. Well, he said that he had worked with grants for many
```

1    years and he considered himself to be well-versed with

2    regards to grants.

3    Q. And I believe that came up in a 2011 interview?

4    A. That's correct.

5    Q. And was that the last interview that you had with the

6    defendant?

7    A. Yes.

8    Q. That was what day?

9    A. That was in September, um, September the 16th, 2011.

10   Q. And so what did he tell you about his understanding of

11   grants?

12   A. He said that he was very knowledgeable of grants; that he

13   sat on committees to evaluate grants and he considered

14   himself to be more knowledgeable than most with regards to

15   grants and grant receivers.

16              He also indicated that as the President and CEO of a

17   corporation receiving grants, that he was responsible for

18   reading the grant and then following the rules and

19   regulations associated with.

20   Q. And did he tell you in that interview whether he had a

21   new investor in GenPhar?

22   A. Yes, he did.

23   Q. What was his explanation of the new investor, what he may

24   or may not have told the investor?

25   A. The new investor was an investor from Hong Kong.  And we

1    asked him if he had informed this investor of the ongoing

2    investigation, and he said that he had not.

3    Q. As far as this issue with time sheets, did you ask him

4    whether he had any role in how the time sheets were filled

5    out?

6    A. He said he was knowledgeable with regards to how the time

7    sheets were filled out.  And he also made a comment, I don't

8    remember exactly which interview it was in, but it was to the

9    effect that GenPhar employees were not authorized to put

10   their time on their time sheets if it was not for work they

11   had not done.

12           MR. WILLIAMS:   Thank you, Agent Leonard.  Nothing

13   else.

14           MR. MACE:   Thank you, Judge.

15           Would it be permissible for me to see the documents

16   that Agent Leonard is refreshing his recollection?

17           THE COURT:  Sure.

18                         CROSS-EXAMINATION

19   BY MR. MACE:

20   Q. Agent Leonard, the style of the caption of the documents

21   you are using to refresh your recollection with, it says "Qui

22   Tam Claim" on it, right?

23   A. The header on the document, yes.

24   Q. Okay.  And I think the ladies and gentlemen of the jury

25   already know this --

1          THE COURT:  I didn't know he was refreshing his

2    recollection.

3          MR. MACE:   I believe he was, Judge.  I believe Mr.

4    Williams asked him and he has been looking down at those

5    documents during his testimony.

6          THE COURT:  Well, I think we need to put that on the

7    record.  I think that the jury has the obligation of judging

8    this witness's credibility.  And if there is anything about

9    his testimony that may be relevant, they have the right and

10   we have the obligation to tell them what it is.

11         Now, we have been through -- yes, sir?

12         MR. WILLIAMS:   I was going to make the record

13   whenever Your Honor wanted.  I can ask him those questions.

14         THE COURT:  We have been through the refreshing of a

15   witness's recollection on several occasions.  Today Mr. Klumb

16   followed a little different procedure than he did the other

17   day to the point where I commented to my clerk and wanted a

18   break.  I said, I finally got somebody to read a rule because

19   it was obvious that he had read the Rule.  I don't know

20   whether it was 608, 602, whatever it is, and asked for

21   permission to refresh the witness's recollection, showed the

22   exhibit, had it approved, went through the procedures

23   outlined in the Rule where that hadn't been done before.

24         Now, here we have a witness who is testifying from a

25   document, and we need to have that document identified so

1    that the jury will know what he's using to prompt himself

2    during this testimony.  That's crucial, it seems to me, or

3    could be crucial in the jury's mind as to judging his

4    credibility.

5            Now, what is it he's using, and has he used this

6    throughout his testimony?

7            MR. WILLIAMS:   I can ask those questions, Your

8    Honor.

9                            EXAMINATION

10   BY MR. WILLIAMS:

11   Q. Agent Leonard, you have some documents with you?

12   A. I do.

13   Q. What are they?

14   A. They are the four reports of the interview that we have

15   been talking about with Dr. Dong.

16   Q. Have you referred to those on occasion in your testimony

17   to refresh your recollection?

18   A. Well, I did look at them, but I didn't have my glasses

19   on, so I really couldn't read them.  But yes, I did look at

20   them.

21   Q. So you weren't testifying from those documents; you just

22   had them there sort of as a crutch?

23   A. Pretty much.

24   Q. So they weren't used to refresh your recollection so much

25   as should that have come up, you may be able to --

1      A. I couldn't find them on the pages.

2              THE COURT:  Come around, Mr. Williams, and be sworn,

3      please.  Okay.

4              MR. WILLIAMS:   Does that suffice, Your Honor?

5              THE COURT:  Anything you want to add to it?  I'm not

6      trying to do anything except paint the proper picture for the

7      jury.

8              MR. MACE:   Judge, my recollection is that Mr.

9      Williams asked Agent Leonard several times several different

10     questions, and Agent Leonard looked down and put his glasses

11     on and reviewed those documents.

12             THE COURT:  Well, I watched him throughout his

13     testimony and I usually pick up on that, and I didn't pick up

14     on it.  So if he looked down, he wasn't constantly reading

15     anything or I would have noticed it, I think, and the jury

16     would have, as well, and --

17             MR. WILLIAMS:   I can mark those as an exhibit just

18     to be safe.  That's fine with me.

19             THE COURT:  Okay.  Go ahead.

20             MR. MACE:   Thank you, Judge.

21     Q. The documents that you generated, the style of the

22     caption, it's called "Qui Tam Claim"; is that correct?

