1

1  IN THE DISTRICT COURT OF THE UNITED STATES
2  DISTRICT OF SOUTH CAROLINA
   CHARLESTON DIVISION
3
   UNITED STATES OF AMERICA,    )         2:11-CR-511
4                               )
                   Plaintiff   )         Charleston,
5                               )         South Carolina
   VS                          )         November 5, 2014
6                               )
   JIAN-YUN DONG, et al,        )
7                               )
                   Defendants   )
8
                   TRANSCRIPT OF TESTIMONY OF
9                  DR. JAN WORARATANADHARM
        BEFORE THE HONORABLE C. WESTON HOUCK,
10        SENIOR UNITED STATES DISTRICT JUDGE

11  APPEARANCES:

12  For the Plaintiff:    MR. ERIC KLUMB
                         MR. NATHAN WILLIAMS
13                       Office of the United States Attorney
                         P.O. Box 978
14                       Charleston, SC 29402

15  For the Defendant:    MS. ROSE MARY PARHAM
    Jian-Yun Dong         Parham Law Office
16                       P.O. Box 1514
                         Charleston, SC 29503
17
                         MR. RUSSELL W. MACE, III
18                       Russell Mace and Associates
                         1341 44th Avenue North
19                       Suite 205
                         Myrtle Beach, SC 29577
20
    Vaxima, Inc.          G. WELLS DICKSON, JR.
21  GenPhar Inc.          Wells Dickson
                         124 S. Academy Street
22                       Kingstree, SC 29556

23  Court Reporter:       Amy C. Diaz, RPR, CRR
                         P.O. Box 835
24                       Charleston, SC 29402

25         Proceedings recorded by mechanical shorthand,
    Transcript produced by computer-aided transcription.

1                                    *  *  *  *

2              MR. KLUMB:    The Government calls Jan

3    Woraratanadharm.

4              THE CLERK:  Place your left hand on the Bible,

5    please, and raise your right hand.

6              THE COURT:  Let's swear them in front of the jury.

7              (Thereupon, the jury returned to the courtroom.)

8              THE COURT:  All right.  Go ahead and swear the

9    witness.

10             THE CLERK:  Please say your name for the record and

11   spell it, please.

12             THE WITNESS:  Jan Woraratanadharm.

13   THEREUPON:

14                       MS. JAN WORARATANADHARM,

15   Called in these proceedings and after having been first duly

16   sworn testifies as follows:

17                        DIRECT EXAMINATION

18   BY MR. KLUMB:

19    Q. Good afternoon, Dr. Woraratanadharm.  Could you tell us,

20   please, what you do for a living now?

21    A. I work at Medicago Biotech Company in Raleigh, North

22   Carolina.

23    Q. And what do you do there?

24    A. I'm a process development engineer.  I do research in the

25   laboratory.

1     Q. Let's go through your work history a little bit, starting
2     with your educational background.  What degrees do you have
3     and from where?
4     A. I went to undergrad at the University of Virginia.  I got
5     a bachelor's degree in biology, and then I went to graduate
6     school at the Medical University of South Carolina where I
7     got a Ph.D. in microbiology and immunology.
8     Q. And when was it that you graduated from MUSC with your
9     Ph.D.?
10    A. In May of 2005.
11    Q. And do you know the defendant in this case, or one of the
12    defendants, Dr. John Dong?
13    A. Yes, I do.
14    Q. How long have you known him?
15    A. About 10 years.
16    Q. Where was it that you first met him?
17    A. At MUSC.  I was a graduate student in his lab.
18    Q. And what was the nature of your contact with him then?
19    A. I just -- I just worked in his lab.  I was a student.
20    Q. And then when you graduated from MUSC with your Ph.D.,
21    were you able to find work?
22    A. Yes.
23    Q. Where at?
24    A. At GenPhar.
25    Q. And roughly again when was that?

1    A. May of 2005.

2    Q. And what was your position with GenPhar when you started?

3    A. Manager of Operations.

4    Q. How did it come about that you got a job there?  Did you

5    interview or what happened?

6    A. Um, I spoke with Dr. Dong.  He was my mentor in graduate

7    school, and he's also the President and Chief Scientific

8    Officer at GenPhar.

9    Q. What does it mean to be a mentor at MUSC?

10   A. Um, basically I worked in his lab.  He -- I had a

11   committee that I would report to every year, and he was -- he

12   was the main person on the committee that I would report to,

13   my research to.

14   Q. Then you started at GenPhar in May.  And you, as

15   indicated, you were the Manager of Operations.  What did that

16   entail?

17   A. Um, initially when I was first hired, I was just

18   compiling some of the data that was developed at GenPhar and

19   putting it together in publications.  And then after that, I

20   did a lot of work writing grant proposals and some work with

21   regulatory documentation.

22   Q. Tell us a little bit about what GenPhar was like, say, in

23   2005 when you started there.

24          First of all, approximately how many people worked

25   there?

1    A. I would say about 10 or 12.

2    Q. And did you have an office?

3    A. I did.  Initially it was just me, and then later I was

4    sharing an office with a few other people.

5    Q. Okay.  Was there a laboratory there, as well?

6    A. Yes, there is a lab at GenPhar.

7    Q. How about other offices, very many?

8    A. Yes.

9    Q. Like how many?

10    A. Um, maybe three or four.

11    Q. And did you work at one location throughout your tenure

12    there or did GenPhar move at some point in time?

13    A. It moved.

14    Q. Approximately when?

15    A. I don't remember exactly.  Maybe 2006 or 2007.

16    Q. Okay.  Both locations were in what city?

17    A. In Mount Pleasant.

18    Q. Was the second facility larger or smaller?

19    A. Um, I think it was a little bit larger.

20    Q. Now, you indicated that after an initial period in which

21    you were compiling data that you began doing grant

22    applications and regulatory responses.  Did you do that

23    throughout your tenure at GenPhar?

