1

```
1                    IN THE DISTRICT COURT OF THE UNITED STATES
2                         DISTRICT OF SOUTH CAROLINA
                              CHARLESTON DIVISION
3
     UNITED STATES OF AMERICA,    )           2:11-CR-511
4                                 )
                    Plaintiff     )           Charleston,
5                                 )           South Carolina
     VS                           )           November 6, 2014
6                                 )
     JIAN-YUN DONG, et al,        )
7                                 )
                    Defendants    )
8
                         TRANSCRIPT OF TESTIMONY OF
9                        DR. JAN WORARATANADHARM
                    BEFORE THE HONORABLE C. WESTON HOUCK,
10                   SENIOR UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Plaintiff:      MR. ERIC KLUMB
                             MR. NATHAN WILLIAMS
13                           Office of the United States Attorney
                             P.O. Box 978
14                           Charleston, SC 29402

15   For the Defendant:      MS. ROSE MARY PARHAM
     Jian-Yun Dong           Parham Law Office
16                           P.O. Box 1514
                             Charleston, SC 29503
17
                             MR. RUSSELL W. MACE, III
18                           Russell Mace and Associates
                             1341 44th Avenue North
19                           Suite 205
                             Myrtle Beach, SC 29577
20
     Vaxima, Inc.            G. WELLS DICKSON, JR.
21   GenPhar Inc.           Wells Dickson
                             124 S. Academy Street
22                           Kingstree, SC 29556

23   Court Reporter:         Amy C. Diaz, RPR, CRR
                             P.O. Box 835
24                           Charleston, SC 29402

25            Proceedings recorded by mechanical shorthand,
     Transcript produced by computer-aided transcription.
```

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

```
 1                THE COURT:  You can bring the jury out.
 2                (Thereupon, the jury returned to the courtroom.)
 3                THE COURT:  Good morning, ladies and gentlemen.
 4     Today is Thursday and tomorrow is Friday.  And I've kind of
 5     told you what hours we run, but usually on Friday, I try to
 6     slow down just a little bit.  Most of you have got some plans
 7     or some of you have got some plans, and if any of you have
 8     any special plans on Friday and you want to leave early, if
 9     you just let the CSO know about it, I'll do the best I can to
10     accommodate it; otherwise, we'll quit a little early on
11     Friday.  But if we have to quit a little earlier than early,
12     then we'll do that to accommodate you, okay?  Next Tuesday is
13     Veterans Day.  I learned that yesterday, I wasn't aware of
14     it, I had forgotten it.  It seems like I always forget
15     November 11, which I shouldn't, but I do.  And this building
16     will be closed, and many of you have asked the question
17     before, I think, from what I understand, whether we'll be
18     closing it up, and we will.  We'll take it as a federal
19     holiday.  And we'll just have to wait until we get to that
20     day and see where we are with the case.  And wherever we are,
21     we'll have to recess and come back on Wednesday.
22                THE COURT:  Okay.  You may proceed.  I think we are
23     at the point of your cross-examination.
24                MS. PARHAM:  Thank you, Your Honor.
25                     CONTINUED CROSS-EXAMINATION
```

BY MS. PARHAM:

Q. Good morning.

A. Good morning.

Q. Dr. Woraratanadharm, is that how you pronounce your name?

A. Yes.  You can just call me Jan.

Q. Jan, okay.  You worked at GenPhar since 2005?

A. That's correct.

Q. And what were your duties there?

A. I did a lot of writing responsibilities for the company, a lot of grant applications, some regulatory work, as well.

Q. And you are a scientist, as we heard your background, correct?

A. Yes.

Q. And were there other scientists that worked at GenPhar?

A. Yes.

Q. How many other scientists worked there?

A. Um, maybe about four or five on average.

Q. How many total employees were at GenPhar when you were there?

A. I think there was about 10.

Q. All right.  Now, when you worked there, GenPhar was working on vaccines for which viruses?

A. There was E-Bola, Marburg, Dengue flu, Avian flu, Chikingunya, I think Rubella Fever.

Q. Now, we've heard about E-Bola because it's been in the

1    news recently, but what is Marburg?  Is it kind of like

2    E-Bola? What type of --

3    A. Yeah, it's a -- it's in the same family of viruses as the

4    E-Bola.

5    Q. Does it also have a hemorrhagic fever component?

6    A. Yes.  It has very similar symptoms.

7    Q. And have a high death rate?

8    A. Yes.

9    Q. How about the other diseases that you mentioned?

10   A. The mortality rate of those other diseases are not as

11   severe.

12   Q. Did you have vaccines in different levels of completion

13   for those illnesses that you named or diseases that you

14   named?

15   A. Yes.

16   Q. So GenPhar had, in fact, formulated some type of vaccine

17   with regard to each of those?

18   A. Yes.

19   Q. Would you tell the jury what stages of completion those

20   were in when you were there?

21   A. Um, I would say E-Bola was the most advanced stage.  It

22   was -- when I left, we had manufactured it.  GMP was an

23   outsource to another company for manufacturing.  And then

24   Marburg was the next one in line.  It was in pre-clinical

25   development.  It had not been manufactured yet.  And then

1     after that Dengue was the next one.  We had done a lot of

2     studies in animals with that one.

3      Q. When you say "pre-clinical development" for Marburg, what

4     does that mean?

5      A. It just means that we have been doing the work that is

6     before clinical trials.  So in the case of Marburg, we had

7     done animal studies with it and we were working towards

8     getting it into the clinic.

9      Q. And you actually had a formulated vaccine for it?

10     A. Um, yes.  It was not a -- not ready to be injected in

11     humans, but yes, we had a vaccine.

12     Q. And even once it gets to the stage of being ready to

13     inject in humans, GenPhar did not have a facility or the

14     capabilities to mass produce vaccines, correct?

15     A. That's correct.

16     Q. And so they would have to contract that labor out with a

17     facility?

18     A. Yes.

19     Q. Because your quarters were pretty confining for the

20     number of people there?

21     A. Yes.  Not only the space but the actual building itself,

22     different specifications that you need for air flow and

23     cleanliness, things like that.

24     Q. Now, didn't GenPhar have several patents for different

25     things with regard to these vaccines?

1    A. Um, yes.  They had several patents or patent

2    applications.

3    Q. And wasn't one of those of most significance the fact

4    that they were able to take a gene off of the common cold and

5    kind of insert the virus into it, or something like -- I

6    might not be explaining it right.

7    A. Yeah, it's I guess flipped, but yeah.

8    Q. Okay.  So would you explain that to the jury?

9    A. Yeah.  So there is -- there is a virus that causes

10   symptoms that are similar to the common cold called

11   Adenovirus.  And that was the basis of most of them,

12   actually, pretty much all of the technology at GenPhar.  So

13   the patent was that we were able to take genes from other

14   viruses and put it into the Adenovirus and use that to

15   develop different vaccines.

16   Q. And was GenPhar, in fact -- well, let me ask you this:

17   Were other companies in the United States trying to work on

18   that same type of kind of scientific philosophy?

19   A. Yes.

20   Q. But was GenPhar the only company that was able to

21   actually move two of the genes?

22   A. Right.  What was unique about GenPhar's technology is we

23   could insert genes on two different sides of the genome, of

24   the DNA sequence.

25   Q. And you were the only company that was able to do that?

1    A. That I'm aware of, yes.

2    Q. So with regard to your vaccines, you -- if you had,

3    say -- which two are the most progressed?  It would be E-Bola

4    and Marburg?

5    A. Yes.

6    Q. Now, when you were writing these grant applications, who

7    would provide the sum for the application?

8    A. Dr. Dong.

9    Q. Would you also write some of the science or pull it from

10    different --

11    A. Yes.

12    Q. And would the other scientists contribute, as well?

13    A. Yes.

14    Q. All right.  And who did you receive the budget

15    information from with regard to the grants that you wrote?

16    A. Um, it was kind of a combination of Dr. Dong and Dr.

17    Wang.

18    Q. All right.  Do you recall agents, federal agents,

19    interviewing you on January 12th, 2010?

20    A. 2010?  Um, I don't remember the date, but yeah, I was

21    interviewed by them.

22    Q. Okay.  Do you recall telling the agents that you received

23    budget information for the grant proposals from Dr. Wang?

24    A. Um, probably.

25    Q. Okay.  And do you also recall telling them that personnel

8

1    levels were provided for by Dr. Dong or Dr. Wang?

2     A. Yes.

3     Q. All right.  Now, you know, the Government was asking you

4    about this 80 percent of your work and how much time you

5    spent on these different projects.  You said that Dr. Wang

6    advised you to charge 60 percent of your time to Marburg and

7    40 percent of your time to E-Bola; is that correct?

8     A. Um, I don't know if the 40 percent was for E-Bola, but it

9    was --

10    Q. Dengue.  I'm sorry.

11    A. Yeah.

12    Q. She was the one that told you to charge like that; is

13    that right?

14    A. That's right.

15    Q. Now, in essence or reality, what percentage of time do

16    you think you were spending on those projects?

17    A. Um, I would say, you know, since I was working about 80

18    percent of my time on grant applications, about 20 percent of

19    it would be spent on other things.

20    Q. Okay.  Going back to this interview that you gave the

21    agent back in January of 2010, could you have told agents

22    that it was 60 percent rather than 80 percent that you were

23    working on the grant applications and business plans?