23     A. That's correct.

24     Q. And that refers to a civil case?

25     A. Actually, what that refers to is a requirement

1      involving -- any time we have an investigation that initiated

2      under qui tam, it has to have that header on it so that it

3      does not -- because it is sealed -- that it does not get

4      released accidentally.  So that header is placed on any case

5      that comes in initially as a qui tam until it is unsealed.

6          Q. Okay.  But are all of your reports that you generated

7      while interviewing Dr. Dong, do they all say qui tam on them?

8          A. I believe they do.

9          Q. So going back to my original question:  This started out

10     as a civil qui tam claim?

11         A. The initial complaint came in as a qui tam claim,

12     correct.

13         Q. And how were you assigned to that qui tam claim?

14         A. Well, I got a call from the Department of Justice that a

15     qui tam had been filed involving the Department of Defense.

16     There was going to be a meeting with the relators of that.  I

17     think I got the actual complaint a day or two maybe or each

18     on the day of, I don't remember at this point, about the qui

19     tam.  I reviewed it; participated in the initial meeting with

20     Special Agent Dimler and two or three AUSAs from the U.S.

21     Attorney's Office here in Columbia.  And that's pretty much

22     the way normal procedure is for any of these kind of

23     allegations.

24         Q. Okay.  And are those relators Elaine Van Voris that

25     testified here earlier today?

1    A. I think her name is Elaine.

2    Q. Elaine.  And then was Johnston the other one?

3    A. Peter Van Voris and then John Johnston.

4    Q. So you met with them.  That was the initial stage of your

5    involvement in this case?

6    A. That's correct.

7            THE COURT:  Ladies and gentlemen of the jury, it's

8    kind of confusing.  Most people have never heard of a qui tam

9    suit.  But it is a lawsuit that is brought almost always -- I

10   can be corrected by counsel if I'm wrong -- but it's almost

11   always brought by a whistle blower.  And it's brought against

12   some institution claiming that they have made false claims

13   against the Federal Government.  They can be brought against

14   hospitals where it was claimed that they used improper

15   influences to get doctors to come practice in their hospital

16   so that their Medicare payments would grow, and whistle

17   blowers in the hospital brought the qui tam litigation.

18            It's brought, it's investigated, and then as I

19   mentioned the other day, it's sealed.  And that's the status

20   of it here today.  I've never seen it.  That aspect of this

21   case was sent before Judge Gergel who sits in the same spot I

22   do over in the other building.  And he has that case and he

23   routinely signed an order of seal.  We normally sign them.

24   And it could go on for a year or longer before the seal is

25   broken.

1          Any other explanation you want me to give to them?

2          MR. MACE:   No, sir, that's sufficient.

3          THE COURT:   As far as -- and it is a suit for a

4     false claim and it's a suit for damages.   Okay.

5          MR. MACE:   Thank you, Judge.

6     Q. Agent Leonard, just briefly, Dr. Dong voluntarily came to

7     see you at the FBI Office?

8     A. Yes, he did.

9     Q. How many times?

10    A. At the FBI Office, I think it was three times.

11    Q. And then the last time where did he come see you?

12    A. The last interview was with his attorney at the U.S.

13    Attorney's Office in Columbia.

14    Q. Okay.  But again, you didn't force him to come in; he

15    voluntarily wanted to come see you?

16    A. We generally don't force people to come in.

17    Q. Again, he voluntarily came to see you?

18    A. Yes.

19          MR. MACE:   Thank you.

20          MR. DICKSON:   My usual one question.

21          THE COURT:  You can ask all the questions you want

22    to.

23          MR. DICKSON:   But I only want to ask these two.

24                         CROSS-EXAMINATION

25    BY MR. DICKSON:

24

1    Q. Agent Leonard, you determined there were about 12 or $13

2    million in original investments in GenPhar?

3    A. That was what he reported.

4    Q. You didn't try to confirm it?

5    A. We had an auditor assigned to the investigation to go

6    through the books and records.

7    Q. I couldn't quite hear you.

8    A. I said we had an auditor assigned to the investigation.

9    There were five agencies involved in this case:  The FBI,

10   DCIS, NCIS, United States Army Criminal Investigation

11   Division, HHS, and we also had an auditor from the Defense

12   Contract Audit Agency.  And so for the most part all --

13           THE COURT:  Wait a minute.  I don't know whether you

14   are going into what the auditor said or not, but I think

15   you've answered the question.

16           Go ahead.

17   Q. You didn't personally determine yourself, is my question?

18   A. I did not.

19   Q. What about the summer of 2010, or at least the last --

20   the interview of Dr. Dong in 2010, you had determined through

21   the investigation that GenPhar was broke, had no money, was

22   out of business?

23   A. Yes.

24   Q. That's your answer?

25   A. Yes.

1      Q. I'm sorry.  I'm a little hard of hearing.  I wanted to be

2      sure I heard you.

3      A. By 2010.

4      Q. Yes.

5      A. Yes.

6              MR. DICKSON:   No further questions.

7              THE COURT:  Anything further from the Government?

8              MR. WILLIAMS:   Not with this witness, Your Honor.

9              THE COURT:  Thank you, sir.  You are excused.

10                     *****     *****     *****

11

12

13

14     I certify that the foregoing is a correct transcript from the

15     record of proceedings in the above-titled matter.

16

17

18

19     ---------------------------

20

21     Amy C. Diaz, RPR, CRR            November 25, 2014

22     S/  Amy Diaz

23

24

25