24    A. Yes.

25    Q. When was it that you left?

1      A. In December of 2009.

2      Q. And why did you leave?

3      A. I found other employment in North Carolina.

4      Q. Now, from 2005 to 2009, could you estimate -- well, first

5      of all, did your workload change much in terms of how much

6      time you spent on doing grants and other things?

7      A. Not really.

8      Q. Pretty much the same throughout?

9      A. Yes.

10     Q. And what would you estimate would be the percentage of

11     time that you spent on drafting new grant applications?

12     A. Probably about 80 percent of my time.

13     Q. How many would you say you worked on in a year?

14     A. I think on average it was about 10 a year.

15     Q. Now, how did you know to apply for a grant?  How does

16     somebody in your position figure out where to put in an

17     application?

18     A. Um, a lot of our applications were to the National

19     Institutes of Health, NIH, and so I was on different e-mail

20     lists so that I would receive announcements of upcoming grant

21     opportunities.  There are also -- you can also look on their

22     website and there is a fed business op, which is another

23     website, which has federally funded opportunities there.

24      Q. During this period of time, what type of projects was

25     GenPhar working on back in, say 2005?

1    A. Vaccines projects.

2    Q. And what types of vaccines?

3    A. Um, we had --

4    Q. Can you list them for us?  Can you list them for us?

5    A. Oh, yeah.  We had vaccines.  We were applying for grants

6    for vaccines for E-Bola, for Marburg, Dengue, influenza, Rift

7    Valley fever, Chikingunya.  Those are the ones I can think of

8    offhand.

9    Q. Avian flu?

10   A. Yes.

11   Q. Was that one of the ones you mentioned or is that

12   something different?

13   A. I said influenza, but yeah, that encompasses both

14   seasonal and Avian flu.

15   Q. How about HIV?  Any work in that area?

16   A. A little bit, but that was not -- not as much of a focus

17   for the vaccines.  There was another product that GenPhar was

18   developing that was an HIV detection.  That was one of the

19   projects at the beginning of the company existence.

20   Q. When you arrived, were they still working on that or had

21   that kind of dwindled?

22   A. It was dwindling when I started.

23   Q. Besides the vaccine and the one HIV assay test that you

24   described, were there other types of projects that were being

25   worked on, say, during your entire tenure?

1    A. That was the main thing was the vaccines.

2    Q. And were you applying for grants for pretty much all of

3    those vaccines?

4    A. Yes.

5    Q. How was it that you decided which ones to apply for and

6    which ones not?

7    A. If there was -- if there is an opportunity that sounded

8    like it was something that we could apply for, I would let

9    Dr. Dong know and he would make a decision on it, whether or

10   not to apply.

11   Q. Okay.  Would you apply unilaterally without bouncing it

12   off him first?

13   A. No.

14   Q. Okay.  And then where did you get the information that

15   went into a grant application?

16   A. Um, we had several grant applications that had been

17   submitted in the past, so we would use -- we used some of

18   that information.  And then, you know, some of it, if it was

19   a new vaccine for us, do literature searches and write things

20   about it from there.

21   Q. And who, if anyone at GenPhar, would you get input from

22   in drafting a grant application?

23   A. Dr. Dong.

24   Q. Anyone else?

25   A. It was mainly him.

1    Q. Okay.  Would you describe sort of the managerial

2    infrastructure of GenPhar when you worked there in 2005?

3    A. Um --

4    Q. Who was in charge of what?

5    A. Dr. Dong was definitely the one in charge of pretty much

6    the direction of the company.  Dr. Danher Wang, she kind of

7    did some of the more supervision of the laboratory

8    activities.

9    Q. And is she related to Dr. Dong, do you know?

10    A. Um, they were married.

11    Q. Okay.  Did you ever submit a grant application that

12    hadn't been reviewed by Dr. Dong?

13    A. No.

14    Q. Can you describe the amount of the input that he would

15    have into your draft applications in terms of how much he

16    changed them?  A lot, a little?

17    A. Um, he was heavily involved throughout the whole entire

18    process.  He was involved in, you know, deciding on what --

19    what things that we would include in the grant, and then

20    reviewing what was written and approving what was submitted.

21    Q. In submitting these grant applications, did you ever feel

22    that the information in them was inaccurate?

23    A. Um, sometimes.

24    Q. Can you give us an example?

25    A. Um, well, there was one proposal for an Anthrax vaccine.

1          MS. PARHAM:   Objection, Your Honor.  Anthrax is not

2     subject to this Indictment.

3          THE COURT:  What relevance does it have?

4          MR. KLUMB:   I think it's classic --

5          THE COURT:  Say what?

6          MR. KLUMB:   I believe it's classic 404(b), Your

7     Honor.  I think it's also encompassed within the general

8     description of the conspiracy in Count 1.

9          THE COURT:  Ms. Parham?

10          MS. PARHAM:   I filed a written 404(b) notice in

11     this case and have received no such 404(b) notice.

12          MR. KLUMB:   Counsel is correct.

13          THE COURT:  Say what?

14          MR. KLUMB:   She's correct.

15          THE COURT:  Okay.  I would have to hear you off the

16     record.  I really don't know enough about what she's going

17     into, but it seems to me that if it involves a grant or an

18     application for a grant that's not involved in this

19     litigation, then it certainly looks like it might be

20     irrelevant.  You say it comes in under 404(b); they say they

21     asked you to reveal that and you didn't tell them.

22          MR. KLUMB:   I have to withdraw that as a basis for

23     the admissibility of the evidence.  Counsel is correct.  I

24     stand corrected.  But I still feel that it's within the scope

25     of the conspiracy and understand why we would have to take

1    that up outside the presence of the jury.