24    A. I don't recall.  I don't remember.

25    Q. Okay.

1    A. Yeah.

2            MS. PARHAM:  May I approach the witness?  Your

3    Honor, may I approach the witness?

4            THE COURT:  Sure.

5    Q. If you will read that sentence right there and see if

6    that refreshes your memory.

7            MR. KLUMB:   I object, Your Honor, to her reading it

8    out loud.

9            THE COURT:  Say what now?

10           MR. KLUMB:   I object to her reading it out loud.

11   If she's trying to refresh her recollection, she should not

12   read it to the jury.

13   Q. Please read it to yourself.

14   A. Oh, okay.

15   Q. Does it appear you told the agents that you spent 60

16   percent rather than 80 percent?

17           MR. KLUMB:   I object.  She's trying to refresh her

18   recollection.

19   Q. Does this refresh your recollection with regard to what

20   you told the agents?

21   A. I suppose so.

22   Q. What did you tell the agents regarding the percentage of

23   your work that you spent writing the proposals?

24   A. I guess according to this statement I said 60 percent at

25   that time.

1          THE COURT:  She's asking you about your knowledge,

2     your recollection of what you told them.

3          THE WITNESS:  Yeah, I don't remember.

4          THE COURT:  She showed you some document --

5          THE WITNESS:  Um-hum.

6          THE COURT:  -- that has supposedly --

7          THE WITNESS:  Um-hum.

8          THE COURT:  -- might refresh your memory.

9          THE WITNESS:  Right.

10          THE COURT:  Whether it does or not, that's between

11     you and that document.  Now, we are talking about what your

12     memory is after you read that document; not what that

13     document says.

14          THE WITNESS:  Okay.

15          THE COURT:  So she's asking you do you recall what

16     you told the agents.

17          THE WITNESS:  I don't recall saying that.

18          THE COURT:  Okay.  The procedure normally is that if

19     you want to refresh a witness's recollection, the documents

20     you use should be submitted to the other side and it should

21     be determined whether it's an appropriate document for the

22     purpose of refreshing her recollection.  Now, we haven't done

23     that in this case, but just in case it comes up again, that's

24     the procedure that the Rules of Evidence dictate.

25          MS. PARHAM:  Yes, sir.  I received this from the

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    Government.

2         THE COURT:  I don't care who you received it from,

3    the procedure is as I just stated.

4         MS. PARHAM:   Yes, sir.  Thank you.

5    Q. Now, when you filled out these grant applications, were

6    they projected for the work that you were going to do in the

7    following years?

8    A. Yes.

9    Q. So they are not saying that you've done the work; they

10   are saying, This is what we project and this is what we

11   believe the research, the path that we are going to take?

12   A. That's correct.

13   Q. Now, when you did those proposals, oftentimes would the

14   actual hours that were worked change after the following

15   year?

16   A. Yes.

17   Q. And would that have been in these progress reports that

18   were submitted?

19   A. That's correct.

20   Q. And how did you get the calendar months for the progress

21   reports that were submitted?

22   A. I got that information from Dr. Wang.

23   Q. Okay.  Now, let me show you what's been admitted into

24   evidence Government's Exhibit 1, page 5.  I believe the

25   Government showed you this.  Is this the estimation and the

1    grant proposal of the time that you believed or that was

2    submitted for work during the first year of the grant?

3    A. Yes.

4    Q. And then in Government's Exhibit 2, is this, the last

5    page of the progress report, for the following year which

6    talks about what was actually completed?

7    A. That's correct.

8    Q. All right.  And this is the page in which you said that

9    you probably did not work 7.2 calendar months?

10   A. That's right.

11   Q. And what do you think would have been an accurate number?

12   A. Um, probably more like 10 percent of my time.  So

13   whatever that is.  Ten divided -- um, 1.2.

14   Q. Okay.  And I believe you testified earlier that you do

15   think Holman's is accurate with regard to the time he spent?

16   A. I'm not sure.

17   Q. Was the science that was put into these progress reports,

18   did you read the science portions before they were submitted

19   in the progress reports?

20   A. Yes.

21   Q. And did you agree with the studies and the results of

22   that science?

23   A. Um, I wrote what Dr. Dong told me to write.

24   Q. Okay.  But you are a scientist?

25   A. I am.

1    Q. And you know what's going on at the GenPhar facility?

2    A. Yes.

3    Q. And did this coincide with the work that you were, in

4    fact, doing at the GenPhar facility?

5    A. Um, there was one thing I think in that progress report I

6    might need to take a look at it, but I think we were

7    reporting about a toxicology study.  That may have been a

8    little misleading in the way it was written.

9    Q. What about the other progress reports, did you read the

10    science that was associated with those?

11    A. Yes.

12    Q. All right.  And were you, in fact, progressing with

13    regard to this Marburg vaccine that is discussed in progress

14    reports?

15    A. I believe some progress was being made, yeah.

16    Q. Now, with regard to the NIH funding, would it not be

17    unusual to apply for multiple grants at the same time because

18    you don't know which ones you are going to get?

19    A. That's true.

20    Q. In fact, what percentage are actually awarded?

21    A. I'm not sure.

22    Q. Do you recall telling agents it would have been around 10

23    percent?

24    A. That sounds about right.

25    Q. All right.  And so when you submit these applications,

1    you don't know which ones you are going to get and which ones

2    you are not going to get?

3    A. That's right.

4    Q. And so there is actually -- and when you submit an

5    application, you tell the Government the other applications

6    that you have applied for?

7    A. Um, yeah.  Yeah.

8    Q. And you say on the side of them whether they are active

9    or they are pending?

10   A. Yes.

11   Q. And so the Government has in its possession the different

12   grants that an agency has applied for and so they can go look

13   at the hours and see if they add up to more than 100 percent?

14        MR. KLUMB:   I object to the form of the question.

15   It's compound.  Compound.

16        THE COURT:  I don't know what you mean by that.

17   I've never heard that objection.  Tell me what that means.

18        MR. KLUMB:   It's -- there were multiple questions

19   asked in the same question.

20        THE COURT:  All right.  Ms. Parham?

21        MS. PARHAM:   I'll restructure the question.

22   Q. On these grant applications, is there a section where you

23   discussed what other grants that your company has applied

24   for?

25   A. Yes, there is.

1    Q. And do you tell whether they are pending applications or

2    they are active applications?

3    A. Yes, we do.

4    Q. And so the Government would have the ability -- or would

5    the Government have these other applications so that they can

6    tell if you over dedicated personnel hours --

7    A. Yes.

8    Q. -- for example?  And in fact they do look at that in the

9    amendments to these applications; isn't that correct?

10   A. Who is "they"?

11   Q. The Government.

12   A. Oh, um, yes.

13   Q. Let me show you page 41 of Government's Exhibit 1.  So

14   would this be an example where it says right here,

15   overcommitted 110 percent?

16   A. That's right.

17   Q. So it's no secret to the Government what grants people

18   have applied for and how hours might be overcommitted because

19   you don't know which ones you are going to get?

20   A. Yes.  Can I clarify one thing, though?

21   Q. Yes.  Uh-huh.

22   A. So this document -- this portion of the document that you

23   are showing --

24   Q. Uh-huh.

25   A. -- shows the active and pending support for the higher

1    level personnel, but it doesn't show everybody.

2    Q. Right.

3    A. Yeah.

4    Q. And with regard to these grants, did you ever read the

5    NIH Guidelines?

6    A. Um, I've read the instructions for the grant proposals.

7    I'm not sure what you mean by the "NIH Guidelines."

8    Q. Well, did you read any of the federal regulations or

9    anything like that in preparation for these grants?

10    A. No, I did not.

11    Q. Did you take any grant writing courses or go to any

12    classes for it to learn how to do it?

13    A. No, I did not.

14    Q. Now, you testified on direct about a search warrant being

15    executed by the federal agents. Was that in or about July of

16    2009?

17    A. I don't remember the date, but that sounds about right.

18    Q. Do you recall telling agents that the way you accounted

19    for your time changed after the search warrants were

20    executed?

21    A. Um, yes.

22    Q. All right. And was it at the time of the search warrant

23    that you recalled my client, Dr. Dong, saying that he thought

24    he could use the indirect costs for a facility?

25                MR. KLUMB:    Objection, hearsay.

1          THE COURT:  Say what?

2          MR. KLUMB:   Objection, hearsay.

3          MS. PARHAM:   I believe she testified to it on

4    direct.  I was just clarifying what the timeframe was that he

5    said that.

6          THE COURT:  It seems to me that it is hearsay.  It's

7    not any exception to the hearsay rule because he is a party

8    and he is your client.  If it's an adverse party, it's a

9    different rule under 801, but it seems to me it's hearsay,

10   unless I'm told for some other reason it's offered for the

11   truth of the matter; and therefore, it's objectionable and I

12   sustain the objection.

13         MS. PARHAM:   Thank you, Your Honor.

14    Q. Do you recall the timeframe that he told you that

15   statement that you testified to on direct?

16    A. I believe it was after the search warrant.

17    Q. Now, who was in charge of the finances of the --

18         THE COURT:  Now, are you testifying that you made

19   that statement on direct examination?  Now, what she's asking

20   you about is some statement that her client, Dr. Dong,

21   allegedly made.  And I don't want to get too complicated, but

22   if you made that statement on direct examination --

23         THE WITNESS:  Yes.

24         THE COURT:  -- upon being questioned by the U.S.

25   Attorney --

1                    THE WITNESS:  Um-hum.

2                    THE COURT:  -- then it's not objectionable as

3       hearsay, okay?  If you didn't make the statement on direct

4       examination and you are now being asked to make it by Dr.