2            THE COURT:  All right.

3            MR. KLUMB:  So I'll move on.

4    Q. Let me show you what's been admitted into evidence as

5    Government's Exhibit 1.  First of all, do you recognize it?

6    A. Yes.

7    Q. What do you recognize it to be?

8    A. It's a grant application for Marburg vaccine.

9    Q. And does it bear any signatures that you recognize?

10   A. Yes.  My signature.

11   Q. And the date?

12   A. September 11th, 2006.

13   Q. Now, you indicated that you were preparing about 10 grant

14   applications a year.  How many of them were successful during

15   your time?

16   A. I think just two, this one and a small business grant for

17   Chikingunya.

18   Q. All right.  Would you read, please, box 14, just the left

19   of your signature on the face page of the grant application.

20   A. "I certify that the statements herein are true, complete

21   and accurate to the best of my knowledge and accept the

22   obligation to comply with Public Health Services's terms and

23   conditions if a grant is awarded as a result of this

24   application.  I am aware that any false, fictitious or

25   fraudulent statements or claims may subject me to criminal,

1    civil or administrative penalties."

2    Q. Why did you sign that and not Dr. Dong?

3    A. He asked me to sign it.  Because we were a small company,

4    I think he wanted to give the impression that we weren't that

5    small.  So, you know, if he signed it and he was the

6    principal investigator, then it seemed like we didn't have a

7    whole lot of staff.

8    Q. Okay.  Now let's turn, if you would, to page 5.  Do you

9    recognize that page?

10    A. Yes.

11    Q. Tell us at the top of the page where it says "Detailed

12    budget for initial budget period, direct costs only,

13    personnel."  Where did you get the information to put into

14    that particular page?

15    A. Um, from Dr. Dong.

16    Q. When you submitted the form to the application to the

17    National Institutes of Health, did it have handwriting in

18    that column down the middle under months devoted to project?

19    A. No.

20    Q. Have you filled out similar forms like that since this

21    particular one?

22    A. Yes.

23    Q. See where you have listed 12 months under calendar months

24    for months devoted to project?

25    A. Yes.

1    Q. What can you tell us about that?  Is that the way you
2    filled out subsequent forms?
3    A. No.  That's -- that's an incorrect way of filling out the
4    form.
5    Q. So for example, for Mr. Holman, David Holman --
6    A. Yes.
7    Q. -- how much time was he supposed to be working on this
8    particular project as a projection?
9    A. 60 percent of his time.
10    Q. And so you put down 12 months basically in error?
11    A. Yes.
12    Q. Okay.  Did you learn that this was the incorrect way to
13    fill it out and you should actually translate the percentage
14    to the number of months?
15    A. Yes.
16    Q. Okay.  And for yourself, how much time was projected to
17    be worked on in this particular project if the grant was
18    given?
19    A. 60 percent.
20    Q. Now, at this point in time you indicated you were working
21    in an office.  Were you sharing it with other people at this
22    point in time?
23    A. Yes.
24    Q. Who?
25    A. David Holman.

1    Q. Do you know, was he a Ph.D.?

2    A. Yes, he has a Ph.D., as well.

3    Q. Do you know if anyone else was sharing office space with

4    you at this point in time that you remember?

5    A. Um, I think at this point in time is the two of us and

6    maybe Bill Cooper.

7    Q. And how far apart were you working from Mr. Holman in

8    terms of distance?

9    A. Maybe four feet away.

10    Q. Did you have a good idea what he was doing every day?

11    A. Yes.

12    Q. What was he working on primarily?

13    A. Um, he worked also on grant proposals, grant

14    applications.  He also worked in the lab.

15    Q. More than you did?

16    A. Yes.

17    Q. Okay.  Now, do you see where the line that says QCQA

18    Director to be hired?

19    A. Yes.

20    Q. Now, in that particular personnel slot, how much did you

21    intend to communicate the QCQA person would be working on

22    this project?

23    A. 100 percent of their time.

24    Q. Was there a QCQA Director at GenPhar at the time you

25    filled this out?

1    A. No, there wasn't.

2    Q. Now, a couple slots down we have equipment.  Would you

3    read that, please, aloud for the jury.

4    A. "Wave bioreactor 200 liters for $140,00.  FPLC for

5    $93,900."

6    Q. And they would total how much?

7    A. $233,900.

8    Q. What is a wave bioreactor?

9    A. A wave bioreactor is a piece of equipment that can be

10   used for manufacturing.  For our purposes, it was for

11   manufacturing vaccines.  Basically grow a lot of cells in it.

12   It's like a big bag with a lot of liquid, and just rocks back

13   and forth to help provide oxygen to the cells that are in

14   there.

15   Q. And at the time you filled out this application, did

16   GenPhar have a wave bioreactor?  If you know.

17   A. We did.  We had a smaller one.

18   Q. And could you estimate for us the volume of that smaller

19   one?  Would that be tough?

20   A. It would be tough for me to estimate, but it was

21   definitely smaller than 200 liters.  Maybe 10 liters.

22   Q. And where did the information come from for the cost data

23   in there, like the 140,00?  Do you know where that came from?

24   A. Um, I believe that came from the vendors.

25   Q. And describe the process for us that you would go through

1    to get those figures for equipment costs that you are putting

2    into a grant.

3    A. For some items you might be able to find the price on

4    line, and other cases you would talk to the vendor directly

5    and ask for a quote.

6    Q. Okay.  Now turn, please, to page 8, the section entitled

7    Consortium Contractual Agreements.  So again, who would have

8    put that information together?

9    A. I probably put that together.

10    Q. And are you familiar with the type of work that these

11    different subcontractors or consortium participants were

12    going to do?

13    A. Yes.

14    Q. Okay.  And Milestone 1 you have identified AppTech for

15    $123,760.  What do they do?

16    A. They do a lot of testing of the vaccine products to

17    ensure that safety.

18    Q. And milestone 2, USAMRIID.  What does that stand for?  If

19    you know.

20    A. I think it's the U.S. Army Medical Research Institute of

21    Infectious Diseases.

22    Q. So that figure of $606,900, where would that have come

23    from?