5       Dong's attorney, it is covered by the hearsay rule and

6       objectionable.  And that's why the difference is important.

7       And we need to know and the jury should know whether you made

8       that statement on direct examination or not.

9                    Yes, sir?

10                   MR. KLUMB:   My recollection is that it was a

11      different statement.

12                   THE COURT:  Well, your recollection -- I wish you

13      would disregard his recollection; it's your recollection that

14      counts.  And we would like to find out if it's important.  We

15      can go look at the record at some recess, but if we are going

16      to talk about that statement, I think if any of you will take

17      the time to peruse Rule 801, you will see the difference.  If

18      he brings it out as opposed to you bringing it out in one

19      instance, it's hearsay and the other it's not.  And so if

20      it's going to be important and it's going to be something you

21      dwell on, something you discuss, then I think we need to

22      determine whether the statement is something that is

23      admissible and is something that the jury can consider.

24                   And since you are the one who wants to do that, I'll

25      leave it up to you to see if you can find it in the record

1      where it was presented at an earlier time.

2                MS. PARHAM:   Yes, sir.  Thank you.  So we would

3      just wait and do that at the break, Your Honor?

4                THE COURT:  I don't know what to say about it,

5      because in the one instance, it becomes a statement by a

6      party, which takes it out of hearsay, and that's when the

7      Government asked it.  And then in another instance, it

8      becomes a declaration against -- I mean, it just -- it's in

9      and out of the Rule 801, and it depends on who asked the

10     question and who brought it out.  The Government has a

11     perfect right to bring out statements made by the defendant;

12     you don't have that right --

13                MS. PARHAM:   Right.

14                THE COURT:  -- under the hearsay as far as you are

15     concerned under the Rules of Evidence.  So let's just -- we

16     just won't deal with that.  She doesn't recall what she did.

17     If she can -- if she can recall it, then fine, maybe we can

18     go back and dig it up.

19                MS. PARHAM:   May I ask her that question?

20                THE COURT:  Sure.

21      Q. Do you recall making any -- that statement on direct

22     examination when asked by the Government?

23                MR. KLUMB:   Again, I just object to the use of --

24     the question is vague.  "That statement" refers to what?

25                MS. PARHAM:    I'm trying not to say the content of

1    the statement because he objected to that too.

2         THE COURT:  I don't see anything wrong with her

3    question.  She's got to start somewhere.

4    A. Um, I -- I don't remember exactly what you said was my

5    statement.

6    Q. Do you recall -- do you recall making a statement on

7    direct examination about what Dr. Dong said about the

8    facility indirect costs after the search warrant?  Do you

9    recall being asked that on direct examination?

10    A. Um, it was a slightly different question, I think.

11         MS. PARHAM:   Your Honor, we'll pull it up on the

12    record.  I think that's the easiest way.

13         THE COURT:  Okay.

14    Q. When you would get your grant monies in, who was in

15    charge of the bookkeeping of the awards and the finances of

16    the awards after grant money came in?

17    A. Um, there -- we had some -- some staff that were involved

18    with the finance area.  And I think it was, um, depending on

19    what timeframe, there was -- well, Danher Wang, Debbie Owens

20    and Elaine Van Voris, I think were in charge.

21    Q. Do you recall making a statement to investigators in

22    January 2010 regarding the fact that you didn't feel like it

23    was intentional as to GenPhar employees showing more than 100

24    percent work level on these applications?

25    A. Um, that sounds possible.

1      Q. What do you recall telling them about that?

2      A. I don't remember what I said specifically.

3      Q. Do you recall saying that it was to try to fund people's

4      salary and not people just doing the research and that you --

5                  THE COURT:  Yes, sir?

6                  MR. KLUMB:   I object.  She's reading from the

7      document.  Not the proper way to refresh.

8                  MS. PARHAM:   May I approach the witness, Your

9      Honor?

10                 THE COURT:  Say what?

11                 MS. PARHAM:   I'll strike that.  May I approach the

12     witness?

13                 THE COURT:  Well, you know, the inference before the

14     jury with the document and the questions I think is

15     inappropriate.  She's already said she doesn't recall what

16     she told them.  And now to read from some document to infer

17     that's what she said she told them, and that's requiring or

18     asking the jury to make a leap that they shouldn't.  If she

19     told somebody that, they ought to be able to come in here and

20     say what she told them.  Until they do that, it's mere

21     speculation what, if anything, she told anybody.

22                 MS. PARHAM:   May I approach the witness, Your

23     Honor?

24                 THE COURT:  You sure may.

25     Q. Let me have you read that last paragraph to yourself.

```
 1                    MR. KLUMB:   Counsel, could I have a page, please?

 2                    MS. PARHAM:   Restricted discovery page 176.

 3                    MR. KLUMB:   Thank you.

 4       A. Okay.

 5       Q. Does that refresh your recollection as to what you may or

 6       may not have told agents?

 7       A. Yes.

 8       Q. Do you remember saying that to the agents?

 9       A. Yes.

10       Q. And what did you tell the agents, to the best of your

11       knowledge?  Not from what you are reading, but what do you

12       remember telling them about that?

13       A. That, um, that we were -- we were just submitting -- we

14       were trying to get all the personnel funded so it didn't

15       always total up to 100 percent.  It might have exceeded that.

16       Q. And what do you recall saying about conduct being

17       unintentional?

18       A. Um, that it might not have been intentional.

19       Q. And with whom were you -- who were you talking about when

20       you said it was unintentional?  The employees?

21       A. Um, I think Dr. Dong.

22       Q. All right.  And you recall telling agents that in January

23       of 2010?

24       A. Yes.

25       Q. Let me show you what's been marked for identification
```

1    purposes only as Defendant's Exhibits 8 through 47, which

2    have been shown to the Government.  Can you look at those and

3    tell me if you can identify what's in those photographs?

4     A. It looks like the laboratory --

5     Q. Just.  Can you identify what's in --

6     A. -- GenPhar.

7     Q. Can you identify what's depicted in each of those

8    photographs?

9     A. Oh, you want me to go through each one of them?

10     Q. Well, not out -- just see if you recognize what's

11    depicted in those photographs.

12     A. Yes.  Okay.

13     Q. After looking at those photographs, do you believe that

14    they fairly and accurately depict what you recognize them to

15    be?

16     A. Um, I think so.  It's been a while.

17          MS. PARHAM:   Your Honor, we would offer Defendant's

18    Exhibits 8 through 47.

19          MR. KLUMB:   Well, I would object.  I don't believe

20    the witness has indicated it's a fair and accurate

21    representation of, what, I'm not sure.

22          THE COURT:  I haven't seen the exhibits.  Okay.  I

23    need to look at them.  I don't know what they are.

24          You asked her:  "Can you look at those photographs

25    and tell me what they are?"

1            "It looks like the laboratory."

2            "Can you identify what's in" --

3            "Answer. GenPhar."

4            "Can you identify what's depicted in each of these

5      photographs?"

6            "You want me to go through each one of them?"

7            "Well not out -- just see if you recognize what's

8      depicted in these photographs."

9            "Yes.  Okay."

10           "Okay.  After looking at these photographs, do you

11     believe that they fairly and accurately depict what you

12     recognize them to be?"

13           "I think so.  It's been a while."

14           I don't think that's a proper foundation.

15           MS. PARHAM:  I didn't realize they were going to be

16     objected to.  I'll go through each one individually.

17           THE COURT:  Well, I mean if this -- if this is

18     GenPhar and they are pictures in GenPhar, you ought to get

19     that.  We don't need to waste the time of the Court or the

20     jury in arguing about it.  But when you offer a photograph

21     in -- gosh, I guess when I started practicing law, it

22     involved skid marks on a highway when two cars ran together

23     and, Does that accurately represent the scene when you went

24     there and photographed it?  Yes, it does.  But you've

25     identified the scene and then you identify the photographs.

1    Here she says she didn't do any of that.  And I don't

2    question the authenticity, but I don't think that they have

3    done what they should have done.

4            Yes, sir?

5            MR. KLUMB:  Your Honor, I will withdraw the

6    objection if we have some testimony as to the timeframe that

7    this is supposed to represent.

8            THE COURT:  Well, you know, you've got investigators

9    been hanging out over there for years, haven't you?

10           MR. KLUMB:  Um, I think if counsel could -- counsel

11   can tell you when those photographs were taken.

12           THE COURT:  They could see this through the window.

13   They wouldn't even have to go inside.  But I mean, do you

14   have anybody that knows what it looked like inside of

15   GenPhar?  First of all.

16           MR. KLUMB:  At certain periods of time, like when

17   the search warrant was executed.

18           THE COURT:  Show him the photographs and see if

19   you've got any objection.

20           MR. KLUMB:  I've seen the photographs.  I think the

21   witness should be asked what timeframe this is supposed to be

22   a fair and accurate representation of.

23           THE COURT:  Do you know when those photographs were

24   taken?

25           THE WITNESS:  I don't know.

1           THE COURT:  Is there a date on them?

2           MS. PARHAM:   No, sir, there is not.

3           THE WITNESS:  I'm not sure if I recognize some of

4    the equipment, so it may have been after I left.

5           MS. PARHAM:   I'll go through each one individually.

6           THE COURT:  I don't know if she's going to be able

7    to identify them.  I mean, she can't tie down a time, and I

8    don't know for the life of me why time is that important.