24    A. That would have come from USAMRIID.

25    Q. And what is meant by non-human primate studies?

1    A. Those are monkey studies to test the efficacy of the

2    vaccines.

3    Q. Does that involve actually inoculating the monkeys with

4    the disease?

5    A. Um, first it involves inoculating them with a vaccine and

6    then challenging them with the actual virus and see if the

7    vaccine protects them against it.

8    Q. Does that have to be done in any sort of special

9    facility?

10   A. Yes.  It requires a biosafety level 4 facility.  There is

11   very few of those in existence.

12   Q. And what does that mean and why does it require that type

13   of facility?

14   A. Um, it just -- biosafety level 4 is the highest level of

15   bio containment that's available.  It just means that you

16   know that that particular pathogen is highly infectious, and

17   so you take certain safety precautions to make sure that

18   everything is performed safely, no one gets infected.

19   Q. Okay.  Now take a look, please, at Milestone 3.  There is

20   three outside entities involved there.  AppTech is one of

21   them.  We've described them already.  The next is Molecular

22   Medicine GMP Vaccine Production.  What's that?

23   A. GMP stands for Good Manufacturing Practices.  It's --

24   it's the level -- it's a guidance, guidelines that you have

25   to follow whenever you are manufacturing any products that

1    will be going into humans, like drugs or vaccines.

2    Q. In GenPhar's lab during the time that you worked there,

3    were they capable of doing GMP vaccine production?

4    A. No.

5    Q. That had to go outsource?

6    A. Yes.  It had to be outsourced.

7    Q. All right.  And then look at the third vendor under

8    Milestone 3.  That's MUSC Pilot Run.  What does that mean --

9    A. Um --

10    Q. -- if you remember?

11    A. I think they were -- they were doing a pilot run of the

12    toxicology studies, I believe.

13    Q. Okay.  And Milestone 4 we have MUSC listed again, this

14    time more specific.  Can you describe that for us?

15    A. Yes.  We were proposing that they would perform

16    toxicology studies on the vaccine product in animals.

17    Q. And how do they do that?  Briefly.

18    A. Um, they would inject animals with the vaccine and just

19    determine the safety of the vaccine, if they had any sort of

20    side effects or adverse reactions to the vaccine product.

21    Q. So to get a vaccine to production for humans through the

22    Food & Drug Administration, what are the two things you have

23    to establish?

24    A. Safety and efficacy.

25    Q. Does it work and does it hurt?

1      A. Right.

2      Q. Now let's turn to Milestone -- I'm sorry.  We covered

3      toxicology.  What does biodistribution mean?

4      A. Biodistribution just looks at where does -- where does

5      the vaccine go after you inject it?  How long does it stick

6      around before it's cleared by the body?

7      Q. And for toxicology and biodistribution studies, do they

8      generally use non-human primates or monkeys or something

9      else?

10     A. Generally they use rabbits and sometimes mice, too.

11     Q. And the last vendor here is Gene Logic, where it says

12     Standby Toxicology Studies.  What does that mean?

13     A. They were -- we had proposed that they would do the same

14     type of work, but they would be as a standby just in case,

15     because MUSC didn't quite have a set -- their facility set up

16     for the GOP toxicology studies yet.  So Gene Logic does have

17     GOP standards already in place, and so that was our backup.

18     Q. Do you remember whether or not you had gotten a bid or a

19     proposal from MUSC for the tox and biodistribution studies?

20     A. Yeah, I think we did receive a proposal from them, or at

21     least a budget.

22     Q. Okay.  Now let's turn, if you would, please, to page 30

23     of Exhibit 1.  The next page.  And take a look at the top,

24     please.  What does this section of the grant application

25     contain?

1    A. Well, we initially had submitted a proposal to the NIH

2    and then they asked us to submit a revised -- a revised

3    proposal and timeline.

4    Q. Okay.  And what was the difference between the original

5    application and this one generally?

6    A. Um, I think they asked us to make it shorter, like

7    instead of -- maybe instead of five years, it was four years,

8    or I'm not -- I just remember they needed to cut the budget a

9    little bit, so we needed to make it.

10    Q. Anyway, this was the one that was successful?  It was

11    granted?

12    A. That's right.

13    Q. Okay.  And this section of the grant application that

14    says Milestones and Timeline, what kind of information is in

15    this section?

16    A. It's describing the work that we propose to be doing on

17    this if we get the grant awarded.

18    Q. So the budget sheets that we saw deal with the money

19    involved and this involves the science.  Fair to say?

20    A. Yes.

21    Q. Take a look, please, at page 33, Milestone 2.  Now,

22    Milestone 2 consists of how many different tasks?

23    A. There are three tasks.

24    Q. What are the first two?

25    A. Task 8 was to determine the minimum number of antigens

1    needed for trivalant protective efficacy.  It was for our

2    monkey studies.

3     Q. And what's task 10?  Is that a monkey study, too, or

4    something different?

5     A. That's also a monkey study.

6     Q. Okay.  Now, do you know if USAMRIID performed the monkey

7    studies that are proposed by this grant?

8     A. I'm not sure.

9     Q. Now take a look, please, at what's been admitted into

10    evidence as Government Exhibit 2.  We'll leave Number 1 up

11    here.  Do you recognize that?

12     A. Yes.

13     Q. What is it?

14     A. It's a grant progress report.

15     Q. And did you have any involvement in preparing that for

16    submission to NIH?

17     A. Yes, I did.

18     Q. Was there more than one that you worked on during the

19    time you were there?

20     A. Yes.

21     Q. Okay.  Who signed this one?

22     A. I did.

23     Q. Now, is there a page on Exhibit 2 -- strike that.

24             Let's take a look, again, at the first page where

25    your signature appears to the left.  We have box 13.  What

1    does that say?