9    But I do know from the testimony that they made at least one

10   move, they have been in at least two offices, and they have

11   built a new office.

12          Now, the record doesn't indicate what happened to

13   that third location, so we don't really know what we are

14   talking about.  And so if time doesn't tie it down, location

15   doesn't tie it down and identification of where it is in the

16   building isn't tied down, I don't see how we are going to get

17   it in.

18          MS. PARHAM:  May I go through each of the

19   photographs?

20          THE COURT:  If she can do that.

21   Q. Let me show you what's been marked as Defendant's Exhibit

22   8.  Do you recognize what's in that photograph?

23   A. Yes.  That's the reception area.

24   Q. Is that how it looked when you worked there?

25   A. Yeah, approximately.

1    Q. Okay.

2             MS. PARHAM:    We would offer Defendant's Exhibit 8.

3             MR. KLUMB:    No objection.

4             (Thereupon, Defendant's Exhibit Number 8 was

5    received in evidence.)

6    Q. Let me show you Defendant's Exhibit 9.  Can you identify

7    that photograph?

8    A. I believe it's one of the labs, but I don't really

9    recognize it.  It's been kind of a long time.

10   Q. Okay.  So you don't recognize that?

11            THE COURT:  She said:  "I believe it's one of the

12   labs, but I don't really recognize it."

13            MS. PARHAM:    All right.

14   Q. Defense Exhibit 10.  Can you recognize that one?

15   A. Yeah, I recognize the equipment.

16   Q. Was that there when you worked there?

17   A. I think so, but I didn't work directly with -- in the

18   lab, so I don't remember all of the equipment that we had.

19            MS. PARHAM:    We would offer Defense Exhibit 10.

20            MR. KLUMB:    May I see it, Counsel?  Thank you.

21            Given the witness's answer, I have no objection.

22            (Thereupon, Defendant's Exhibit Number 10 was

23   received in evidence.)

24   Q. That's Exhibit 11.  Do you recognize what's in that

25   photograph?

```
 1        A. No, I don't.

 2        Q. Defendant's Exhibit 12?

 3        A. Yes.

 4             MS. PARHAM:   We would offer Defense Exhibit 12

 5             MR. KLUMB:   No objection.

 6             THE COURT:   Any objection?

 7             MR. KLUMB:   No objection.

 8             (Thereupon, Defendant's Exhibit Number 12 was

 9        received in evidence.)

10        Q. Defense exhibit 13.  Do you recognize that?

11        A. Yes.

12             MS. PARHAM:   We would offer Defense Exhibit 13.

13             MR. KLUMB:   No objection.

14             (Thereupon, Defendant's Exhibit Number 13 was

15        received in evidence.)

16        Q. Defense Exhibit 14.  Do you recognize what's in that

17        photograph?

18        A. I'm trying to remember if we had that, um, I think

19        that's -- yes.

20             MR. KLUMB:   I'm sorry, I didn't hear the answer.

21             THE WITNESS:  I'm sorry.  Yes.

22        Q. You believe that fairly and accurately represents --

23        A. Um --

24        Q. -- the way it looked when you were there?

25        A. I feel like it might have been a different room because I
```

1     don't really remember the arrangement, but...

2      Q. We'll not offer that one.

3             Defense exhibit 15.  Can you identify that?

4      A. Yes.

5      Q. Does that fairly and accurately represent the way it

6     looked when you were there?

7      A. Yes.

8      Q. Defense Exhibit 16.

9      A. Yes.

10     Q. Does that fairly and accurately depict the way it looked

11     when you were there?

12     A. Yes.

13     Q. Defense Exhibit 17.

14     A. I don't recall this one.

15     Q. Okay.  Defense Exhibit 18.

16     A. Oh, wait a second.  Sorry.  No, um, 18 -- oh, yes.

17     Q. And does that fairly and accurately represent what you

18     believe --

19     A. Yes.

20     Q. Defense Exhibit 19.

21     A. Yes.

22     Q. Does that fairly and accurately represent the way it

23     looked when you were there?

24     A. Yes.

25     Q. Defendant's Exhibit 20.

1        A. Okay.  Yes.

2        Q. Does that fairly and accurately represent the way it

3    looked when you were there?

4        A. Um, a few things are moved around, but for the most part

5    it's the same.

6        Q. Defense Exhibit 21.

7        A. I don't remember this one.

8        Q. Defense Exhibit 22.

9        A. Yes.

10        Q. Does that fairly and accurately represent the way it

11    looked when you were there?

12        A. Yes.

13        Q. Defense Exhibit 23.

14        A. Yes.

15        Q. Does that fairly and accurately represent the way it

16    looked when you were there?

17        A. Yes.

18        Q. Defense Exhibit 24.

19        A. Yes.

20        Q. Does that fairly and accurately represent the way it

21    looked when you were there?

22        A. Yes.

23        Q. Defense Exhibit 25.

24        A. Yes.

25        Q. Does that look like it did when you were there?

1    A. Yes.

2    Q. Defense Exhibit 26.

3    A. Um, I don't recall that one.

4    Q. Okay.  Defense Exhibit 27.

5    A. Yes.

6    Q. Does that look like it did when you were there?

7    A. Yes.

8    Q. Defense Exhibit 28.

9    A. Yes.

10    Q. Does that look like it did when you worked there?

11    A. Yes.

12    Q. Defense Exhibit 29.

13    A. Yes.

14    Q. Does that look like it did when you worked there?

15    A. Yes.

16    Q. Defense Exhibit 30.

17    A. Yes.

18    Q. Does that look like it did when you worked there?

19    A. Yes.

20    Q. Defense Exhibit 31.

21    A. Yes.

22    Q. Does that look like it did when you worked there?

23    A. Yes.

24    Q. Defense Exhibit 32.

25    A. I don't recognize that one.

1      Q. Defense Exhibit 33.

2      A. Um, I don't recognize that one.

3      Q. Defense Exhibit 34.

4      A. Yes.

5      Q. Does that look like it did when you worked there?

6      A. Yes.

7      Q. Defense Exhibit 35.

8      A. Um, yes.

9      Q. That looks like it did when you worked there?

10     A. Yes.

11     Q. Defense Exhibit 36.

12     A. Yes.

13     Q. Does that look like it did when you worked there?

14     A. Yes.

15     Q. Defense Exhibit 37.

16     A. Yes.

17     Q. Does it look like it did when you worked there?

18     A. Yes.

19     Q. Defense Exhibit 38.

20     A. Yes.

21     Q. Does it look like it did when you worked there?

22     A. Yes.

23     Q. Defense Exhibit 39.

24     A. Yes.

25     Q. Does it look like it did when you worked there?

1    A. Yes.

2    Q. Defense Exhibit 40.

3    A. Yes.

4    Q. Does it look like it did when you worked there?

5    A. Yes.

6    Q. Defense Exhibit 41.

7    A. I don't recognize.

8    Q. Defense Exhibit 42.

9    A. Yes.

10   Q. Does it look like it did when you worked there?

11   A. Yes.

12   Q. Defense Exhibit 43.

13   A. I don't recognize that.

14   Q. Defense Exhibit 44.

15   A. Yes.

16   Q. Does that look like it did when you worked there?

17   A. Yes.

18   Q. Defense Exhibit 45.

19   A. Yes.

20   Q. That looks like it did when you worked there?

21   A. Yes.

22   Q. Defense Exhibit 46.

23   A. I don't recognize that one.

24   Q. Defense Exhibit 47.

25   A. I don't recognize that one.

1              MS. PARHAM:   Based on her answers, Your Honor, we

2        would offer Defendant's Exhibits 8, 10, 12, 13, 15, 16, 18,

3        19, 20, 22, 23, 24, 25, 27, 28, 29, 30, 31, 34, 35, 36, 37,

4        38, 39, 40, 42, 44 and 45.

5              MR. KLUMB:   No objection.

6              THE COURT:  Without objection.

7              (Thereupon, Defendant's Exhibit Numbers 8, 10, 12,

8        13, 15, 16, 18, 19, 20, 22, 23, 24, 25, 27, 28, 29, 30, 31,

9        34, 35, 36, 37, 38, 39, 40, 42, 44 and 45 were received in

10        evidence.)

11        Q. You testified on direct that you were in one office

12        location and then moved to a second location.

13        A. That's right.

14        Q. Are these photographs of the first or second location

15        that you testified to on direct?

16        A. The second location.

17        Q. And these are pictures of the last place you worked

18        basically?

19        A. At GenPhar, yes.

20        Q. Is this where the search warrant was executed?

21        A. Yes.

22        Q. Let me show you Defense Exhibit 8.  What's that a picture

23        of?

24        A. That's the reception area.

25        Q. All right.  Defense Exhibit 10.  What is that a

1      photograph of?

2       A. Some of the lab equipment.

3       Q. All right.  What is that depicted right there?

4       A. It looks like the wave bioreactor.

5       Q. Do you recall testifying on direct that y'all had a

6      5-liter bioreactor?

7       A. I recall that it was a small version.  I didn't know what

8      size exactly.  But yeah, that's the one.

9       Q. Do you recall testifying on direct that you had a 5-liter

10     bioreactor?

11      A. I think I said 10, but I wasn't sure of the size.

12      Q. Okay.  Do you know that that -- do you know whether

13     that's a 5-liter bioreactor or not?

14      A. I don't know.

15      Q. All right.  Defense Exhibit 12.

16      A. Yeah.  That's a piece of equipment there.

17      Q. What is that equipment for?

18      A. That's for chromatography.

19      Q. Okay.  What is that called, that piece of equipment?  If

20     you know.