2     A. "I certify that the statements herein are true, complete

3    and accurate to the best of my knowledge and accept the

4    obligation to comply with Public Health Services's terms and

5    conditions if a grant is awarded as a result of this

6    application.  I'm aware that any false, fictitious or

7    fraudulent statements or claims may subject me to criminal,

8    civil or administrative penalties."

9     Q. Now, is this particular grant progress report, would you

10   have prepared that yourself or with the assistance of anyone

11   else?

12    A. Um, I probably would have put together the first draft,

13   but it would require approval by Dr. Dong.

14    Q. Is there a page on this exhibit where you report the

15   actual time spent by key personnel on the first year of the

16   project?

17    A. Yes.

18    Q. Where would that be?

19    A. That's on page 9.

20    Q. Okay.  If you go to that page, please.  Now, is there a

21   month devoted to project figure for your work on this grant

22   that appears on page 9?

23    A. Yes.

24    Q. What is it?

25    A. It's 7.2 calendar months.

1    Q. Which is approximately what percentage of year, or not

2    approximately, what percentage?

3    A. You are making me do math.  Whatever 7.2 divided by 12

4    is.

5    Q. Should I do the math on the board?

6    A. Sure.

7    Q. 60 percent times 12 would be?

8    A. 60 percent then.

9    Q. Okay.  Did you work 7.2 months of the first year of the

10   NIH Marburg Grant on Marburg-related work?

11   A. Probably not.

12   Q. What do you mean "probably"?

13   A. Well, I did say that I was spending about 80 percent of

14   my time on grant applications.

15   Q. For other grants?

16   A. For other grants.

17   Q. And 20 percent of 12 months would be, what, 2.4 months,

18   right?

19   A. Um-hum.

20   Q. Did you know that this was not true at the time you

21   submitted it?

22   A. Yes.

23   Q. Why did you do that?

24   A. Um, that's what I was told to report.

25   Q. By whom?

1    A. Um, I think that we were getting -- I got these numbers

2    from Dr. Danher Wang.

3    Q. Now, the 7.2 months on the project, did that match the

4    percentage of time that was projected for you in Exhibit 1 we

5    just looked at?  Do you want to go back and confirm it?

6    A. No.  Yeah, it was the -- it was the same as of what was

7    projected.

8    Q. Did Dr. Wang give you specific instructions about how it

9    was you should be booking your time on this form?

10    A. Um, yeah.  She told -- she told me the percentages to

11    write on -- write for each personnel.

12    Q. And in the case of David Holman, he is a Ph.D., as well,

13    right?

14    A. Yes.

15    Q. Did his number of percentage of time also match the

16    percentage of time on the initial grant application?  Do you

17    remember?

18    A. Yes.

19    Q. Okay.  Now, on Exhibit 1, when we looked at the

20    projection, you recall that there were many different

21    individuals that were listed?

22    A. Yes, I do.

23    Q. And this particular personnel report identifies only

24    four?

25    A. That's correct.

1      Q. Did you hear something about that from NIH?

2      A. Yes, we did.

3              MR. KLUMB:   Do you have Exhibit 6?

4      Q. Let me show you what's been marked for identification as

5      Government Exhibit 6.  Having previously given it to counsel.

6      Do you recognize that?

7      A. Yes.

8      Q. First of all, how many pages is the exhibit?

9      A. It's three pages.

10     Q. And what do the three pages consist of?  Can you describe

11     them for us generally?

12     A. The first two pages are an e-mail discussion, and the

13     third page is the key personnel report, report form, what we

14     were just describing, but it has additional personnel listed

15     there.

16     Q. And were the e-mail messages from and to you?

17     A. Um, they were initially to Dr. Dong, and then the

18     response was from me.

19     Q. Okay.  Were you copied on the initial one?

20     A. No.  Oh, yes, I was.  Sorry.  Yes.

21             MR. KLUMB:   At this time I would offer into

22     evidence Government's Exhibit 6.

23             MS. PARHAM:   No objection.  No objection.

24             THE COURT:  What exhibit is it?

25             MR. KLUMB:   6, Your Honor.

1          THE COURT:  Exhibit 6 without objection.

2          (Thereupon, Government's Exhibit Number 6 was

3     received in evidence.)

4     Q. Okay.  First of all, let's turn to page 2, which is the

5     first e-mail, correct?

6     A. Yes.  That's correct.

7     Q. And who is Kim Belk?  Do you know?

8     A. She was a Grants Management Specialist that was working

9     on our grants.

10    Q. And this e-mail, what is it that she's bringing to your

11    attention?

12    A. Um, she was noting that there was a difference between

13    what was proposed and what we reported in the progress report

14    as far as personnel, the key personnel listed.

15    Q. So how did you respond to that?

16    A. In the e-mail I said -- it was explaining that some --

17    that Dr. Cooper was no longer working at GenPhar and that we

18    did not end up hiring a QCQA Director yet.  And that those

19    efforts were then split up among other staff members within

20    GenPhar.

21    Q. Okay.  And in fact, would you please read the third

22    paragraph of your e-mail to Kimberly Belk dated August 29th,

23    2007.

24    A. "Additionally, GenPhar has been seeking a QCQA Director

25    but has not yet filled that position.  In order to accomplish

1    the goals listed for the QCQA Director, these

2    responsibilities were split up among several research support

3    staff within the company.  The main responsibilities were

4    accomplished by Jianghua Zang, who contributed 70 percent

5    effort, or 8.4 calendar months for year one of the project.

6    Jianghui has also been generally listed as research support

7    among our usual grant documents, and similar to Mr. Moore,

8    was accidentally not listed on the key personnel report for

9    that reason.  Additional efforts from five other personnel

10   within the company whose efforts were only for either one

11   month, three months or five months also went into assisting

12   Jianghua in his QCQA efforts."

13    Q. Are you familiar with whether or not anyone with GenPhar

14   was doing QCQA work on the Marburg Grant during the first

15   year of its funding?