21      A. FPLC.

22      Q. And FPLC --

23      A. Yeah.  I mean, the -- technically that one is an active

24     purifier, but it's in the same family.

25      Q. All right.

1       A. That's a wave bioreactor.

2       Q. Is that a 50-liter bioreactor?

3       A. Um, I don't think so.

4       Q. What do you believe that to be?

5       A. A small one.  So I would guess 5 or 10.

6       Q. Defendant's Exhibit 15.  What is that a photograph of?

7       A. Can you flip it?

8       Q. I'm sorry.

9       A. I think that's the robot that they had.

10      Q. What is that used for?

11      A. Um, that was for their HIV diagnostics project.

12      Q. Defense Exhibit 16.

13      A. Do you want me to identify it?

14      Q. Yes.

15      A. That's a doc system, documentation system.

16      Q. Defense 18.

17      A. That's the office where I worked.

18      Q. Defense 19.

19      A. That's an area where we had all the printers and the

20      scanner.

21      Q. Defendant's 20.

22      A. That was the office where I worked.

23      Q. Defendant's 22.

24      A. This is a tissue culture lab.

25      Q. And what is done in a tissue culture lab?

1        A. That's where you grow cells and viruses.

2        Q. Defendant's 23.

3        A. I think that's the same room.

4        Q. Defendant's 24.

5        A. That's our minus 80 freezer.

6        Q. And what's done with that?

7        A. That's where you store items under deep freeze.

8        Q. Defendant's Exhibit 25.

9        A. That's an ultra centrifuge.

10       Q. 27.

11       A. It looks like more items in the tissue culture area.

12       Q. 28.

13       A. Break room.

14       Q. 29.

15       A. Book shelf with some of our reference materials.

16       Q. 30.

17       A. More of the tissue culture room.

18       Q. 31.

19       A. I think that's the animal facility, but it's hard to

20       tell.

21       Q. 34.

22       A. Some of the equipment in the lab.

23       Q. Defense Exhibit 35.

24       A. More laboratory equipment, the biology stuff.

25       Q. Defendant's Exhibit 36.

1    A. I think that's still the tissue culture room.

2    Q. Defense Exhibit 37.

3    A. More tissue culture incubators for tissue culture.

4    Q. That's Defense Exhibit 38.

5            Defense Exhibit 39.

6    A. Some equipment and the tissue culture room.

7    Q. Defendant's Exhibit 40.

8    A. This is the main laboratory.

9    Q. Defendant's Exhibit 42.

10   A. A shelf with chemicals.

11   Q. Defense Exhibit 44.

12   A. Some small equipment in the main lab.

13   Q. Defense Exhibit 45.

14   A. More equipment.

15   Q. Are you aware -- do you know which of this equipment was

16   purchased with grant money and which wasn't purchased with

17   grant money?

18   A. I do not know.

19   Q. Are you aware of whether GenPhar had investor money?

20   A. Yes, it did.

21   Q. All right.  Do you know how much investor money they had?

22           MR. KLUMB:   Objection as to time.

23           THE COURT:  I'm sorry, I couldn't hear you.

24           MR. KLUMB:   I object as to no time specified.

25           THE COURT:  I'll rule -- I don't know whether it

1    makes any difference what time is involved.  She's talking

2    about the time that she was there and the time she had

3    knowledge.  If an investor came in in the middle of the deal

4    or the beginning or the end, I don't know that that makes any

5    difference, but I don't know that she can answer the

6    question.  She hasn't said she could so far.

7              Are you aware of who the investors were and how much

8    they contributed?

9              THE WITNESS:  I'm aware of some of the investors,

10    but I don't know how much they contributed.

11              THE COURT:  Go ahead.

12              MS. PARHAM:   Thank you.

13    Q. Do you have any idea of the total dollar amount of

14    investor money?

15    A. No.

16    Q. In February of 2013 do you recall entering into what's

17    called a proffer agreement with the Government?

18    A. Yes.

19    Q. What's your understanding of that agreement that you

20    entered into with the Government?

21              THE COURT:  Doesn't it speak for itself?

22              MS. PARHAM:   Yes, sir, it does.  We'll just offer

23    it as Defense Exhibit 48.

24              MR. KLUMB:   No objection.

25              THE COURT:  Was she represented by a lawyer at that

1    time?

2              MR. KLUMB:   No, Your Honor.

3              MS. PARHAM:   There may be --

4              THE COURT:  You can publish any part of it you want

5    to and I suggest you do that now.

6              MS. PARHAM:   Let me get a clean copy.  I believe

7    there is a mark on the last page of this.

8              THE COURT:  Okay.  You can go ahead and publish what

9    you want to and then we can clean it up and put the clean

10   copy in at the first break.

11             MS. PARHAM:   Thank you.  I received one.

12   Q. Did you sign this on February 25th, 2013?

13   A. Yes, I did.

14   Q. Is that your signature?

15   A. Yes.

16   Q. Does the fourth paragraph discuss what you are agreeing

17   to with the Government, that you agree to be fully truthful

18   and forthright with the U.S. Attorney's Office and federal

19   law enforcement?

20   A. Yes.

21             MS. PARHAM:   Your Honor, I don't believe I can

22   publish the second page.  I think there is some --

23             THE COURT:  Do they agree in there, the Government

24   agree in there they are not going to prosecute her?

25             MS. PARHAM:   No, Your Honor.  They agree not to use

1        the information against her in a prosecution as long as she's

2        truthful.  But there is a portion of the second page that's

3        required to be redacted, so I can't publish the second page.

4                THE COURT:  I mean, the purpose of the proffer

5        was -- it had a purpose.  What was the purpose?  She says her

6        obligation was to testify truthfully.

7                Now, what was the Government to give her in return?

8                MS. PARHAM:   Not to use her information against

9        her.

10               THE COURT:  Not to what?

11               MS. PARHAM:   Not to use her information against

12       her.

13               THE COURT:  Okay.  It looks like they might have

14       gotten the best deal.

15               Is that your understanding of it, Mr. U.S. Attorney?

16               MR. KLUMB:   It is, Your Honor.

17               THE COURT:  So you retain the right to prosecute

18       her, but you just couldn't use her testimony against her; is

19       that correct?

20               MR. KLUMB:   That's correct.

21               THE COURT:  But she has not been prosecuted yet?

22               MR. KLUMB:   That is correct.

23               THE COURT:  Okay.  So they entered into an agreement

24       where she agreed to tell them everything she knew and to be

25       perfectly truthful and they said that the information she

```
 1    gave them, they would not use that to prosecute her.  Now,
 2    they got other information that they could use, but what she
 3    gave them, they would not use that against her.  And I'm sure
 4    that most of these agreements contain in there a provision
 5    that they can give her a polygraph test to make sure that she
 6    is fulfilling the agreement and telling the truth.
 7              Is that correct, Ms. Parham?
 8              MS. PARHAM:   Um --
 9              THE COURT:  Or that's not in there?
10              MS. PARHAM:   No, it is in here, Your Honor.  But
11    may we approach side bar, Your Honor?
12              THE COURT:  Say what?
13              MS. PARHAM:   May we approach?
14              THE COURT:  Um-hum.  Come around here, if you
15    would.                     (At the bench.)
16              MR. KLUMB:   We are not allowed to talk about the
17    polygraph in front of the jury.
18              THE COURT:  She can't -- if a polygraph was done, I
19    don't think we can bring that out.  If that was in the
20    agreement, they might could bring it out, that has some
21    effect on whether it's in there, exercised or not, and it
22    seems to me that that's to create -- I mean --
23              MS. PARHAM:   I would ask for a mistrial based on
24    that, talking about it in front of the jury.
25              THE COURT:  You what now?
```

1           MS. PARHAM:    I will ask for a mistrial, that being

2       discussed in front of the jury, because I think it implies

3       that they did and they didn't do one.

4           THE COURT:  Well, tell them they didn't do one, if

5       that makes you feel better.

6           MR. WILLIAMS:    Judge, I think it's better just to

7       strike all references and instruct the jury not to --

8           THE COURT:  That would probably be better if I

9       hadn't mentioned it, but I did, and --

10          MR. DICKSON:    I say now we need to finish it up.

11          THE COURT:  I think if the polygraph was not -- I

12      think we could tell them that, you agree to it.

13          MR. WILLIAMS:    I think the best way to deal with

14      it -- I think the best way to deal with it is not to continue

15      mentioning but to instruct the jury to disregard it and

16      strike any reference to it.

17          THE COURT:  Well, I think the defendant is probably

18      entitled to a charge that -- since it's been brought up --

19      and of course the agreement is in evidence, it's in there.

20      Nobody objected to it when they offered the agreement.

21          MR. WILLIAMS:    I don't know that we admitted it

22      yet.

23          MR. KLUMB:    We did.

24          MR. WILLIAMS:    I would ask that we redact that

25      portion.

1           THE COURT:  It wasn't redacted.

2           MR. WILLIAMS:   Well --

3           MS. PARHAM:   Obviously make the redaction before it

4    was published.  That's why I didn't publish the second page.

5           THE COURT:  I've never seen it.  But if no polygraph

6    was ever given, I'll just instruct the jury to that.

7           MR. WILLIAMS:   I would -- Judge, I just -- I guess

8    to make a record, we would prefer that any reference to the

9    polygraph just be redacted and the jury be instructed to

10   disregard.  I think that fixes the problem, rather than

11   trying to add more to it.