16    A. I don't think any QCQA work was being done.

17    Q. At all?

18    A. No.

19    Q. So when you wrote this e-mail, did you believe it to be

20   false?

21    A. Yes.

22    Q. Why did you do that?

23    A. I was asked to write the letter.

24    Q. By whom?

25    A. By Dr. Dong.

1    Q. Did you copy it to him?

2    A. Yes.

3    Q. Did you copy it to anyone else besides Kimberly Belk and

4    Dr. Dong?

5    A. Um, to Patricia Repik from the NIH.

6    Q. And who is she?

7    A. I think she was the program officer for this particular

8    grant.

9    Q. Okay.  Now I would like to show you what's been marked

10   for identification as Government Exhibits 11, 12, 13.

11          MR. KLUMB:  And I'm now showing them to counsel.

12          MS. PARHAM:   No objection.

13   Q. Take a look at those, please, and tell us whether you

14   recognize them.

15   A. Yes, I recognize them.

16   Q. What do you recognize them to be?

17   A. These are my time sheets at GenPhar.

18   Q. Now, are these internal documents or documents that you

19   gave to NIH?

20   A. These were internal documents.

21   Q. How did you fill out your time and attendance back then?

22   A. Um, it was basically a split with between the Marburg --

23   Q. I'm sorry, just the process.  Did you fill out, do it on

24   a computer or did you have to fill them out by hand, what --

25   A. Oh, sorry.  We did it on a computer.

1    Q. Okay.  And did you do that on a regular basis?

2    A. Yes.

3    Q. Do you remember how often?

4    A. Um, about once a month.

5    Q. And these are a collection of time sheets for what

6    periods of time?  Starting with Government Exhibit 11.

7    A. Um, for 2007, 2008 and 2009.

8    Q. Respectively, 11, 12 and 13.

9    A. Yes.

10   Q. Okay.  Thanks.  And when you were filling these out, did

11   you fill them out to accurately reflect the time spent on the

12   projects listed?

13   A. Um, not necessarily.

14   Q. What do you mean by that?

15   A. I was asked -- well, I was told that, you know, we had

16   certain grants that were funding different personnel and that

17   I was to report approximately 60 percent of my effort on the

18   NIH Marburg Grant.

19    Q. All right.

20         MR. KLUMB:  I think I forgot to introduce these.

21         At this time I would offer 11, 12 and 13 into

22   evidence.

23         MS. PARHAM:   No objection.

24         (Thereupon, Government Exhibit Numbers 11-13 were

25   received in evidence.)

1      Q. Okay.  Take a look, please, at page 2 of Government

2      Exhibit 11.  Just do this as an example.

3              MR. KLUMB:  If we could zoom in on that a bit.

4      Thank you.

5      Q. First of all, let's -- what month is this for?

6      A. This is for February of 2007.

7      Q. And the left-hand column lists a bunch of different

8      projects, correct?

9      A. That's correct.

10     Q. And you filled this out for the time period to reflect

11     what percentage on the NIH Grant?

12     A. 60 percent of my time on the NIH Marburg Grant.

13     Q. And did you, in fact, work 60 percent of your time on the

14     NIH Marburg Grant?

15     A. No.

16     Q. The next one is project 3, that's Dengue.  How much

17     percentage of time did you log there?

18     A. I logged in 36.3 percent.

19     Q. And did you, in fact, work 36 percent of your time during

20     that time period on the Dengue project?

21     A. No.

22     Q. You indicated that you did about 80 percent of your work

23     for doing new grant applications.  Did you do some lab work?

24     A. No, I didn't do any lab work.

25     Q. You worked on the progress reports, for example, for the

1       Marburg Grant, correct?

2        A. That's right.

3        Q. Okay.  And who was it that instructed you to fill out

4       your time sheets to reflect this breakdown of 60 percent on

5       Marburg and roughly 36 percent on Dengue?

6        A. Dr. Danher Wang.

7        Q. Did she tell you why?

8        A. Um, basically that the grants were funding us at

9       different percentages, percent efforts, so we needed to fill

10      out the timesheet to reflect that.

11       Q. Did you hear whether she instructed other people to do

12      the same?

13       A. Yes, I've heard that she instructed other people to do

14      the same, um, with the percentage.

15       Q. I asked a bad question.

16       A. Oh, sorry.

17       Q. Did you personally hear her instruct any other people to

18      do the same?

19       A. Um, yes.

20       Q. Thank you.  Do you remember who they were?

21       A. Um, I think Adam Penn Nicholson was one of them that I

22      remember her speaking with.

23       Q. Now, let me show you what's been marked for

24      identification as Government's Exhibit 5.

25       Q. Having shown it to counsel, I'll now show it to you.  I

1    ask you whether you recognize that e-mail.

2    A. Yes, I recognize it.

3    Q. Who is it an e-mail from and to and what date?

4    A. It's an e-mail from myself to Kimberly Belk at NIH on

5    September 25th, 2007.

6          MR. KLUMB:    At this time I would offer Exhibit 5.

7          MS. PARHAM:    No objection.

8          (Thereupon, Government Exhibit Number 5 was received

9    in evidence.)

10    Q. Okay.  Now, I know this is years old, but you've had a

11    chance to review it more recently, correct?

12    A. That's correct.

13    Q. What are you bringing to Ms. Belk's attention here?

14    A. We are requesting to change how we are spending our

15    equipment money.  Initially in the grant proposal we had

16    requested money to pay for the wave bioreactor and the FPLC

17    machine.  And in this e-mail we are providing justification

18    to purchase a different set of equipment, a smaller wave

19    bioreactor, which would cost less money, and to -- and in

20    place of the savings from buying the smaller wave bioreactor,

21    we would purchase the AKTAcrossflow machine.

22    Q. And then read the last paragraph of, if you would, at

23    page 2, right above where you thank her for her time.