12          THE COURT:  I don't think we add more; I think we

13   level the playing field.

14          MR. KLUMB:   The question is does the defense have a

15   preference whether to --

16          THE COURT:  What you want to do is get the

17   advantages of having that in there without --

18          MR. WILLIAMS:   Judge --

19          THE COURT:  -- giving the jury the --

20          MR. WILLIAMS:   I think that there is case law that

21   says it's reversible error in certain circumstances to

22   mention polygraphs at all.  That's what worries me.  But if

23   the defense is offering that exhibit knowing that, and they

24   are inviting that and waiving that argument, if they want to

25   invite that information --

1          THE COURT:  Well, what we are trying to do is give

2     both sides a fair trial, and the polygraph should not -- it

3     doesn't have a thing to do with it.  And the best thing to do

4     is tell the jury the truth, to say it's in there and

5     disregard it.

6          MR. WILLIAMS:  As long as we are clear that the

7     defense is offering -- as long as we are clear that the

8     defense is arguing that.  She's bringing that exhibit in.

9          MS. PARHAM:  That's not true.

10         THE COURT:  What you are trying to do is get the

11    advantage of the polygraph.  You want to use that.

12         MR. WILLIAMS:  Judge, we never gave one.

13         THE COURT:  Well, then let's admit it.

14         MR. WILLIAMS:  I think --

15         THE COURT:  You don't want to admit it because you

16    want to hang it out there as a possibility that they will

17    hang on it and think it was done and that's not fair.  That's

18    not right.  That's not what we are going to do.  I'm not

19    declaring a mistrial.  I'm going to charge the jury.

20         (In open court:)

21         THE COURT:  I brought up the fact that in the

22    agreement there was a provision concerning a polygraph.  I

23    had never seen the agreement.  I assumed it was in there.  It

24    was introduced into evidence, the agreement, without any

25    objection.  But be that as it may, whether by introducing it

1    into evidence or not objecting to it when it was introduced,

2    the parties agreed that it all comes in, including the

3    provision about the polygraph.

4         Be that as it may, the truth of the matter is as

5    admitted by the parties, no polygraph was ever given to this

6    witness.  And so the fact that it's in the report or in the

7    proffer really doesn't make any difference.  And so disregard

8    it.  I shouldn't have brought it out.  Counsel advised me

9    that they were getting ready to strike it out before they

10   actually published the agreement, in spite of the fact that

11   they had offered the entire agreement in.

12        But that's beside the point.  The important point is

13   that it has no place in this case.  It was -- that right was

14   never exercised.  She was never given a polygraph, and so it

15   has no place in this case, so disregard it.

16        You may proceed.

17        MS. PARHAM:    Thank you, Your Honor.

18   Q. Dr. Woraratanadharm, did you contribute to multiple

19   publications with Dr. Dong and GenPhar and the different

20   agencies?

21   A. Yes.

22   Q. How many publications do you believe that you -- your

23   name is on?

24   A. I don't remember.

25   Q. Okay.  Before doing a publication, what steps would you

```
 1    take for your contribution?
 2     A. Um, depending on my role in the paper, but I would
 3    contribute some of the writing portions of it.
 4     Q. All right.  And did you read these before they were
 5    published to make sure you agreed with the science in them?
 6     A. Yes.
 7          MS. PARHAM:   May I approach the witness, Your
 8    Honor?
 9     Q. Let me show you Defendant's Exhibit 1.  Do you recognize
10    that?
11     A. Yes.
12     Q. Is that a publication that you participated in jointly?
13     A. Yes, it is.
14     Q. Defense Exhibit --
15          THE COURT:  Yes, sir?
16          MR. KLUMB:   I'll wait, Your Honor.  I'm sorry.
17     Q. Defense Exhibit 2.  Can you identify that?
18     A. Yes.  It's another paper that I was an author on.
19     Q. Have you seen these before?
20     A. Yes, I have.
21     Q. And do these accurately represent the publications that
22    they purport to be?
23     A. Yes.
24     Q. Defense Exhibit 5.
25     A. That's another paper.
```

1      Q. Defense Exhibit 6.

2      A. Yes.

3      Q. And Defense Exhibit 7.

4      A. Yes.

5      Q. Are these all of them or are there more?

6      A. I don't remember.  It looks like all of them.

7      Q. All right.

8              MR. KLUMB:   I object on relevance grounds.

9              THE COURT:  Let me see them.  I gather these are

10     scientific articles that were put in?

11             MS. PARHAM:   Yes, sir.

12             THE COURT:  Published in scientific --

13             (Pause in proceedings.)

14             THE COURT:  You know, it would probably take me the

15     rest of the week to read these, and I don't know that I would

16     understand them if I read them.  What they are trying to show

17     here is that these people were involved in a scientific

18     endeavor and that they were writing articles published in

19     scientifically-recognized publications, and that these are

20     some representative samples of those articles.

21             Now, it seems to me that that does have some

22     relevance.  The defense can't be sure what the Government is

23     going to prove, but I think that they have the right to prove

24     that they were involved in a scientific endeavor.

25             Now, are there any particular articles in here that

1    you've -- have you read these?

2            MR. KLUMB:   I've reviewed them very briefly, some

3    of them.

4            THE COURT:   So you haven't read them?

5            MR. KLUMB:   Correct.

6            THE COURT:   Because I was getting ready to ask you

7    some questions about some specific articles that I read last

8    night.  Any particular ones that concern you?

9            MR. KLUMB:   I did not, I don't believe, even look

10   at the ones that had to do with Avian flu, Rift Valley fever

11   or the other ones that have nothing to do with the vaccines

12   that were grant supported --

13           THE COURT:   Okay.

14           MR. KLUMB:   -- Your Honor.

15           THE COURT:   You see, the problem I run into, I think

16   as a general proposition, that you are entitled to show what

17   the defendant was doing in the scientific community.  But by

18   springing -- and I don't use that word in a mean way, but in

19   a descriptive way -- five not lengthy, but small print

20   documents on us, there may be something in here that has some

21   bearing on this case and that we don't know about it.  And so

22   basically by saying it's relevant -- I think it is -- and

23   letting it in, um, in toto, it seems to me is taking a chance

24   that there is something in here that you might not even know

25   about, and the Government doesn't know about it, and I don't

1    know about that the jury is going to find out about when they

2    get out there and start reading it.  And then we realize, Oh,

3    my goodness, that wasn't supposed to be in evidence.

4        So I think to the extent that these articles show in

5    a general way that the defendant was participating in the

6    scientific community by publishing articles involving his

7    trade, that they are admissible.  And that may mean that just

8    the heading, like in this first one I have here it said:  "A

9    complex" -- I can't even pronounce the name -- "and in a

10   virus vectored vaccine against Rift Valley fever virus

11   protects mice against lethal infection in the presence of

12   pre-existing vector immunity."

13       And I think if we publish that and show who

14   contributed to that, I think that sets forth what you want.

15       MS. PARHAM:    Yes, sir.

16       THE COURT:  And we can do that in each of these.

17   And then in the meantime, if there is something in these

18   articles specifically that you think is relevant, then I can

19   hear you on that.  But just to have this whole thing thrown

20   at me and try to say it's relevant, I can't say that now.

21   And I'm not into buying a pig in a poke, so we'll just say

22   that the heading -- you can see what I'm talking about -- the

23   heading here at the top which shows the contributors, and

24   it's a small italics saying down to the bold type that I

25   think describes the article, just down here, the

1    contributors, the name of the article, and when it was

2    published.  And I think that gives the jury all they need to

3    know.

4         And if you want to add anything to it, fine, but

5    let's mark those in, the portions thereof -- the whole

6    document can come in, but the only part that goes to the jury

7    is the part -- the heading with the title of the article and

8    the people that contributed to it, and the publication and

9    when it was published.  And then if it develops that some

10   other part is relevant we can deal with that, okay?

11        MS. PARHAM:   Yes, sir.  Thank you.

12        THE COURT:  Okay.  Anything further of this witness?

13        MS. PARHAM:   Yes.  I would like to pull that place

14   in the record.  So I didn't know if we could take a short

15   morning break, so I could pull that question that we talked

16   about looking up earlier from the record of direct

17   examination --

18        THE COURT:  Okay.

19        MS. PARHAM:  -- about the statement from my client,

20   whether it was hearsay or not.

21        THE COURT:  Okay.  I'm not sure I know you want to

22   do that.  What do you mean you want to do that?

23        MS. PARHAM:   Well, she couldn't remember what the

24   question was on direct, and you -- if she couldn't remember,

25   we were going to be able to pull the record to see what the

```
 1    question and answer actually was.
 2              THE COURT:  You can do it at some break.  I'm not
 3    going to do it while the jury is here.
 4              MS. PARHAM:   That's why I was asking -- I'm almost
 5    finished with my cross-examination but for that one question,
 6    so I didn't know if we were going to take a break any time
 7    soon.
 8              THE COURT:  We sure are.  We are going to take one
 9    in a few minutes.  But I don't know, the court reporter, she
10    likes a take a break, too.
11              Anything further of this witness?
12              MS. PARHAM:   Just that question, Your Honor.
13              THE COURT:  Okay.  Any redirect?
14              Excuse me.  I'm sorry, Wells, I --
15              MR. DICKSON:   That's all right.  I don't think I'll
16    be taking long.
17              THE COURT:  I'm sorry, but I don't mean to suggest
18    that what you have to say or have to offer in this case is
19    unimportant.  It is important and I want to hear you.
20              So you may proceed.
21              MR. DICKSON:   Thank you, sir.
22              THE COURT:  You know, as you can tell, in reviewing
23    this evidence that I have total recall, and I can recall all
24    of the evidence just 100 percent, which is pretty miraculous.
25    And I'm always tempted to let jurors go away with that
```

1    thought, but there is more to it than that.  Science plays a

2    part.  And it's really a remarkable science that's been

3    developed over the last few years, and it's called realtime

4    reporting.