24    A. "Additionally, we realize that the project period for

25    year 1 of this award is ending soon.  Would it also be

1    possible to extend the deadline for purchasing this equipment

2    by an additional six months so that we have sufficient time

3    to make certain that all equipment specifications are exactly

4    what are needed before we make the final purchase?"

5    Q. Why did you need to ask permission from her to do this?

6    A. Generally when you -- for NIH grants you have to use up

7    your equipment money during the first year of the project,

8    and so here we are asking for an extension to give us a

9    little bit more time to spend that money.

10    Q. Why couldn't you just draw the money down and spend it in

11    six months without asking for permission?

12    A. That's just the process that they require at NIH, is you

13    drawdown the money as soon as you need it.

14    Q. To spend it?

15    A. To spend, yeah.

16    Q. And do you recall whether or not your request was granted

17    and you were allowed to purchase it in the second year of the

18    grant?

19    A. I believe we were.  That was -- the grant -- or I'm

20    sorry -- they did allow us to do that.

21    Q. To your knowledge was a small wave bioreactor ever

22    purchased by GenPhar after you got this permission?

23    A. To my knowledge, no, the wave bioreactor was not

24    purchased.

25    Q. And at least at the time that you left, which was what

1    again?

2     A. In December of 2009.

3     Q. Thank you.  Now I would like to show you what's been

4    marked for identification as -- well, strike that.  I'm going

5    to hold on to that.

6          MR. KLUMB:  The Court's indulgence.

7     Q. Okay.  During the period of time that you were working at

8    GenPhar, was GenPhar constructing any office buildings?

9     A. They were constructing a pretty sizeable manufacturing

10   facility.

11    Q. Have you seen it?

12    A. Yes, I've seen the building.

13    Q. Did you have much involvement in that project while you

14   were working at GenPhar?

15    A. No.

16    Q. Do you know anybody who did?

17    A. Dr. Dong.

18    Q. Did you have an understanding back then whether it was

19   permissible to use grant funds to pay for construction costs

20   in a new building?

21    A. Um, yeah.  We were not supposed to be using grant funds

22   for that.

23    Q. Where did you come by that understanding?

24    A. Um, I think it was just general knowledge.  Also, you

25   know, our grant budgets budgeted for specific things and that

1    was never listed.

2      Q. Did you ever discuss that subject with anyone at GenPhar?

3      A. Um, yes.

4      Q. Do you remember who?

5      A. Um, Dr. Dong did discuss it with me once.

6      Q. And can you tell us about that conversation, what he

7    said, what you said and how it came up?

8      A. Um, well, the -- the company had been visited by the FBI

9    regarding this, the subject of this case.  And so after that,

10   I had a conversation with Dr. Dong where he approached me and

11   was basically, you know, trying to say, you know, Aren't we

12   supposed -- Aren't we able to use indirect costs for -- for

13   buildings and renovations and things like that?  And I just

14   didn't really say anything.  I didn't agree with him.

15     Q. Did you disagree?

16     A. I didn't say anything either way.

17     Q. Was that the only time that you had a discussion with him

18   about the building, to pay for it with grant funds?

19     A. Yes.

20     Q. Do you recall a conversation with Dr. Dong and a Debbie

21   Owens?

22     A. Yes.

23     Q. Did it involve the construction of the building and

24   funding it?

25     A. Yes.  Um, they were having an argument about what could

1    be used to pay for the building.  And at that point Dr. Dong

2    said to the effect of basically, you know, Of course we can't

3    use grant funds to pay for the building.

4    Q. Thank you.  During the period of time that you worked at

5    GenPhar, did you partake in anything that you would consider

6    to be lobbying activities?

7    A. Um, yes.

8    Q. Tell us about that.

9    A. One time I did go up to DC, and we visited -- had some

10   dinner with some lobbying folks or people that were -- they

11   were involved in lobbying.

12   Q. What else did you do on that trip?

13   A. I don't recall.

14   Q. Okay.  Nothing comes to mind?

15   A. No.

16   Q. Okay.  Tell me whether it was your understanding that,

17   during this period of time, whether or not grant funds could

18   be used for lobbying activities?

19   A. Um, it was my understanding that you could not use grant

20   funds for lobbying.

21   Q. And how did you come by that understanding?

22   A. I believe it stated in our -- the notice of grant award

23   that we receive when we are awarded a grant.

24   Q. Now, during the period of time that you worked at

25   GenPhar, did you have an understanding about whether or not

1    you -- GenPhar could make a profit off the grants?

2      A. Um, I think for a specific kind of grant, a small

3    business grant, you are allowed to put in a fee, but other

4    than that, no, you are not allowed to make a profit.

5      Q. And tell us, what does the phrase IND mean?

6      A. That's Investigational New Drug.

7      Q. And what does that entail?

8      A. Um, whenever you have a new drug that you are trying to

9    get into the market, the first step is to get into a phase 1

10   clinical trial.  And in order to get into that phase 1 trial,

11   you have to submit an Investigational New Drug application to

12   the FDA.

13             MR. KLUMB:   Thank you, Your Honor.  That's all I

14   have at this time.

15             THE COURT:  Any cross-examination?  I'm about ready

16   to break.  I don't know how long you've got, but if you've

17   got more than just a few minutes, we are going to recess for

18   the evening.

19             MS. PARHAM:   We would recess then.

20             THE COURT:  Okay.  Ladies and gentlemen, it's just

21   about 5:30 and it's about to get dark outside, so we are

22   going to recess now until 10:00 in the morning.  If you would

23   come back at 10.  As you know, there is coffee and

24   refreshments back there you can enjoy.  We'll try to start

25   promptly at 10:00.