5         And what this young lady does here, she's not only a

6    qualified court reporter, she's applied herself and become

7    knowledgeable about realtime court reporting.  And so what

8    she's done is the stenotype that she uses to take down the

9    testimony, now she has built up a vocabulary in her computer

10   and it has certain software with it she uses that when she

11   hits a symbol there, it comes out on my computer in words.

12   In other words, I can read it right here.  It comes out on my

13   computer in words.  In other words, I -- and so what it does

14   for the lawyers, if they use it -- and they have to pay for

15   it to use it, I don't have to pay for it -- is what it does

16   for me is it keeps me awake, but -- I'm awake anyway, but it

17   gives me a chance to be a little more precise as to what

18   exactly was said and that gives me the ability to rule a

19   little more intelligently.  It's a wonderful, wonderful

20   addition.  And of course we have some judges that write notes

21   and love letters and all kind of stuff all day on the bench,

22   and of course it helps them, too, but for us that pay

23   attention, it just doubles your attention and gives you the

24   opportunity to know better what's going on.

25         The first time -- and I'll let you go -- the first

1    time I ever saw it was in Florence, I was holding court

2    there, and they didn't have it up here, but they had it down

3    there, where the court reporter, it was on her computer, and

4    I made a ruling on the hearsay.  And I said objection

5    overruled, or sustained, whatever it was.  And when I did

6    that, I looked down and I saw her computer and I said, you

7    know, technical science just overruled.  I made a mistake and

8    I could see what actually was said and could rule on that as

9    opposed to what my ears had heard, which was a mistake.

10           But anyway, that's where I get my total recall.  I

11   think you probably figured it out, but just in case you

12   hadn't.

13           Okay.  Mr. Dickson, I've taken up your time, sir.

14   You can go on.

15           MR. DICKSON:   Won't take but a moment, Your Honor.

16                     CROSS-EXAMINATION

17   BY MR. DICKSON:

18   Q. May I just call you Dr. Jan?

19   A. That's fine.

20   Q. Thank you very much.

21           It's my understanding that you were the Operations

22   Manager at GenPhar when you were working there; is that fair?

23   A. Yes.

24   Q. Okay.  And you were also doing non-grant-related

25   management work?

1      A. I was doing, yeah, other work besides.

2      Q. Tell me what other work you were doing.

3      A. I was working on the regulatory written pieces.

4      Q. I'm going to have to explain why I'm asking these.  Where

5      I was sitting over there, you have the water carafe right in

6      the way and I was having trouble hearing you.  So I'm going

7      back through a couple of things that you may have already

8      been asked that I wasn't clear.

9      A. Okay.

10     Q. Okay?  GenPhar was in two different locations -- has been

11     in two different locations in Mount Pleasant, both places --

12     A. Yes.

13     Q. -- is that correct?

14     A. Yes, that's correct.

15     Q. Okay.  The first location they moved out of.  And they

16     moved into the second location, which these photographs that

17     you identified earlier represent?

18     A. That's correct.

19     Q. It's my understanding that the address for that is 600

20     Seacoast Highway?

21     A. Yes.

22     Q. Does that sound right to you?

23     A. That sounds right.

24     Q. Okay.  And that's -- you come off the -- exit at the Long

25     Point Road exit in Mount Pleasant, right?

1      A. Yes.

2      Q. You've got Belle Hall Shopping Center on the right.  Do

3      you remember the shopping center on the right?

4      A. I don't remember the name.

5      Q. You don't remember that?  Okay.  But anyway, it's in that

6      general area?

7      A. Yes.

8      Q. Okay.  Also while you were there, there was some

9      construction going on on a new facility?

10     A. Yes.

11     Q. You testified about that yesterday?

12     A. Yes.

13     Q. Okay.  Did you ever go to the new facility?

14     A. I did.

15     Q. Okay.  I've got some photographs I want you to look at

16     and tell me whether or not you can identify them, okay?

17     A. Okay.

18          MR. DICKSON:  Before I do that, I'm going to make

19     sure that the Government has seen them.

20          MR. KLUMB:    Thank you.

21          MR. DICKSON:  I'll pass them up to His Honor and let

22     him look at them and see if he thinks anything is improper.

23          THE COURT:  I don't care.  Show them to the other

24     side.

25     Q. Look at those and tell me whether or not you recognize

1    those six photographs, please, ma'am.

2     A. Yes, I recognize them.

3     Q. And what -- they are the photographs of what?

4     A. They are the new facility that was being built.

5     Q. Okay.  Does that look -- does that look like it did the

6    last time you saw it?  In other words, do those photographs

7    fairly and accurately represent what you said you saw?

8     A. Yes.

9     Q. Okay.

10                MR. DICKSON:  Thank you.

11                THE COURT:  And when was that?

12                THE WITNESS:  Um, when I saw the building?  Probably

13    the last time was sometime in 2009.

14                THE COURT:  2009?

15                THE WITNESS:  Um-hum.

16                THE COURT:  Any objection?

17                MR. KLUMB:   None, Your Honor.

18                THE COURT:  Without objection.

19                MR. DICKSON:   I need to put numbers on them.

20                Your Honor, at this time I would move Defense

21    Exhibits 51 -- 50, 51, 52 and 53 into evidence.

22                THE COURT:  Without objection.

23                (Thereupon, Defendant's Exhibit Numbers 50-53 were

24    received in evidence.)

25                MR. DICKSON:   Thank you, sir.

```
 1                    Bear with me for just a moment.
 2        Q. I'm going to try it this way:  You said that this is the
 3   way the building looked in 2009, the last time that you saw
 4   it?
 5        A. Yes.
 6        Q. Okay.  Are you aware that construction stopped about 2009
 7   or 2010?
 8        A. I was aware that construction stopped; I didn't know
 9   when.
10        Q. Okay.  But this Exhibit 50 looks like it -- reminds --
11   looks like it did when you last saw it?
12        A. Yes, I believe so.
13        Q. Okay.  Another side.  Would -- is your testimony the same
14   on these two?
15        A. Yes.
16        Q. Okay.  Are you looking at them or have you already looked
17   at them?
18        A. Yes.
19        Q. All right.  Thank you.
20                    This is the front of the building, I understand.  Is
21   that your recollection?
22        A. Yes, that's my recollection.
23        Q. Okay.
24        Q. Your testimony is the same --
25        A. Yes.
```

1    Q. -- the way -- okay.

2            And another view from the back?

3    A. Yes.

4    Q. Okay.  And that little centerpiece there, that's the main

5    entrance at the back, isn't it?  The main entry, the main

6    back entrance?  There is a main entrance of the building in

7    front?

8    A. I think that's correct.

9    Q. Okay.  All right.  Do you know how much of the interior

10   work was completed?

11   A. I do not know.  I know that floors were installed, but I

12   don't remember anything beyond that.

13   Q. Floors were installed.  Do you know anything else?

14   A. No.

15   Q. Okay.  Now, did I understand you correctly to say that

16   you were aware that there were individual investors in

17   GenPhar?

18   A. Yes.

19   Q. Okay.  And do you have any recollection of how many over

20   the period of time that you were there?

21   A. I only recall at least one of them.

22   Q. Were you aware that there were more than a hundred?

23   A. No.

24   Q. Okay.  And you don't have any knowledge of how many --

25   how much money they actually contributed, is what I

1    understood you to say?  Is that correct?

2     A. That's correct.  I don't know how much they contributed.

3            MR. DICKSON:    Bear with me just one moment, Your

4    Honor.

5            (Pause in proceedings.)

6            MR. DICKSON:    That's all I have.

7            THE COURT:  Anything, Ms. Parham?

8            MS. PARHAM:    Just that one question with the

9    record.

10           THE COURT:  Anything from the Government?

11           MR. KLUMB:    Yes, Your Honor.  Thank you.

12                         REDIRECT-EXAMINATION

13   BY MR. KLUMB:

14    Q. You indicated to Ms. Parham that GenPhar was using the

15   Adenovirus platform to deliver the vaccine.

16    A. Yes, that's right.

17    Q. What is the single biggest obstacle to the effectiveness

18   of using that particular platform to administer the vaccines

19   that you were working on?

20    A. Um, the single biggest obstacle was there was a concern

21   for pre-existing immunity to Adeno.

22    Q. And what does that mean?

23    A. That means that -- so the way the vaccines work is

24   usually you get injected with maybe a killed version of a

25   virus or a weakened version.  And because you've seen -- your

1    immune system has seen that pathogen, the next time you

2    actually are exposed to the real thing your body is able to

3    mount an immune response very quickly.  And that's what --

4    that's how the vaccine protects you from the real pathogen.

5         So for the -- for the Adenovirus-based vaccines,

6    because it is based on a virus that a lot of people have been

7    exposed to, even, you know, when you were, you know, a young

8    child, you know, by the age of five I think most people have

9    been exposed to Adenovirus.  So there is a concern that if

10    you receive this vaccine that your immune response may then

11    prevent the vaccine from actually working because it's

12    recognizing the Adenovirus portion of it.