1          During this recess -- I don't know whether you are

2    going home or you are spending the night here in Charleston

3    or what, but undoubtedly, you will be confronted by somebody

4    who asks you what you have been doing.  And at home they know

5    what you have been doing, so they know about the case, and

6    the temptation is going to be to discuss it with them.  But

7    don't discuss the case with anybody or permit anybody to

8    discuss it with you.  You are sworn to try this case based on

9    what you hear here in the courtroom.  And if you go out on

10   the street, or wherever you go, and start talking about this

11   case, you are inevitably going to get input from somebody

12   else and that could influence your thinking.  So let's don't

13   discuss it with anybody or permit anybody to discuss it with

14   you.

15         If you see something in the newspaper about it -- I

16   don't know who wrote it, nobody out there looks like they

17   might be writing for the paper -- that doesn't mean we are

18   not going to see a spread tomorrow in the paper covering this

19   thing.  And if you do see that, just put it aside and look at

20   it after the case is over.  Don't read it, don't partake in

21   any outside information during this recess.     Have a great

22   time.  Forget about the case until 10:00 in the morning and

23   we'll see you back then.

24         Thank you.

25         (Thereupon, the jury retired from the courtroom.)

1          THE COURT:  Okay.  I believe you had something you

2    wanted to take up before we recessed?

3          MR. KLUMB:   In part because it will narrow the

4    scope of the trial.

5          If the Court please, I think that the scope of the

6    Indictment, the conspiracy count, would cover basically all

7    fraudulent conduct in connection with grant applications in

8    general covering that timeframe.  It's a conspiracy to

9    provide false statements to the Government, to steal

10   government money, to commit wire fraud, to impair and impede

11   the lawful functions of the Government administering grants,

12   etcetera, and that anything -- for any type of grant to any

13   agency during that timeframe would be fair game.

14         THE COURT:  Anything from the defense?

15         MS. PARHAM:   Yes, sir.

16         THE COURT:  This is in response to his question of

17   the witness about other applications that are not involved in

18   this case, and he said he wanted to offer it under 404(b).

19   And since he now admits that he didn't do what the Rule

20   requires thereunder, he's kind of, I don't want to say

21   reverse field, but he's kind of juked somebody and gone the

22   other way a little bit.

23         MR. KLUMB:   I confess.

24         THE COURT:  I've done it a hundred times.  That's

25   what good lawyers do.  Go ahead.

1          MS. PARHAM:   Yes, sir.  Those other grants, not the

2     one he mentioned, but the Navy Dengue Grant and the Army

3     Marburg Grant, are two earlier grants.  That's not the one he

4     asked her about.  He asked her about the Avian Flu Grant.

5     Those two are mentioned in the introduction in Count 1.

6     Those grants are not mentioned in the conspiracy count where

7     it lays out the conspiracy, which dates between August 2004

8     and April of 2011.  It -- and those grants were not included

9     in the overt acts of the conspiracy.

10          So our reading of the Indictment is that they

11     charged fraud with regard to the NIH Marburg Grant.  And so I

12     noticed in their exhibits, when I was going through them

13     again, that they are trying to put in all these other grants;

14     some of which are not even mentioned in the introduction

15     paragraph of the Indictment.  And I just -- I think what they

16     are -- I don't know why they are trying to get it in.  There

17     might be pieces of paper in there.  I think, A, it's

18     confusing.  B, it is 404(b) because there could be

19     something -- one of those that duplicates.  And I just have

20     no idea what they are trying to do.  But I don't think it's

21     appropriate or admissible.

22          THE COURT:  Anything from the Government?

23          MR. KLUMB:   Nothing further, Your Honor.

24          THE COURT:  I don't know if it's proper 404(b)

25     material or not.  Years ago when 404(b) was first born, we

1    looked at it one way as being a doctrine that was going to

2    limit the admissibility of character evidence.  And lo and

3    behold, it's developed as an inclusive rule.  And the Fourth

4    Circuit has time and time again said that we ought to

5    consider it as something that would permit evidence to come

6    in and only rule it out under certain circumstances.  I still

7    don't agree with that approach, but it is a broad approach.

8    But even thereunder, I'm not sure whether I would let it in

9    or not, but I'm saved by the fact the Government didn't give

10   the notice required by 404(b).

11           As far as coming in because it's part of the

12   conspiracy, I don't quite understand that.  It is -- if we go

13   to trial on this, is this -- is the defendant in jeopardy as

14   far as these grants are concerned?

15           Say what now?  You were shaking your head.  I just

16   don't understand.  I don't think it's prejudicial to the

17   defendant.  Obviously you wanted to get it in one way and

18   can't, so you are trying to claim it comes in another way.

19   There is no notice whatsoever that I can see where the

20   defendant would know about those grants as being evidence;

21   that they could defend against them; that they could possibly

22   get witnesses here who could testify as to the circumstances

23   existing in those grants.  And they don't add anything to the

24   case.

25           If you can't convict this defendant on the grants

1    that you have chosen to pursue, then you ought not convict

2    him.  It's that simple.  And just to run another red herring

3    through the courtroom and hope that some juror will hook on

4    to that and decide the case thereon when it's irrelevant, I

5    don't think is appropriate.  So I might change my mind

6    somewhere down the road as I learn more about the case, but

7    right now I don't think it's admissible and I sustain the

8    objection.

9         And the Indictment itself, I have never seen a more

10    confusing Indictment.  It's really hard for me to tell what

11    the Government is pursuing, but I'm looking at it and maybe

12    in a few days I'll get enough knowledge to where I can start

13    asking some questions about it.  But it is quite confusing.

14         But anyway, anything before we recess?

15         MR. KLUMB:  Not from the Government, Your Honor.

16         THE COURT:  All right.  We'll be in recess until

17    10:00.

18         (Thereupon, the Court was in recess.)

19              *****      *****      *****

20

21    I certify that the foregoing is a correct transcript from the

22    record of proceedings in the above-titled matter.

23

24

25

1      ----------------------------

2

3      Amy C. Diaz, RPR, CRR              November 24, 2014

4      S/  Amy Diaz

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25