13    Q. And are you aware whether or not the Adenovirus platform

14    has been successfully tested in human beings and been able to

15    overcome that pre-existing immunity issue?

16    A. Um, I am aware of a cancer-based approach -- a cancer

17    approach using Adenovirus that was able to overcome the

18    pre-existing immunity.

19    Q. And what cancer was that?  Do you remember?

20    A. I remember the gene that they used, but I don't remember

21    which cancer.

22    Q. And for E-Bola and Marburg?

23    A. I -- I have to remember the literature.  I know that

24    they, the NIH, had an Adenovirus -- Adenovirus-based E-Bola

25    vaccine that they have tested in monkeys, I think.

1    Q. My question was humans.

2    A. Huh?

3    Q. My question was humans.

4    A. Yeah.  I don't remember if they had gotten into humans

5    yet.

6    Q. Okay.  Now, you discussed, I think, statements that you

7    made to investigators back in January of 2010.  And we'll go

8    over that very briefly in just a second.  But first of all,

9    in a grant application, when you have that spreadsheet of

10   personnel, is that a projection or a part of time actually

11   spent?

12   A. In a grant application, that's a projection.

13   Q. Is there another document where there is a similar table

14   that represents time actually spent as reported to the

15   Government?

16   A. That's the In the Progress report.

17   Q. When you said in 2010 to agents that you didn't feel that

18   the table was intentionally false, were you referring to the

19   projection in the application or the actual statement in the

20   progress reports?  And if you need to refresh your

21   recollection, I'll do so.

22   A. I think I was talking about the projection.

23            MR. KLUMB:   Thank you, Your Honor.  That's all I

24   have.

25            THE COURT:  Okay.  Ladies and gentlemen, it's a

1    little bit, 20 minutes to 12.  Let's take about a 15-minute

2    recess.

3            (Thereupon, the jury retired from the courtroom.)

4            THE COURT:  All right, Ms. Parham.  I asked you if

5    you had any further questions of this witness, and you said

6    just one question.  Now, I know there is one matter you want

7    to go into, but I didn't realize there was another question

8    of this witness.  I thought you wanted to go back and look at

9    the record of her direct testimony and see if she made a

10   statement there.  She's already said she doesn't remember

11   what she said, or I think the last thing she said, I think

12   the question was different.

13           MS. PARHAM:   My recollection is he asked it on

14   direct examination.

15           THE COURT:  Well, you have to go back and look at

16   the record.  I don't know what you are going to ask her about

17   it.

18           MS. PARHAM:   Well, Your Honor's ruling was that if

19   he asked it on direct, then -- I'm not offering in my own

20   client's hearsay statements -- but if he asked it on direct,

21   it's fair game because it's a statement of a party opponent.

22   And he's opened the door and I believe that the record is

23   going to show --

24           THE COURT:  I just have to see what took place

25   before.  How many doors were swinging open and how many

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1   weren't, I don't know.  I mean, you know, the opening doors

2   is a word that's used a lot more than it needs to be used.

3   You just have to look back at the record, see what it is and

4   make your case.

5          But I don't know why you need to ask her any

6   additional questions because she's either -- the Government's

7   not going back into it.  They are not bringing it out again.

8   And so the only way you are going to get advantage of it --

9   get the advantage of it is if they asked her originally.  And

10  then the 801 takes place, as I've explained it, though you

11  haven't addressed that yet.  So there may be some

12  disagreement with what I said.  But I can't do anything, even

13  with this total recall I have, until I find out what the

14  question was and what the answer was, and maybe even what the

15  context was.

16         And so I'm sure the court reporter will work with

17  you --

18         MS. PARHAM:   Yes, sir.

19         THE COURT:  -- in any way she can, but I don't know

20  what this witness is going to be able to help you with.

21  She's already said she doesn't remember what she told them.

22  And then the last thing she said, which wasn't followed up by

23  anybody, if I recall correctly, I think it was a different

24  question.  I believe the record will reflect that that's

25  almost a direct quote.  Okay.  We'll be in recess for 15

1      minutes.

2                  (Thereupon, there was a brief recess.)

3                  THE COURT:  We got a question from one of the

4      jurors.  I got it from the CSO and he gave it to us.  It's

5      not signed.  Usually, as I mentioned earlier, we get the

6      questions from the foreperson.  In this case we haven't

7      appointed a foreperson yet, so obviously they can't give us

8      the question.  I made a copy for you.

9                  "Page 2 of the proffer statement has been admitted

10     into evidence; however, we have been advised to not consider

11     it.  Should we not consider it insofar as it did constitute a

12     potential challenge in the future to any information

13     disclosed to the Government?"

14                 Anybody understands -- anybody understands that

15     question, please stand on their head.  I haven't -- I haven't

16     seen the proffer agreement.  I gather more than just page 2

17     has been admitted, hadn't it?

18                 MR. DICKSON:   The whole thing.

19                 MR. KLUMB:   Yes.  And I don't remember Your Honor's

20     advising them not to consider it.

21                 THE COURT:  No.  The only thing I talked about was

22     the polygraph test.  That's the only thing I mentioned.

23                 MR. KLUMB:   And I would interpret the question,

24     Should we not consider it in so far as it constitutes a

25     potential challenge in the future.  They are talking about a

1    potential challenge involving the witness, not --

2            THE COURT:  I don't think this is important to deal

3    with right now.  I think this is -- we can deal with this at

4    lunch, we can deal with it this afternoon, we can deal with

5    it tomorrow.  So why don't you look at it and see what you

6    come up with.  It's kind of confusing, I think.

7            And you know, sometimes I'm sitting here and jurors

8    are coming up and talking to the clerk after jury selection

9    and they are asking them questions and things like that, and

10   I'm working, but I'm listening, too, out of one ear.  And you

11   kind of hear jurors come up and you say, Oh, my goodness, he

12   or she is going to be a problem.  And so I think I can

13   probably put my finger on who is asking these questions and I

14   think it was predictable, you know.

15           Okay.  You can bring them out.

16           MS. PARHAM:   May I ask how you want to proceed

17   with -- I pulled the record.  May I read it to you to see

18   how --

19           THE COURT:  Let me see the record when you get it

20   and then we can talk about it.  Bring the jury out.

21           I think she's through, isn't she?

22           MS. PARHAM:   This question.

23           THE COURT:  Say what?

24           MS. PARHAM:   No, sir.  This question has to do with

25   her.  You were going to read this record and tell us how we

1    could proceed.  This --

2              THE COURT:  Sit down.

3              Have you given the Government a copy of it?

4              MS. PARHAM:   Yes, sir.

5              THE COURT:  Okay.  Do I have a copy?

6              MS. PARHAM:   I just wrote it out.  We read it

7    together.  She's not able to print it, so I wrote it out.

8              THE COURT:  Okay.  I know we've got copy machines.

9    You can copy stuff you write just like anything else.

10             MS. PARHAM:   I don't have one here at this desk.

11             THE COURT:  Well, I do.

12             Do you have any objection to what she wants to do?

13             MR. KLUMB:   No, Your Honor.

14             THE COURT:  Okay.  I don't need a copy.

15             (Thereupon, the jury returned to the courtroom.)

16             THE COURT:  Okay.  I understand you have another

17   question of this witness.  You can sit down.  I remind you

18   you are still under oath.  Go ahead.

19             MS. PARHAM:   Thank you, Your Honor.

20                           CROSS-EXAMINATION

21   BY MS. PARHAM:

22    Q. Do you recall being asked yesterday:

23             "Did you ever discuss the subject with anyone at

24   GenPhar?"

25             "Answer.  Yes."

1          "Do you remember who?"

2          "Dr. Dong discussed it with me once.

3          "Question.  And can you tell us about that

4     conversation, what he said and how it came up?"

5          And do you recall your answer being:  "Um, well, the

6     company had been visited by the FBI regarding this -- the

7     subject of this case.  And so after I had a conversation with

8     Dr. Dong where he approached me and was basically, you know,

9     trying to say, you know, Aren't we supposed to -- Aren't we

10    able to use indirect costs for buildings and renovations and

11    things like that?  And I just didn't really say anything.  I

12    didn't agree with him."

13         "Question.  Did you disagree?"

14         "Answer.  I didn't say anything either way."

15         Do you recall that being said yesterday during your

16    direct examination?

17     A. Yes.

18         MS. PARHAM:   That's all I have.

19         THE COURT:  My understanding is that they've gone

20    back and looked at the record, and with the assistance of the

21    court reporter, they have gotten that portion of the record

22    and written it down and she was verbatim reading from it.  Is

23    that not correct?

24         MS. PARHAM:   Yes, sir.

25         MR. KLUMB:   That's correct.

1           THE COURT:  Any further questions of this witness by

2   anybody?

3           MS. PARHAM:   No, sir.

4           MR. KLUMB:   No, sir.

5           THE COURT:  Okay.  Wait a minute.  Mr. Dickson?

6           MR. DICKSON:   No, sir.

7           THE COURT:  Thank you very much.  You are excused.

8                   *****     *****     *****

9

10  I certify that the foregoing is a correct transcript from the

11  record of proceedings in the above-titled matter.

12

13

14

15  ---------------------------

16

17  Amy C. Diaz, RPR, CRR              November 24, 2014

18  S/  Amy Diaz

19

20

21

22

23

24

25