1

```
1                    IN THE DISTRICT COURT OF THE UNITED STATES
2                          DISTRICT OF SOUTH CAROLINA
                              CHARLESTON DIVISION
3
     UNITED STATES OF AMERICA,    )           2:11-CR-511
4                                 )
                      Plaintiff   )           Charleston,
5                                 )           South Carolina
     VS                           )           November 5, 2014
6                                 )
     JIAN-YUN DONG, et al,        )
7                                 )
                      Defendants  )
8
                          TRANSCRIPT OF TESTIMONY OF
9                                MICHAEL FATO
                     BEFORE THE HONORABLE C. WESTON HOUCK,
10                    SENIOR UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Plaintiff:       MR. ERIC KLUMB
                              MR. NATHAN WILLIAMS
13                            Office of the United States Attorney
                              P.O. Box 978
14                            Charleston, SC 29402

15   For the Defendant:       MS. ROSE MARY PARHAM
     Jian-Yun Dong            Parham Law Office
16                            P.O. Box 1514
                              Charleston, SC 29503
17
                              MR. RUSSELL W. MACE, III
18                            Russell Mace and Associates
                              1341 44th Avenue North
19                            Suite 205
                              Myrtle Beach, SC 29577
20
     Vaxima, Inc.             G. WELLS DICKSON, JR.
21   GenPhar Inc.             Wells Dickson
                              124 S. Academy Street
22                            Kingstree, SC 29556

23   Court Reporter:          Amy C. Diaz, RPR, CRR
                              P.O. Box 835
24                            Charleston, SC 29402

25              Proceedings recorded by mechanical shorthand,
     Transcript produced by computer-aided transcription.
```

1                                        *    *    *    *

2                THE COURT:  All right, sir.  Call your first

3      witness.

4                MR. KLUMB:   The Government calls Michael Fato.

5                THE COURT:  Come on, sir, and be sworn right here.

6                THE CLERK:  Please state your name for the record.

7                THE WITNESS:  Michael Fato.

8      THEREUPON:

9                          MR. MICHAEL FATO,

10     Called in these proceedings and after having been first duly

11     sworn testifies as follows:

12                THE CLERK:  And the witness stand is right there.

13                          DIRECT EXAMINATION

14     BY MR. KLUMB:

15      Q. Would you state your full name, please, spelling your

16     last name.

17      A. Sure.  It's Michael William Fato, F, as in Frank, A T O.

18      Q. And how are you employed, Mr. Fato?

19      A. I currently work for the National Institutes of Health as

20     a Grants Management Specialist.

21      Q. Are you in a particular subpart of the National

22     Institutes of Health?

23      A. Yes, I am.  I have worked for the National Institutes of

24     Allergy and Infectious Diseases.

25      Q. Often referred to just as NIAID; is that correct?

1    A. Correct.  NIAID.  Right.

2    Q. And the National Institutes of Health, in what agency

3    does that belong?

4    A. The National Institutes of Health belongs to the

5    Department of Health and Human Services.

6    Q. So just to review that, it's Department of Health and

7    Human Services, NIH, NIAID, and that's where you work?

8    A. Correct.

9    Q. What does a Grants Management Specialist do?

10   A. A Grants Management Specialist, um, reviews awards or

11   grants to make sure that the grants -- I'm sorry, I'm a

12   little nervous.

13   Q. That's all right.

14   A. What we do is we review the grants to make sure they are

15   going to abide by all the certifications.  We negotiate the

16   award.  We look at the budget.  We look at the administrative

17   aspects of the grant itself.  And we work closely with --

18   there is a Program Officer, it's a Scientific Program Officer

19   at the National Institutes of Health, and they do the

20   scientific aspects, as we do the administrative and budget

21   aspects of it, review it for award.

22   Q. What's your current title?

23   A. My current title is a Lead Grants Management Specialist.

24   Q. And what does a Lead Grants Management Specialist do that

25   a Grants Management Specialist does not?

1    A. Basically, the difference is I review other Grants

2    Management Specialist's work and make sure that they are

3    doing their work appropriately, and they are doing all their

4    actions.  They review the administrative and the budgetary

5    portion, as well.

6    Q. How long have you been with NIAID?

7    A. I have been with them for 12 years.

8    Q. And what did you start off as?

9    A. I started off as a Grants Management Specialist.

10   Q. Let's run through a little bit of the grant process.

11            First of all, how does a grant applicant become

12   aware that funding for a grant is available?

13   A. So there is a couple different ways.  There is a website

14   that NIH maintains and they can look for an announcement, a

15   couple different announcements.  There is a general

16   announcement and then there is a specific announcement.

17            A general announcement is for a grant that would

18   leave it up to the institution to develop a grant and submit

19   it to NIH.  There is also a specific announcement, it's

20   called a request for an application, where NIH wants a

21   certain study and we are requesting applicants to apply to

22   that.

23   Q. And what's the name of the kind of general invitation

24   that you described?  Does that have a specific name?

25   A. We just call it a notice or an announcement.

Q. And the more narrow one is an RFA or a Request For Application?

A. Correct.

Q. Let's go through a little bit of that application process then.  Let's say that, whether or not it's a general announcement or an RFA, I want to apply for a grant.  What do I do first?

A. Okay.  So if you want to apply for a grant, then you've got the idea.  You would submit it to the Center For Scientific Review.  What the Center For Scientific Review does is they look at the grants and they will assign it to a specific institute, a specific study section.  A study section is a group of scientists with expertise in a certain area and they review the grant.  So Center For Scientific Review will assign it to the institute and then a study section.

Q. Let me just back up for just a second.  I noticed you said it's assigned to an Institute.  I hear a lot of people say National Institute of Health, but it's really National Institutes, right?

A. Correct.  And if I said Institute, yeah, it's Institutes of Health.

Q. Why is that?

A. There is 27 Institutes.  Like I said earlier, I work for the National Institutes of Allergy and Infectious Diseases.

1    There is also another large one would be the National Cancer

2    Institute, or the National Institute of Mental Health.  There

3    is 27 other National Institutes, or 26 other Institutes

4    including mine, the NIH.

5    Q. You said it's assigned to an Institute and then it goes

6    out for scientific review.  What happens next?

7    A. Okay.  So it's been assigned to the Institute and it's

8    going out for scientific review.  We call that the initial

9    review group or scientific review.  And it's basically

10   scientists from across the country with expertise in that

11   grant field.  And they review the application and they

12   provide a score on scientific merit.  And they provide a

13   score, 1 being the best and 5 being the worst.  And that's

14   what the initial review group does.

15   Q. After that what happens?

16   A. After the initial review group, it goes to a secondary

17   review.  And it's the National Advisory Council at the

18   Institute.  So at the Institute, the National Advisory

19   Council, it looks at the grants that scored well, and it

20   said, Okay, we are going to recommend these for funding.

21   They have reviewed the grants based on the initial review

22   group.  They have just said, Make sure that there is no major

23   issues.  The initial review group has done the specifics, the

24   National Advisory Council has done a broad review and said,

25   These look good, we are going to send them off to the Budget

1    Office of the specific Institute and say, Feel free to send
2    these out for negotiation if you would like.
3    Q. Now, has -- at this stage if it makes it that far in the
4    process, has it reached your office yet?
5    A. Not yet.
6    Q. Okay.  I would like to show you for identification what's
7    been marked as Government Exhibit 193.  It should pop up on
8    your screen in a moment.
9              THE COURT:  Is it in evidence?
10             MR. KLUMB:   No, Your Honor.  I'm just showing it to
11   the witness.
12             THE COURT:  Well, you said pop up on the screen.  I
13   don't know if it's on the jury's screen or not.
14             MR. KLUMB:   No, it should not be.
15             THE COURT:  It certainly should not be, but I'm
16   asking you the question.  Is it?
17             A JUROR:   No.
18             THE COURT:  Okay.
19             Go ahead.
20             MR. KLUMB:   Kill it.  My apologies, Your Honor.
21   We'll move on.
22             THE COURT:  You don't need to move on, I just want
23   to be sure that the exhibit is not published to the jury
24   until it is in evidence.
25             MR. KLUMB:   Understood.

1            THE COURT:  Do you have the exhibit itself?

2            MR. KLUMB:   Not in a physical form, but I saw the

3    witness took a look at it.

4     Q. Did you recognize it?

5     A. I didn't see the whole screen pop up.

6            THE COURT:  Do we have the exhibit physically in

7    hand?

8            MR. KLUMB:   No, Your Honor, just electronic.

9            THE COURT:  How are we going to offer it in evidence

10    then?

11            MR. KLUMB:   I'll move on, Your Honor.  We have --

12    all the other exhibits that are marked we have physical

13    copies.

14            THE COURT:  Okay.

15            MR. KLUMB:  We might return to it if we can work

16    that out.

17     Q. Okay.  So it then goes to the Budget Office, it's

18    reviewed there.  That is not your office yet, is that?

19     A. That's correct.

20     Q. What's the next step?

21     A. Once the Budget Office has received it, they make sure

22    that it's been reviewed by the Assure Review Group and it's

23    been reviewed by the National Advisory Council.  They

24    establish a pay line at the Budget Office, and they say --

25    based on the amount of funds available in our Institute, they

1   say, Okay, we are going to fund grants.  This is just an

2   estimate.  We are going to fund grants that scored between 1

3   and 2, and we are going to award those.  So we are going to

4   issue a release to the Grants Management Specialist and then

5   a Grants Management Specialist will begin its work.  That's

6   what the Budget Office would do.

7   Q. Generally what kind of information has to go into the

8   grant application and start the whole process off?

9   A. Um, there is a form, there is a specific form that needs

10   to be filled out, it's a PHS 398.  And it's -- it's the

11   information about the title.  There is names, budget

12   information.  There is a signature from a business official,

13   face page that tells the -- tells NIH to abide by all the

14   rules and regulations set forth in the document itself.

15   Q. Okay.  Then when does the process get to your office and

16   what would be the involvement of the Grants Management

17   Specialist at that stage?

18   A. Okay.  Once Budget releases it for award or negotiation

19   for award, that's when it gets to my office as Grants

20   Management Specialist.  What I will do is I will take a look

21   at the grant itself, review it for basically the

22   administrative details and the budgetary details to make sure

23   it's all applicable.  I work closely with the NIH Program

24   Officer who is the NIH scientist.  We work together, and

25   together we negotiate the award with the grantee institution

1    or the institution receiving the award.  So we negotiate the

2    award.

3    Q. What kind of negotiation takes place at that stage?  What

4    are you and the grant applicant discussing?

5    A. Me and the grant applicant, we discuss -- basically,

6    there is several items that we discuss -- I'll touch on just

7    a few.  We look for things prior to award and we request

8    information, it's called "just in time" information.  And

9    with this information, we can start our review.

10        One of the things we do is to make sure that the

11    scientist that is actually getting the award has enough time

12    to do the award.  Often the scientists have several awards

13    and we just document the fact that they do have time with

14    this new award.  That's one of the features we look at in the

15    grant.  We also look to make sure that the funds requested in

16    the budget are allowable, and they are allowable to this

17    grant itself.

18        There are several regulations that they have to

19    adhere to, and if the -- if the funds aren't allowable, they

20    shouldn't be in there and you negotiate those out.

21    Q. Okay.  Now, I would like to direct your attention to,

22    say, the timeframe about 2006.  At that point in time did a

23    Grants Management Specialist maintain a file on a particular

24    grant?

25    A. Yes.

1    Q. Now, what kind of file, electronic or paper back then?

2    A. At that time it was a paper file.

3    Q. What do you do today?

4    A. We do electronic files today.

5    Q. And what kind of materials would a Grants Management

6    Specialist retain in the file?

7    A. Any documentation that was related to the grant, any

8    negotiation that took place.  So for example, e-mails, phone

9    calls, documentation to the file on a phone call, mail,

10   regular snail mail, that would come in.  Anything we would

11   maintain in the official file there with any contact we've

12   had with the institution, personal investigator who is the

13   scientist at the institution or the Program Officer at NIH.

14   Q. Let's go through some of the particular documents that

15   would be in there.  The grant application itself you've

16   already discussed.  Would that be retained in the file in the

17   regular course of business?

18   A. Yes.

19   Q. If the grant is awarded, what kind of documentation is

20   generated there?

21   A. So if the grant is awarded we -- we create a Notice of

22   Award.  And what a Notice of Award is -- and that would also

23   be in the official file -- what a Notice of Award is, is the

24   legal binding document saying, Okay, yes we have authorized

25   federal funding for you to do this study.

1          In the Notice of Award, it gives you all of the

2     policy, the regulations, the assurances and certifications,

3     everything that needs to be followed by the grantee once they

4     receive the funds.  It becomes legally binding the moment

5     they drawdown funds and start using money for that research.

6     Q. And then what kind of post-grant monitoring does the

7     Grants Management Specialist do?

8     A. Post-grant monitoring by a Grants Management Specialist

9     starts immediately after the initial award where they are

10    going to answer questions for the grantee, the grantee

11    institution.  And throughout the year if they have questions

12    on anything, re-budgeting, moving money around from line

13    items, questions about how to apply for the next segment, and

14    then it starts again.  Well, it starts, as well, after 12

15    months where we award grants for 12-month segments.  And

16    after the first 12 months, the grantee has to provide a

17    Progress Report to us to let us know what they've done in

18    those past 12 months and what they plan on doing the next 12

19    months.

20    Q. And the progress reports, those would be maintained in

21    the ordinary course of business in the file, as well?

22    A. Correct.

23    Q. And that's submitted by the grant recipient?

24    A. The grant recipient, yes.

25    Q. So far we have been using the term "grant" to describe

1    this funding.  Are there different types of funding vehicles

2    that the National Institutes of Health provides?

3     A. There are.  There are several.

4          THE COURT:  It seems to me that you've educated us

5    all as to the General Grants Program.  And of course, some of

6    what he said, it seems to me, may be applicable to the

7    present case, and though I don't know for sure, some of it

8    may not.  But it looks to me like we've talked enough in

9    generalities and we need to deal with this specific case.

10          MR. KLUMB:   I would be happy to do that, Your

11    Honor.

12          THE COURT:  I don't know whether he had any

13    responsibilities as a Grants Management Specialist with any

14    grants that are involved in this case or not.  He may or he

15    may not.  But still, I think he's talked in generalities.  He

16    talked about a file a minute ago in 2006, and we don't know

17    if a file involved the defendant or -- the defendants or not.

18    There is no testimony to that effect.

19          But it seems to me at some point in time we need to

20    start to deal with the specifics.  Unless you've got a good

21    argument to the contrary, it seems to me we have reached that

22    point.

23          MR. KLUMB:   Thank you, Your Honor.  I'll jump right

24    into it.

25          THE COURT:  All right.

1    Q. Let me show you what's been marked for identification as

2    Government Exhibit 1.  Do you recognize that?

3    A. Yes, I do.

4    Q. And what do you recognize it to be?

5    A. This is a PHS 398 form, which I discussed earlier.

6    That's an application for a grant.

7    Q. Who is the applicant in this case?

8    A. The applicant in this case is GenPhar, Inc.

9    Q. And does the application bear copies of signatures?

10   A. Yes, it does.

11   Q. Whose signatures?

12   A. Um, Jan -- and I'm having trouble with the last name.

13   Q. Spell it for the record.

14   A. Okay.  The last name is W O R A R A T A N A D H A R M.

15   Q. And the purported date of signature?

16   A. September 11th, 2006.

17   Q. As the Judge suggested, we covered -- did you have any

18   involvement at all in the GenPhar grant?

19   A. Yes, I did.

20   Q. And how did that come about?

21   A. In 2008, in year 2 of this grant, I revised the award to

22   unrestricted and to allow animal use or animal studies in

23   this grant.

24   Q. And at that point in time was there a different Grant

25   Management Specialist that had the case, I guess before you?

1    A. Yes, there was.

2    Q. Okay.  And did you inherit the entire file basically at

3    that stage in 2008?

4    A. Yes.

5    Q. Okay.  And became the Grants Management Specialist for

6    this particular grant?

7    A. Yes.

8    Q. Okay.  Is Government Exhibit 1 a true and accurate copy

9    of the -- of your file copy of the grant application in

10   question?

11   A. Yes.

12            MR. KLUMB:   At this time, Your Honor, I would offer

13   Government Exhibit 1 into evidence.

14            THE COURT:  Any objection?

15            MS. PARHAM:   May I see their copy?

16            THE COURT:  Sure.  I thought -- show her a copy.

17   Show the defendant a copy of the exhibit.

18            MS. PARHAM:   No objection, Your Honor.

19            THE COURT:  I couldn't hear you.

20            MS. PARHAM:   No objection.

21            THE COURT:  Okay.  Government's Exhibit 1 is

22   admitted without objection.

23            (Thereupon, Government's Exhibit Number 1 was

24   received in evidence.)

25            MR. KLUMB:   Request permission to publish the

1    exhibits to the jury electronically.

2              THE COURT:  Certainly.

3              MR. KLUMB:   Thank you.  Can we have page --

4              THE COURT:  How many pages is it?

5              MR. KLUMB:   Mr. Fato, can you tell how many pages

6    there are in it?

7              THE WITNESS:  It looks to be about 53 pages.

8              MR. KLUMB:  For the application itself.

9              THE COURT:  Do you ask to publish all 53?

10             MR. KLUMB:   I'm going to go through just a handful

11   of pages, Your Honor.

12             THE COURT:  Well, you see, if you published -- if

13   you publish a part, then the defense, in fairness, has a

14   right to have another part published that gives the jury a

15   better understanding of what's in there.  So what you need to

16   do is tell them what you plan to publish and see what they

17   want to add to that.

18             MR. KLUMB:   All right.

19             THE COURT:  Have you done that?

20             MR. KLUMB:   In advance?  No, Your Honor.  Which

21   pages I plan to publish to the jury, no, I have not.

22             THE COURT:  Okay.  Let's just skip over this.  I

23   don't know that this is a problem at all, but if we -- if you

24   publish five pages out of the 50 some odd pages in that

25   document and some of those five pages are half pages and

1    one-fourth pages and one-third pages, and then the defendant

2    gets a chance to look at the document and says, Look, one

3    half page over here is not enough, you need to publish the

4    whole page.  And invariably where we have partial publication

5    of exhibits, we run into that.

6         And it just seems to me it's better to work it out

7    in advance, and then you could publish to the jury what you

8    want, and at the same time what the defendant wants.  That

9    way they get a better understanding of the total picture;

10   whereas, if I let you publish yours now and then we take a

11   break in 10 minutes and the defendants want to add something,

12   then it's just confusing.  So you've got a lot to do.

13        Let's just take Government's Exhibit Number 1, set

14   it aside, we'll take a break in about 10 minutes, and you can

15   give that to the defendant and tell them what you want to

16   publish during that break; they can tell you what they want

17   to add, okay?  And then we come back and we've got smooth

18   sailing.

19        MR. KLUMB:   All right, Your Honor.  Very well.

20    Q. Let's move, then, to -- well, first of all, let me ask

21   this: Based upon your review of the file, Mr. Fato, was this

22   grant application acted upon by the NIH?

23    A. Was it successful?  Yes, this was a successful

24   application.

25    Q. So did your file also contain, then, the Notice of Award

1    that you described earlier?

2     A. Yes, it did.

3     Q. Okay.  Let me show you what's been marked for

4    identification as Government Exhibit 15 and 16.  Do you

5    recognize those?

6     A. Yes, I do.

7     Q. What do you recognize them to be?

8     A. These look to be a Notice of Grant Award.

9     Q. For what business?

10     A. It looks to be for GenPhar, Inc.

11     Q. And you are looking at Government Exhibit 15 at the

12    moment?

13     A. Yes, I am.

14     Q. And for what budget period is it, and project period?

15     A. The budget period is for September 30th, 2006 to August

16    31st, 2007.  And the project period is from September 30th,

17    2006 to August 31st, 2010.

18     Q. And again, is this the type of document that's generated

19    and maintained in the ordinary course of NIAD's business?

20     A. Yes.  On the successful award it is.

21         MR. KLUMB:   I would offer at this time, Your Honor,

22    Government Exhibit 15 into evidence.

23         THE COURT:  Show them to the defense.

24         MS. PARHAM:   We have what I believe is a copy of

25    the exhibit, Your Honor.

1              THE COURT:  Any objection?

2              MS. PARHAM:   No, Your Honor.

3              THE COURT:  Government's 15, 16 admitted without

4     objection.

5              (Thereupon, Government's Exhibit Numbers 15 and 16

6     were admitted into evidence.)

7     Q. First of all, how many pages is Government 15, Mr. Fato?

8     A. Eleven pages.

9     Q. All right.

10             MR. KLUMB:   The Court's indulgence.

11             (Pause in proceedings.)

12    Q. First of all, let's start with Government Exhibit 15.

13    Let's start with page 1.  Directing your attention to the

14    top, middle part of the page.  Who is identified as a

15    representative of GenPhar?

16    A. The representative here is Jan, and it's the last name I

17    had trouble with and I spelled.

18    Q. We'll just call her Jan from now on.

19    A. Jan W.  Okay.

20    Q. What is her title?

21    A. Here it's listed as business manager.

22    Q. And you indicated that the budget and project period were

23    designated on this exhibit.  Where is that?

24    A. About halfway.  And they are identified as budget period

25    and project period.

1    Q. And is the amount of the grant set forth on this page, as

2    well?

3    A. It is, yes.

4    Q. And where is that?

5    A. The very first sentence after "Dear business official."

6    Q. And what is the amount of this particular grant?

7    A. $974,845.

8    Q. And now turn, please, to page 2.  It indicates there that

9    the Grants Management Officer is Donna Sullivan.  Who would

10   she be?

11   A. She's currently a Divisional Coordinator at the National

12   Institutes of Infectious Diseases and a Grants Management

13   Officer who signed this grant in year '01.

14   Q. And take a look, please, at page 3.  What kind of

15   information is set forth on this page?

16   A. Starting from the top in section 1, it -- it's outlining

17   the salaries and wages that were requested and were awarded,

18   the fringe benefits that were awarded, equipment, other

19   budgetary aspects such as travel costs.

20   Q. Where do those numbers come from?

21   A. These numbers come from the PHS 398 form, which is the

22   application that the grantee submits prior to award, and the

23   numbers may have been negotiated from what was on that PHS

24   398.

25   Q. So they may be the same numbers, but they may be

1    different in some respects?

2     A. Correct.  Based on negotiation, right.

3     Q. Now take a look, please, at page -- it's the bottom of

4    the page, section 3.  You see the heading down there?

5     A. Yes.

6     Q. What does that say?

7     A. Terms and conditions of 1UO1KI 070382-01.  That's the NIH

8    identifier or the grant number.

9     Q. This prefix UO1, does that stand for something?

10     A. NIH awards several different types of grants.  This is a

11    cooperative agreement.  And what a cooperative agreement is,

12    is where the NIH program official, or the NIH scientist, has

13    a lot of input with the principal investigator at the

14    institution as to the direction of the grant.

15     Q. How does the cooperative agreement differ from a straight

16    grant?

17     A. A straight grant versus a cooperative agreement, the

18    straight grant we basically leave it up to the institution

19    for the direction of their grant based on their submission.

20    So they can direct it however they please as long as their

21    goal is the same at the time of submission.  A cooperative

22    agreement can change, the goals can change slightly.  There

23    is a lot of NIH program and scientific input into the

24    direction of a grant.

25     Q. All right.  Then take a look, please, at the next page.

1    I believe that's page 4 on the document.

2     A. Okay.

3     Q. And would you read that out loud to the jury, please.

4     A. "This award is based on the applications submitted to and

5    as approved by the NIH on the above-titled project and is

6    subject to the terms and conditions incorporated either

7    directly or by reference in the following:  A.  The grant

8    program legislation and program regulations cited in this

9    Notice of Grant Award.  B.  The restrictions on the

10   expenditure of federal funds and appropriation acts to the

11   extent those restrictions are pertinent to the award.  C.  45

12   CFR part 74 or 45 CFR part 92 as applicable.  The NIH grants

13   policy statement, including addenda in effect as of the

14   beginning date of the budget period.  E.  This award notice

15   include the terms and conditions cited above."

16    Q. All right.  Thank you.

17          Now, are you familiar with the NIH Grants Policy

18   Statement?

19    A. Yes, I am.

20    Q. What is that?

21    A. The NIH Grants Policy Statement outlined all the rules

22   and regulations and policies that the grantee has to follow

23   during the award process and during the award itself.  That's

24   basically one of our most important documents as a Grants

25   Management Specialist that we go to and we reference quite

1    frequently.

2            THE COURT:  Okay.  Ladies and gentlemen of the jury,

3    it's 11:30.  Let's take a break.  Let's take about 15

4    minutes.  And you can go to your jury room and you can take

5    your pads with you or leave them in your chair there and they

6    will be there when you get back.  Okay.  Have a nice break.

7    We'll recess for 15 minutes.

8            (Thereupon, the jury retired from the courtroom.)

9            (Thereupon, there was a brief recess.)

10            THE COURT:  The Court Security Officer has just

11   handed me a note from the jury.  Normally I copy these and

12   give them to you before I publish them, but as you can see,

13   he just handed it to me.  And it contains two questions.

14   It's not signed.  And normally I require the foreman to sign

15   it, but it says:  "Are we allowed to discuss the case among

16   ourselves at breaks?"  Two.  "When we can't see exhibits on

17   the screen, can we speak up?"

18            Obviously the answer to the second question is, If

19   you are supposed to see them, you can speak up, I guess.  The

20   other one is discussing the case among yourselves.  And I

21   think the rule is we have to instruct them that they can't

22   discuss the case.  I, in all honestly, doubt that they adhere

23   to that instruction, but I think it's one that judges have

24   been giving to jurors from the beginning of time.  And so I

25   think -- I don't know that we have any alternative but to

1    tell them they can't discuss it until the case is given to

2    them and they can discuss it in toto at that time.

3         I think that the difference here -- and I've never

4    tried to research it, and I've never tried to refine it --

5    but I think the difference is that it's unfair and improper

6    for them to discuss the case because they don't have all of

7    the case.  But can they then discuss one witness who just got

8    off the stand, can they discuss his testimony, or can they

9    discuss a photograph somebody just put in or a doctor's

10   testimony?  I mean, I've never looked into it that far.  It

11   seems only human nature that they want to come out of the

12   jury box and discuss what just took place in the courtroom.

13        But I think that we should instruct them that they

14   cannot discuss the case until they receive it in toto.

15        And secondly, if there is anything they can't see or

16   hear concerning any exhibit on the screen or otherwise, just

17   raise their hand and we'll take care of it.

18        Anything else from the Government?

19        MR. KLUMB:  Yes, Your Honor.  Basically, what we

20   did was we provided our exhibit list and the Bates numbers to

21   the defense sometime last week, if not the week before, as we

22   revised our exhibit list.  And my belief is that they have

23   copies of every exhibit that we plan to refer to in the days

24   to come.

25        THE COURT:  Now, who is "they"?

```
 1                    MR. KLUMB:   The defense.

 2                    THE COURT:  Okay.

 3                    MR. KLUMB:   So I am happy, if the defense wants to

 4      see an exhibit before I offer its admission, to show them

 5      that because of course that's the way things --

 6                    THE COURT:  This is from the jury.

 7                    MR. KLUMB:   I'm taking up a different subject.

 8                    THE COURT:  Well, I want to deal with these

 9      questions.

10                    MR. KLUMB:   I'm sorry.

11                    THE COURT:  Anything you add or any objections to

12      what I said?

13                    MR. KLUMB:   No.  The Government agrees that they

14      should be instructed not to discuss this.

15                    THE COURT:  What about the defendant?

16                    MS. PARHAM:   We think that they should be

17      instructed not to discuss.

18                    THE COURT:  Anything you want to add or object to

19      what I said?

20                    MS. PARHAM:   No, sir.

21                    THE COURT:  Okay.  Now, what did you say about the

22      exhibits?

23                    MR. KLUMB:   I'm sorry?

24                    THE COURT:  Well, you've given them to them and

25      that's fine, but it's just a formality.  When a party has a
```

1    document and they want to introduce that, they lay a

2    foundation for it, then the question is, Did you give the

3    other side a copy?  Well, certainly we gave it to them three

4    weeks ago.  Do you have a copy?  Yes, I got it three weeks

5    ago.  But we need to touch that base.  And so as each exhibit

6    is brought up, and as you offer it or lay a foundation for

7    it, then you should point out in the record that Ms. Parham,

8    or whoever is involved, got a copy of it sometime ago, and

9    then I confirm that with them and then we can proceed.

10             MR. KLUMB:   Okay.  Very well.  That's easy to do.

11             THE COURT:  It's just the way you try a case.

12             MR. KLUMB:   I understand, Judge.

13             THE COURT:  And that's the way to do it.

14             MR. KLUMB:   The last --

15             THE COURT:  We put it on the record what happened

16    with that exhibit.

17             MR. KLUMB:   Understood.

18         The last thing that we discussed, too, was that

19    publication of specific pages.  Again, this is a fairly

20    document-intensive case that we would drive them crazy,

21    obviously, if we flipped through the entire exhibit.

22             So the understanding that I have with the defense is

23    that to the extent that they feel that there are pages that

24    should have been covered in direct, they'll take it up in

25    cross.  I have given them the page numbers that I'm going to

 1    cover.  And if there is a change in mind about that and they

 2    want to see something in direct, we can do that, as well.

 3             THE COURT:  Okay.  That suits me.

 4             What -- I think it's Rule 104 -- 106, I always get

 5    the two mixed up -- Rule 106 of the Federal Rules of Evidence

 6    says:  "When a writing or recorded statement or part there is

 7    introduced by a party, an adverse party may require the

 8    introduction at the time of any other part or any other

 9    writing or recorded statement which ought in fairness to be

10    considered contemporaneously with it."

11             That's talking about the introduction of documents.

12    I think that goes to publication, as well, and I enforce that

13    rule as to publication.  And that's what I'm talking about.

14    If y'all are happy with the way you are doing it, that suits

15    me just fine.

16             Okay.  You can bring the jury out.  I said I usually

17    require these questions be signed by the foreman, but since

18    we don't have a foreman, I don't know who could sign it.

19             (Thereupon, the jury returned to the courtroom.)

20             THE COURT:  Okay.  Thank you.

21             I have gotten a couple of questions from you guys

22    during the break, and let me try to answer them.

23             "Are we allowed to discuss the case among ourselves

24    at break?"  The rule is you can't discuss the case until the

25    end of the case, until you hear all the evidence, until you

1    hear the law, and then you can discuss it intelligently.  And
2    the idea behind that is that you just need to see the whole
3    picture before you can make an honest determination as to
4    what it means.  And it's -- it might not be consistent with
5    human nature, and it might sound wrong, and you may have some
6    impulse to talk about the case, but the rule is that you
7    can't.  I don't know what the punishment is if you do it, but
8    I know the rule.

9         It says:  "When we can't see exhibits on the screen,
10   can we speak up?"  Certainly you can speak up any time you
11   want to.  This whole trial is being carried out to give you
12   the benefit of all facts that may be relevant to this case
13   and the law that's relevant to it.  And the lawyers are
14   involved in the presentation, and I'm involved in directing
15   the traffic and the presentation, to some extent, but the
16   whole purpose is to get the information to you.  And so if
17   you can't hear it, if you need for us to go down the street
18   and get you a hearing aid, or whatever, a new battery,
19   whatever it needs, we want to do that to enhance the process
20   and let you hear it.

21        So sure, raise your hand, beat on the side, do
22   whatever you've got to do.  If you can't see it, if you can't
23   hear it, you couldn't understand it, and therefore you want
24   it repeated, do any of those things, and then certainly we'll
25   accommodate your desires to make it better available to you.

1        Okay?

2                    Okay.  You may proceed.

3                    MR. KLUMB:    Thank you, Your Honor.

4        Q. All right, Mr. Fato.  When we left off, I think we were

5        on Government Exhibit 15, the Notice of Award.  So let's go

6        back to the first page of that exhibit, if we could.  And

7        again, what is the budget period that this Notice of Award

8        applies to?

9        A. The budget period is from September 30th, 2006 to August

10       31st, 2007.

11       Q. Now take a look, please, at what's been admitted into

12       evidence as Government Exhibit 17.  Again, the first page.

13       I'm sorry.  Government Exhibit 16.

14       A. Okay.

15       Q. The first page.

16       A. Okay.  I've got it.

17       Q. What budget period does this relate to?

18       A. This looks to be the same budget period, it's September

19       30th, 2006 to August 31st, 2007.

20       Q. Okay.  Why are there two different Notice of Awards for

21       the same budget period?

22       A. Um, if you look in the upper, very first line of the

23       Notice of Award, the last word in that top sentence is

24       "revised."  So this grant was revised for one reason or

25       another.

1       Q. And can you examine the two documents and tell us what

2       the revision would be?

3       A. Absolutely.  Typically in section -- in section 4, which

4       is page 4 of the Notice of Award that's revised, it tells you

5       what the revision is for.  And in this case, it was

6       revised -- "This revise Notice of Award was issued to lift

7       the restrictions on facilities, administrative appropriate

8       fee negotiation that may increase."  Dated 7-17.

9       Q. What does that mean in non-grant fees?

10      A. So when we award a grant at NIH, we award direct costs,

11      and a direct cost is a cost that's directly attributed to the

12      grant itself.  So if a scientist needs some supplies for the

13      study, they put it down as a direct cost, and we put it in

14      the computer as a direct cost.  We also issue facilities and

15      administrative costs or an indirect cost.

16              And an indirect cost is a cost such as utilities or

17      lighting or security to a building or something like that.

18      And we award them that, as well.  So looking at this, it

19      looks like the facilities administrative rate was revised or

20      the facilities administrative cost was revised for one reason

21      or another.

22              THE COURT:  Let me inject myself here a moment.  He

23      has testified as to direct, indirect costs, the meaning of

24      certain terms.  And of course, the issue that arises in my

25      mind is whether or not he can testify as to that.  And I know

1    the defendant hadn't objected, and I don't like to raise

2    evidentiary questions unless the parties get involved in it,

3    but sometimes I need to do that; otherwise, I face a very

4    difficult decision somewhere down the road.  And this might

5    be that place.

6          It seems to me that ultimately what these words mean

7    is what they mean to an average, reasonable person, and not

8    what they mean to an expert Grant Management Specialist in

9    the Office of the Institutes of Health.  Now, that's what the

10   testimony does.

11         Now, is the defendant responsible for this

12   knowledge?  If the juror has a grant, are they responsible

13   for this knowledge, or can they assume that these words mean

14   to them in this grant process and in this contract what they

15   mean to them in their everyday lives?  If that latter is the

16   case, then he can't testify.

17         Now, what's the defendant's position on that?  Do

18   you have any objection to that?  You have no objection so

19   far, I assume maybe you don't mind.

20         MS. PARHAM:   We do object, Your Honor.  We should

21   have objected earlier to his defining those terms to the

22   jury.

23         THE COURT:  I just don't see -- I just think what we

24   are doing is we are basically invading the province of the

25   jury.

1          If you go over to Rule 702, which is a basic expert

2     rule, and it says that:  "A witness can express an

3     opinion" -- and that's what he's expressing, a definition --

4     "if because of certain technical knowledge they have more

5     knowledge than the jury."

6          And you go before Rule 702 and what you have there

7     is no technical knowledge; and therefore, the subject matter

8     means the same thing to the jury as it means to the witness.

9     And that means the jury doesn't need any help with it; they

10    can define that term themselves.

11         And so I think it's very important to draw that

12    line.  And I think in this particular case what we are

13    looking for is if he is able to define all these terms, at

14    some point in time we are coming down to a head-on collision

15    between his definitions and the jury's interpretations.  And

16    it seems to me that when we have that head-on collision, the

17    jury is going to win because it's what they think these terms

18    mean as reasonable people and not what he thinks as a

19    government employee, and a technical one at that.  And so why

20    would we want to get into that maze and create that problem

21    just to have it undone sometime down the line?

22         So I think what we need to do is, unless you can

23    show me some authority and make me some strong argument, is

24    to strike his definition of these terms and instruct the jury

25    to disregard them because of what I just said.  I think they

1    understand what I've said, and I think that they can follow

2    those instructions very well.

3             But I'll be glad to hear from the Government.

4             MR. KLUMB:   I have nothing more to offer.  That's

5    acceptable.

6             THE COURT:   In other words, you agree it's not

7    admissible?

8             MR. KLUMB:   I think there are other witnesses for

9    whom it may be --

10            THE COURT:   I'm talking about the one we are talking

11   about right now.

12            MR. KLUMB:   Yes.  I'm calling an expert witness who

13   I believe has expertise in this area.

14            THE COURT:   Well, you've got a different situation

15   when you have an expert witness, and that's why I referred to

16   Rule 702.  702 is a jumping off place where you start letting

17   witnesses express opinions.  Prior to that, they can't unless

18   they fall under 701, which is a different animal entirely.

19            I hope you understand what I'm -- what I'm talking

20   about.  The Rules of Evidence that we follow in this Court

21   are not difficult.  I mean, once you have them explained to

22   them, you understand why they are there and you understand

23   how they keep the player to your level, and how they let the

24   jury decide the case based upon the proper evidence and the

25   proper law.

1       That what we have here -- let me contrast what we

2   have here and kind of give you a little more of an

3   explanation by looking at Rule 702.  Now, as a general -- as

4   a general rule, a witness can testify only as to his or her

5   knowledge, information that he or she has become aware of

6   through the exercise of one or more of their senses.  They

7   either saw it, they heard it, whatever.  That's what a

8   witness is limited to.

9       Then you get over into expert testimony, and they

10  can do more than that.  They can do more than just testify as

11  to something they became aware of.  They can go further and

12  express an opinion.  And that rule provides as follows -- and

13  you have to fall within the scope of this rule to express an

14  opinion; otherwise, you are limited to something you became

15  aware of through the exercise of one or more senses:  "If

16  scientific, technical or other specialized knowledge will

17  assist the trier of fact to understand the evidence or to

18  determine a fact in issue" -- and bear in mind you are the

19  trier of fact, you are the jury -- "a witness qualified as an

20  expert by knowledge, skill, experience, training or education

21  may testify thereto in the form of an opinion or otherwise if

22  the testimony is based upon sufficient facts or data.  Two,

23  the testimony is reliable principles or methods.  And three,

24  the witness has applied the principles and methods reliably

25  to the facts in the case."

1          In looking at expert testimony, the United States

2     Supreme Court has said that there are two things you look at.

3     One is the testimony must be relevant and it must be

4     reliable.  Now, to be relevant it has to be if scientific,

5     technical or other specialized knowledge will assist the jury

6     to understand the evidence or to determine a fact in issue,

7     then their scientific or technical knowledge must be greater

8     than what you have.  In other words, you must need something

9     in that area to help you decide that fact.

10          And when it comes to defining these terms, you don't

11     need any help.  You know just as much about the definition as

12     he does.  And besides, the parties are not held to a higher

13     standard.  I mean, the defendant receiving a grant has a

14     right to use his experience to interpret it and not to go

15     down the street and get a lawyer or get an expert telling him

16     what these words mean.  And so they mean to you exactly what

17     they mean to you in your everyday life.

18          So his attempt to define them, disregard it.  Give

19     these words the meaning that you would give them in your

20     everyday life, okay?

21          You may proceed.

22          MR. KLUMB:    Thank you, Your Honor.

23     Q. Okay.  Let's -- if you would, Mr. Fato, we are going to

24     be returning to Government Exhibit 1, which you previously

25     testified was the grant application on behalf of GenPhar,

36

1    signed and dated September 11th, 2006.

2     A. Okay.

3     Q. All right.  First of all, directing your attention to box

4    1 of the grant application, at the top of the page, what is

5    the title of this project?

6     A. "Preclinical Evaluation of Trivalent Marburg

7    Vaccination."

8     Q. Now, the Grants Management Specialist who is working this

9    case at the beginning, do they have to understand the

10    technical aspects of the evaluation of trivalent Marburg

11    vaccine?

12     A. No.

13     Q. Who do they rely upon as the technical person working for

14    the Government that monitors that grant?

15     A. The NIH Program Officer.

16     Q. All right.  Now take a look, please, at box 3, entitled

17    "Principal Investigator Program Director."  You see that?

18     A. Yes.

19     Q. Who's identified as the principal investigator?

20     A. John Y. Dong.

21     Q. And what does it mean to be a principal investigator?

22     A. A principal investigator directs the scientific studies

23    of the grant.

24     Q. Okay.  Now I would like to direct your attention to boxes

25    5 and 6.  Number 5 says "Vertebrate Animals."  And a box is

1    checked, correct?

2     A. Yes.

3     Q. And in the next box, 5-A, it says, "If yes, IACUP

4    approval."

5     A. An IACUP approval is an Institutional Animal Care and Use

6    Committee review.  And it gives -- it gives the Institution

7    the okay to study vertebrate animals.

8     Q. And then box 6 is what, sir?

9     A. Box 6, it's the dates of the proposed period of support.

10     Q. January 1st, 2007 to the end of 2010, right?

11     A. Correct.

12     Q. Now, the Notice of Award that we were just looking at,

13    Exhibit 15, that indicated that different timeframe, did it

14    not?

15     A. Yes, it did.

16     Q. Why is that?

17     A. It looks -- item number 6 is a proposed start date, and

18    the negotiations that have taken place were computed prior to

19    that start date.  So the actual start date or the budget

20    period was a little bit sooner.

21     Q. Okay.  And then take a look at box 7.

22          And first of all, I notice that in box 7 there is

23    some handwriting.  Would that handwriting have been on the

24    application when it was submitted to your office?

25     A. I don't believe so.

1    Q. From time to time throughout this document there is

2    handwriting on it that would be put in by the personnel in

3    your office and not the grant applicant?

4    A. That's the way we would document the filings when they

5    were submitted as a paper copy.

6    Q. Okay.  And then in box 7-A is the "Direct Cost."  You

7    previously made reference to this, but let's write that

8    number down.  What is it?

9    A. It's 754,193.

10   Q. And the next box contains a different figure.  It says

11   "Total Costs."  What's that?

12   A. Do you want the figure or what total?

13   Q. The figure.

14   A. The figure that's typed in is 974,845.  And there is a

15   handwritten figure.

16   Q. Okay.  Well, we'll return to that later.

17   A. Okay.

18   Q. And then box 8 is "Costs Requested for Proposed Period of

19   Support."  What are those figures?

20   A. The direct costs in item 8-A, 3,581,844.

21   Q. And the total?

22   A. 4,077,111.

23   Q. That's faster than I could write.

24   A. 4,077,111.

25   Q. All right.  Okay.  Now, to the left of the signature at

1    the bottom of the page is box 14.  Do you see that?

2    A. Yes.

3    Q. Could you read that for the jury, please?

4    A. Yes.  "I certify that the statements herein are true,

5    complete, accurate to the best of my knowledge, and accept

6    the obligation to comply with Public Health Services's terms

7    and conditions of the grant award as a result of this

8    application.  I am aware that any false or fictitious or

9    fraudulent statements or claims may subject me to criminal,

10   civil or administrative penalties."

11   Q. Thank you.  Now let's turn to page 5 of the exhibit, if

12   you would.  Okay.  Do you recognize that particular page?

13   A. Yes, I do.

14   Q. What is it?

15   A. It's a PHS 398 detailed budget page for the initial

16   budget period.

17   Q. And the information on this form, where does it come

18   from?  The applicant or your office?

19   A. The information on this form is supplied by the

20   applicant.

21   Q. Okay.  The first line is designated as "Personnel."  What

22   would that be?

23   A. These are the personnel involved in the study itself, the

24   proposed study.

25   Q. Okay.  And then there are columns across the top are

"Initial Budget Periods, second, third, fourth and fifth."

What do those refer to?

A. I'm sorry. What columns are you referring to?

Q. Oh, I'm sorry. I'm on the wrong page. Got it. My apologies. Let me back up again, just because I was totally off.

What is the -- what does this particular form again refer to?

A. This is the PHS 398, detailed budget page for the initial budget period.

Q. Okay. And then in the column "Months Devoted to Project" to the right of each name of the personnel involved are some calendar months written. In this case what are they?

A. The written figures?

Q. The typewritten.

A. The typewritten? It looks to be 12 months per person.

Q. Okay. And then look at the column for INST Base Salary and Salary Requested." What are those two columns supposed to be?

A. The institute base salary is the salary that is received by each individual at their institution, and the salary requested is the salary requested in this grant.

Q. Okay. So direct your attention, please, to the line for David Holman. It shows his base salary at 50,000 and the salary requested as 30. What would you understand that to

1    mean?

2     A. To mean institutional based salary is $50,000.  He's

3    requesting $30,000 on this grant.  And I would say that he's

4    going to be working about 60 percent of his time on this

5    grant.

6     Q. The column then that has calendar months that all of

7    which say 12, is that -- what is your opinion about that?

8     A. It doesn't look to be accurate with the salary requested.

9     Q. Sort of as the person filling out the form didn't

10    understand it?

11     A. That may be the case, yes.

12     Q. All right.  And the percentage that's written down there,

13    again, that would be done by your office; is that correct?

14     A. That's the way, yes, we used to document files.

15     Q. And the period covered by this particular budget is,

16    what?

17     A. The proposed period covered by this budget is in the

18    upper, right corner, January 1st, 2007 to December 31st,

19    2007.

20     Q. The first year of the grant?

21     A. Correct.

22     Q. At this stage the proposed grant?

23     A. The proposed grant.  Correct.

24     Q. So is this -- is this an actual figure here, the figures

25    on that particular part of the form, or is it projected?

1    A. These are all projected figures and a projected budget.

2    Q. So what would be the total salary requested and fringe

3    benefits for the first year of this proposed grant?

4    A. On the subtotal box it's indicated as 296,459.

5    Q. 296,459.  Now let's take a look at the next page, page 6.

6    A. Okay.

7    Q. And what does this page represent?

8    A. This is a budget for an entire proposed project period.

9    Typically it can be anywhere from one to five years.

10   Q. And in the upper, left-hand corner you see our same

11   number 296,495?

12   A. Under "Initial Budget Period," yes.

13   Q. That would be the projected personnel costs for the first

14   year?

15   A. Correct.

16   Q. And then beneath that we have some other items.

17   "Equipment," for example.

18   A. Yeah.

19   Q. How much was set aside for that?

20   A. $233,900.

21   Q. It also requests supplies, travel, other expenses.  And

22   then you see on the bottom right before the subtotal it says

23   "Consortium Contractual Costs."

24   A. Yes.

25   Q. First of all, what's the dollar amount for that?

1      A. I'm sorry?

2      Q. What's the dollar amount requested?

3      A. 123,760.

4      Q. What are consortium or contractual costs?

5              MS. PARHAM:   Your Honor, I object to him again

6      defining those terms.

7              THE COURT:  You object on what grounds?

8              MS. PARHAM:   To him defining the terms.  The same

9      thing that we talked about earlier.

10             THE COURT:  Okay.  Go ahead.

11             MR. KLUMB:   My position, Your Honor, would be that

12     this is not a matter of expertise.

13             THE COURT:  Okay.  Let me hear from the Government.

14             MR. KLUMB:   Um, yes, Your Honor.  It is a standard

15     form that's used.  It's not a term of art.  It's -- I think

16     the meaning of it is evident from the document.  It's just a

17     document; it's not a matter of technical expertise.

18             THE COURT:  The language is in the exhibit itself?

19             MR. KLUMB:   Yes, it is.  And I think it would be

20     helpful to the jury.

21             THE COURT:  Well, I don't know why it would be any

22     different from any other term.  Now, those terms have a

23     little more technical meaning to them than your average day

24     statement made.  But what I'm thinking about is looking at

25     this grant as a form of a contract, and that the terms of

1    that contract bind the parties.  And if those terms are

2    ambiguous, then you treat them in one way possibly, and if

3    they are not, you treat them in another.

4         And usually when we are dealing with ambiguous

5    terms, which I think ultimately we may find that that's what

6    we are doing with these terms, we just simply apply rules of

7    construction and we know exactly how to apply that.

8         But there is also a rule in this State that we

9    follow very seldom because we don't have it come up, but the

10   Rule is, is interpreting the contract if it's clear and

11   ambiguous it's for the Court to interpret and tell the jury

12   what it means.  And if it is ambiguous, it is for the jury to

13   resolve that ambiguity if it can be resolved.  And of course,

14   the ultimate rule for resolution is to interpret the contract

15   in a certain direction.

16        I don't see any problem with letting this witness

17   testify as to what those terms mean to him because I do think

18   that they have a certain -- the possibility of having more

19   than one meaning.  But in all fairness, if he does that, then

20   I think that the defendant certainly has an opportunity to

21   call a witness or to introduce evidence as to what they think

22   those terms mean.

23        Now, ultimately how we come down on that issue, I

24   don't know.  I don't know how significant it's going to be

25   when we get to the end of the case.  Maybe it's more

1    significant now than it will be then.  But I'm going to

2    permit his testimony -- does he have some government document

3    that the defendant was aware of that interprets these terms?

4         MR. KLUMB:  No.  It's possible, Your Honor, but I

5    can't say that for sure.  There are some terms that I would

6    recognize would be in dispute, and some that I thought were

7    fairly self-evident and would not, and this fell in the

8    latter category.

9         THE COURT:  Okay.  It's a good evidentiary question,

10   and I'm not sure of the answer, but -- and I don't like to

11   change course, but I still think the meaning of these terms

12   is what the defendant or the average person takes them to

13   mean.  And I don't think his testimony is directed at that

14   issue; and therefore, I think the objection is appropriate,

15   it is sustained, and the jury is asked to disregard his

16   interpretation of those terms.  It's for you to determine

17   what they mean, okay?

18        Go ahead.

19   Q. All right.  Approximately how many different grants does

20   a typical Grants Management Specialist monitor?

21   A. We monitor about 150 grants per year.

22   Q. And how long have you been a Grants Management

23   Specialist?

24   A. Approximately 12 years.

25   Q. When you see a projected budget like this one and you see

the term "consortium contractual costs," what do you
understand it to mean?

     THE COURT:  That's what I just sustained the
objection to.  That's objectionable.  What it means to him is
not important; it's what it means to the defendant, the
average person.

     Go ahead.  I sustained the objection again.

Q. All right.  Let's take a look, first of all, at that
first figure, that $123,760 identified for the initial budget
period in the first column, and let's turn to page 8 of
the -- of Exhibit 1, the application.  And let's see if we
see that same figure, 123,760.  You see it on page 8?

A. Yes, I do.

Q. And it's sort of difficult to see on this particular
photocopy, but what is the heading of that entry?

A. Milestone 1.

Q. And then underneath it, what does it say?

A. "AppTec validate cell and viral banks."

Q. And again, when you -- when you see that on a grant
application, what -- dollar amount next to a company that is
not the applicant, what do you understand that to mean?

     MS. PARHAM:  Same objection, Your Honor.

     THE COURT:  I sustain the objection.  I think the
exhibit speaks for itself.

     MR. KLUMB:  Okay.  Very well, Your Honor.

1    Q. In that case, please read the caption for that section on

2    page 8.  What does it say?

3    A. What section?

4    Q. I'm sorry.  Right above Milestone 1 on page 8.

5    A. "Consortium Contractual Agreement."

6    Q. And then underneath Milestone 1 it identifies, what?

7    A. Underneath Milestone 1, it identifies -- is what your

8    question is?

9    Q. Yes, sir.

10   A. It identifies, it looks to me, as a company that would be

11   doing some work.

12   Q. And under Milestone 2?

13   A. "USAMRIID Nonhuman Primate Studies."

14   Q. What amount?

15   A. $606,900.

16   Q. And if we go back to page 5, which was the overall

17   budget, should we see that figure on page 5 for milestone for

18   year 2, USAMRIID?

19   A. There should be some numbers that are the same there.  A

20   milestone and a detailed budget for the year may differ.

21   Q. I'm sorry, I meant page 6.  My apologies.

22           You see that figure there, $606,900?

23   A. Yes.

24   Q. Okay.  Now let's go back to page 8 for Milestone 3.

25   Which companies are identified and the amounts?

1        A. It looks like Molecular Medicine GMP vaccine production

2        for 480,000, AppTec master GMP lot testing for $93,900, and

3        MUSC pilot run for $105,509.

4        Q. And those are titled up under Milestone 4 in the amount

5        of 678,599?

6        A. Milestone 3.  Correct.

7        Q. Okay.  My apologies again?.

8                And then for Milestone 4, what is listed and for

9        what amounts?

10       A. Milestone 4 "MUSC Toxicology Biodistribution Cost" for

11       304,536 and "Gene Logic Toxicology Studies" for 373,000.

12       Q. Let's talk a little bit about, staying on that page,

13       about payments under a grant once it's accepted by NIH.  Do

14       those figures on this particular page have anything to do

15       with the payments to the grant recipient?

16       A. In this case, it looks like Milestone 1 will be completed

17       in year 1 of the grant, since it's also on page 6, for

18       $123,760.  The grantee will drawdown funds from the Payment

19       Management System as needed.

20       Q. All right.  So do the milestones on this particular page

21       control when payments can be drawn down or does something

22       else do that?

23       A. These don't control when they can be paid down.  These --

24       this is just an outline on when the anticipated costs are

25       going to take place.

1        Q. Thank you.  Now let's go to page 23 of Exhibit 1.  What

2    type of page is this for the application?

3        A. This is a PHS 398, detailed budget for the initial budget

4    period.

5        Q. And identified name here is what?

6        A. The identified name is Gene Logic.

7        Q. Okay.  So when you see a form like this and you see a

8    Gene Logic's name on there, they are not the applicant,

9    right?

10       A. Correct.

11       Q. What do they have to do with the work on this grant

12   application?

13       A. Um, on the upper, right corner there is some dates.  And

14   it looks to me that they will be doing some work on this

15   grant later on in this grant.  It looks like it's a

16   third-party doing some work.

17       Q. And is there -- is there a reference to a specific work

18   that they are going to be doing and a dollar amount?

19       A. Yes, there is.  Midway down under "Supplies," it looks

20   like there is going to be some rabbit GLP toxicology studies

21   for $204,000 and some rabbit GLP biodistribution studies for

22   $169,000, totalling $373,000.

23       Q. And that -- this was a four-year grant application.  What

24   year would this be for?

25       A. Based on the projection they wanted the grant to start,

1    this looks like it should be taking place in year 4 of the

2    grant.  And there is a notation on the bottom of the page, it

3    looks like from a Grants Management Specialist in our office,

4    indicating that.

5    Q. All right.  And that's consistent with the date range in

6    the upper right-hand corner, as well?

7    A. Yes.

8    Q. Okay.  Now let's turn to page 29.  What is that?

9    A. This looks to be a milestone timeline.

10   Q. And this -- would this have been prepared by the grant

11   applicant, GenPhar, or your office?

12   A. This was prepared by the grantee application or GenPhar.

13   Q. Okay.  And take a look, please, at task 17 at the bottom

14   of the page.  What is that entitled?

15   A. "Conduct GLP Toxicology Biodistribution Study."

16   Q. And then according to this timeline, what period would

17   this fall into?

18   A. It looks to be the fourth year, or 2010.

19   Q. Consistent with the page 23 that we just examined?

20   A. Correct.

21   Q. Thank you.  Now let's turn to page 33.  It's still part

22   of the grant application, right?

23   A. Yes.

24   Q. This looks like a lot of technical stuff, right?

25   A. Yes.

1    Q. When you review, take a look at a grant application,

2    again, is this kind of information of much concern to you?

3    Yes or no?

4            MS. PARHAM:    Objection to leading, Your Honor.

5            THE COURT:  Go ahead.

6    Q. Do you pay -- what type of attention do you pay to a page

7    like this in the grant application?

8    A. I look at it, but it's more of a programatic review.

9    Q. Okay.  Now, at the very top of this page it says

10   Milestone 2.  Would you read what it states after that?

11   A. Sure.  "Nonhuman Primate Studies, Efficacy Studies and

12   Addressing the Potential Effects of Pre-Existing Immunity,

13   budget $1,004,099.

14   Q. And under task 8, what does it say?

15   A. Determine the minimum numbers of antigens needed for

16   trivalent protective efficacy, USAMRIID 13 through 17, cost,

17   399,450.

18   Q. Do you know what USAMRIID, or USAMRIID is?

19   A. Yes.

20   Q. What is it?

21   A. It's the United States Army Research for Infectious

22   Diseases.

23   Q. And the cost of this particular task you indicated was,

24   what?

25   A. $339,450.

1    Q. Just write that down.  Again, one more time, please?

2    A. 339,450.

3    Q. Now take a look at Milestone -- or I'm sorry -- task 9,

4    if you would.  What does that say, bottom of the page?

5    A. Task 9.  "Determine Effects of Ad5 Pre-Existing Immunity

6    to Protective Efficacy, USAMRIID, months 18 through 22, cost

7    267,450.

8    Q. Do some math.  Those total up to 606,900; is that

9    correct?

10    A. Yes.

11    Q. And let's go back again to page 8 and confirm whether or

12    not we see that figure anywhere -- on page 6, sorry.  You

13    find that figure on that page?

14    A. Yes.

15    Q. And again, it's next to -- it's in what column in what

16    row?

17    A. It's under year 2, and it's across from "Consortium

18    Contractual Costs, Direct Costs."

19    Q. Now, as a Grants Management Specialist, what, if any,

20    concern to you -- in monitoring the grant going farther is a

21    cost like that particular one identified as a consortium

22    contractual cost in the amount of $606,900, do you pay

23    attention to that at all; and if so, for what purpose?

24    A. We do.  We make sure -- it's called justified.  We

25    discuss it with the program officer at NIH to make sure there

1   is a justified cost.

2   Q. Now, what happens if that cost does not occur, is that of

3   interest to you?

4   A. If it's not incurred, they could re-budget funds that are

5   directly related to this grant.  It would still have to meet

6   the goal of the grant and program.  The program officer at

7   NIH would be involved in that, as well, to make sure we are

8   still on task, we are still getting the grant accomplished.

9   Q. And what if it's -- is it of concern to you if it's not

10   within the scope of the grant, if it's re-budgeted for some

11   other purpose that is not within the scope of the grant?

12   A. That would have to come to us, my office, for prior

13   approval.  They would have to discuss that with me.

14   Q. Okay.  Now, moving on, we jumped -- I'm sorry, we are

15   jumping around just a little bit.  Recall that right before

16   the break when we were looking at Exhibit 15, you identified

17   some information about what terms and conditions applied to

18   the grant award.  Do you remember that?

19   A. Yes.

20   Q. And then one of the things you read for the jury was the

21   NIH Grants Policy Statement.  Do you remember that?

22   A. Yes.

23   Q. Okay.  I'm going it show you what's been -- strike that.

24   After showing it to defense counsel.

25            Let me show you what's been marked for

1    identification as Government Exhibit 14.  Do you recognize

2    that?

3    A. Yes, I do.

4    Q. And what do you recognize that to be?

5    A. The NIH Grants Policy Statement.

6    Q. Now, what's the date of that particular document?

7    A. December 1st, 2003.

8    Q. Is that the Grants Policy Statement that is in effect

9    today?

10    A. No.

11    Q. Is that the Grants Policy Statement that would have been

12    in effect in 2006?

13    A. Yes.

14            MR. KLUMB:   At this time, Your Honor, I would offer

15    into evidence Government Exhibit 14.

16            MS. PARHAM:   No objection.

17            THE COURT:  Without objection.

18            (Thereupon, Government Exhibit Number 14 was

19    received in evidence.)

20    Q. Have you read that cover to cover?

21    A. Not all of it, but I would say 90 percent of it.

22    Q. Okay.  You refer to it from time to time in connection

23    with your employment?

24    A. All the time.

25    Q. All the time.  Take a look, please, at page 49.  And

1    directing your attention to the bottom of the page, the

2    section on lobbying, would you read, please, for the jury the

3    first sentence.

4    A. "Recipients of federal grants, cooperative agreements,

5    contracts and loans are prohibited by 31 USC 1352, limitation

6    on use of appropriated funds to influence certain federal

7    contracting and financial transactions from using

8    appropriated federal funds to pay any person for influencing

9    or attempting to influence any officer or employee of an

10    agency, a member of Congress, any officer or employee of

11    Congress, or an employee of a member of Congress with respect

12    to the award continuation renewal, amendment or modification

13    of any of these instruments."

14    Q. Okay.  While you are there, why don't you read the second

15    sentence, as well, please?

16    A. "These requirements are implemented for the HHC in 45 CFR

17    part 93 which also describes the type of activities, such as

18    legislation liaison activities and professional and technical

19    services, which are not subject to this prohibition."

20    Q. Now turn your attention, please, to page 76.  The section

21    on payment.  And read the first sentence, please.

22    A. "HHS grants payments made may be made by one of several

23    advance payment methods, including SMARTLINK II ACH, CASHLINE

24    ACH or cash requests, or by cash requests on reimbursement

25    basis as specified in the NGA, which is Notice of Grant

1    Award.  And as described in this section."

2     Q. Okay.  So basically what are these -- what is the

3    reference here, if you know, to these two methods of ACH

4    payment?  What does that mean?

5     A. I'm unaware.

6     Q. Who is it that handles payment of funds underneath a

7    grant?

8     A. There is a system that we have, it's called Payment

9    Management System.  The funds are put into that system and

10   then the grantee can withdraw as needed.

11    Q. Is that another component of the National Institutes of

12   Health?

13    A. It's a division.  It's another program, yes.

14    Q. Basically the NIH is a bank, if you will?

15    A. Yes.

16    Q. Okay.  Now, read the next sentence, please, beginning

17   with "Payments."

18    A. "Payments under NIH grants generally are made as advanced

19   payments."

20    Q. And then read the last sentence in that -- last two

21   sentences in that paragraph if you would, please.

22    A. "Except as indicated in this section, NIH grant payments

23   are made by PMS, operated by DPM in accordance with the

24   Department of Treasury and OMB requirements as implemented in

25   45, CFR, 74.22 and 92.21.  These requirements are intended to

1    minimize the time elapsing from the transfer of funds from

2    the Federal Government and disbursement by the grantee."

3            I guess I read an extra sentence here.

4    Q. Please continue.

5    A. "Therefore, although the grant may be financed by

6    advanced payments, the intent is that the grantees draw back

7    funds on an as-needed basis.  Specifically, no more than

8    three days before the funds are needed."

9    Q. And the GenPhar grant that we have been discussing that,

10   was that that type of grant?  Were payments to be made in

11   that manner?

12   A. Yes.

13   Q. Take a look, please, at the next paragraph on page 76,

14   the last sentence.  Would you read that aloud, please?

15   A. Sure.  "The grantee is responsible for determining when

16   federal funds have been deposited into its bank account for

17   each drawdown ensuring that the funds are fully disbursed by

18   the close of business the next workday after they are

19   received.  And immediately return all undisbursed federal

20   funds to PMS."

21   Q. All right.  Now let's move on to page 78, if you will,

22   the top of the page where it says:  "Interest earned on

23   advances of grant funds."

24   A. Yes.

25   Q. And read the preamble, if you would, and the first

1    bullet.

2     A. "Except as provided in 45 CFR 74.22 K any NIH grantee

3    subject to the requirements of 45 CFR part 74 that receives

4    advanced payments must maintain those advances in an interest

5    bearing account.  Interest earned on advances of federal

6    funds must be handled as follows:  Nongovernmental grantees.

7    Any interest on federal advances of grant funds that exceeds

8    $250 per year in the aggregate must be remitted annually to

9    PMS as the Government-wide agent for collection."

10              Next sentence?

11     Q. Please.

12     A. "Recipients with electronic funds transfer capability

13    should use electronic means to remit interest."

14     Q. You are familiar with the file in the case of the GenPhar

15    collective agreement -- I'm sorry -- cooperative grant?

16     A. Yes.

17     Q. Were there any indications that any interest payments

18    were ever remitted to the Government?

19     A. Not that I'm aware of.

20     Q. Okay.  Now let's turn, please, to page 79.  And for

21    starters, would you read the first paragraph under the "Cost

22    Principles"?

23     A. Sure.  "In general, NIH grant awards provide for

24    reimbursement of actual allowable costs incurred and are

25    subject to federal cost principles.  The cost principles

1    establish standards for allow ability of costs, provide

2    detailed guidance on the cost accounting treatment of costs

3    as direct or F&A costs and set forth allow ability,

4    allocability, principles for selected items of cost.

5    Applicability of a particular set of costs principals depends

6    on the type of organization making the expenditure.  For

7    example, a for-profit organization collaborating with the

8    university grantee would be subject to the cost principles

9    for commercial organizations, while the university would be

10   subject to the cost principles for educational institutions."

11    Q. Okay.  Thank you.  And then underneath that it lists

12   various sources for these cost principles.  Would you read

13   the last one?

14    A. Sure.  The last one is 48 CFR subpart 31.2, the Federal

15   Acquisition Regulation Contract with Commercial

16   Organizations.

17    Q. And the Federal Acquisition Regulation is oftentimes

18   referred to as what for short?

19    A. The FAR.

20    Q. And then back up in the paragraph that you read us

21   earlier, under the "Cost Principles" there is the, I guess

22   abbreviation F&A.  Without defining the term, what does F&A

23   stand for?

24    A. Facilities & Administrative Costs.  It's often referred

25   to as indirect costs, as well.

1    Q. Okay.  Now let's turn to page 89 of the NIH Guidelines.

2    This is a table.  Are you familiar with what it is?

3    A. Yes.

4    Q. What is it?

5    A. It's a table that shows allowable costs and unallowable

6    costs.

7    Q. And would you read us, please, the entry in the middle of

8    the page having to do with construction?

9    A. "Construction.  Allowable only when program legislation

10   specifically authorizes new construction, modernization or

11   major A&R, and NIH specifically authorizes such costs in the

12   NGA.  When authorized, construction activities may include

13   construction of a new facility or projects in an existing

14   building that are considered to be construction, such as

15   relocation of exterior walls, roofs, and floors, attachment

16   of fire escapes or completion of unfinished shelf space to

17   make it suitable for human occupancy.  See construction

18   grants and subpart B of this part."

19   Q. You know earlier, Mr. Fato, I asked you about different

20   types of grants that your office administers.  Let's just

21   kind of run through the different types that are available to

22   businesses.  We have been covering grants.  Other types of

23   funding?

24   A. We have cooperative agreement, as well.

25   Q. Okay.

1        A. We have construction grants.

2        Q. And what -- how does one apply for those?

3        A. The -- there are very few.  We didn't have construction

4        authorization -- I think we had it in 2003 is when it

5        started.  And one applies -- it's a -- it's a different set

6        of rules.  There is a subsection in this policy statement

7        that shows how it should apply.  NIH gives it a different

8        activity code.  We haven't discussed activity codes, but it's

9        a different activity code specifically for construction

10       grants.  And that's how we know they are construction grants.

11       Q. In this particular case, the application, did it apply

12       for construction costs?

13       A. No.

14       Q. Again, you referred to this earlier as a UO1 grant,

15       correct?

16       A. The grant we are looking at, yes, it's a UO1.

17       Q. And do UO1 grants ever include construction costs?

18       A. No.

19       Q. When you are monitoring and managing a grant after it's

20       been authorized and it's in process in the four-year term,

21       for example, should it come to your attention that grant

22       funds were used in a UO1 grant like this one?

23              MS. PARHAM:   Objection, leading, Your Honor.

24              THE COURT:  Go ahead.  I'll permit it.

25       Q. If you were to find in this case that grant funds were

1    being applied to construction of a building, how would you

2    respond?

3     A. So there would be a couple different ways how I would

4    find out if it was submitted within the --

5              THE COURT:  Wait a minute.  What relevance does that

6    have?

7              MR. KLUMB:   Materiality, Your Honor.

8              THE COURT:  Say what?

9              MR. KLUMB:   Materiality.

10             THE COURT:  That doesn't answer my question.

11             MR. KLUMB:   Um, the Government has to demonstrate

12   that the information alleged to be concealed was material and

13   to show the response of the agency to establish that.

14             THE COURT:  I think there are other ways that you

15   can show materiality without adopting a set of facts that may

16   be very, very important in this case.  I mean, you are asking

17   him questions about the construction of the building.  And

18   what I'm afraid of is though you say it's relevant on the

19   issue of materiality, it may develop in the future that it's

20   relevant or could be considered relevant on other issues such

21   as construction of these contracts.  And I don't know that he

22   can testify to that.

23             It's about 1:00.  And so what I'll do, we are going

24   to recess now for lunch, and we can discuss it maybe a little

25   more fully in the next few minutes.

1          But anyway, ladies and gentlemen, it's time for

2     lunch.  Let's take a lunch break until 2:30.  If you will

3     come back at 2:30, we'll start promptly at that time.  Have a

4     nice break.  It's not as pretty now as when you came in this

5     morning.  The sun has kind of hidden from us.

6          (Thereupon, the jury retired from the courtroom.)

7          THE COURT:  The question is:  "If you were to find

8     in this case that grant funds were being used in the

9     construction of a building, how would you respond?"

10         Basically the great weight of that question has to

11    do with whether or not the construction of a building was

12    permitted under the grant, and that's an interpretation of

13    that grant which I don't think I'm going to let him do.  And

14    it may be material, as well, but I think there is another way

15    that you can get to the question of materiality.

16         MR. KLUMB:  There may be other ways, Your Honor, I

17    can't argue with the Court on that point, but the question is

18    whether it's relevant.  And from the Government's perspective

19    obviously --

20         THE COURT:  Well, that was my first question; it's

21    not necessarily my last question.  I mean, you can -- let's

22    say it's relevant, that doesn't mean it comes into evidence.

23    It could be more prejudicial than it is probative.  And I

24    think it falls within that category.  I mean, one of the big

25    arguments in this case is whether or not under this grant

1    money the defendant could build a GenPhar building.  And what

2    you are getting this witness to say is -- my reading of the

3    documents -- and he has not been qualified as an expert, so

4    to testify upon my reading of the documents -- he couldn't

5    use funds for the construction of the building.  That's where

6    he's testified.  That's what you are asking him right there

7    in so many words.

8            MR. KLUMB:  But, Your Honor, the defendants are

9    accused -- the defendants are accused, among other things, of

10   concealing the fact that funds from the grants were going

11   into the building.

12           We heard in opening statements by counsel that they

13   weren't going to contest that grant funds went into the

14   building.  The question will be is whether or not the

15   defendant thought that it was appropriate or not.

16           To establish the materiality of that concealment,

17   that omission, those misrepresentations, I have to show that

18   the man in the office responsible for administering and

19   monitoring that grant would have responded had he learned

20   that that were the case, that grant funds were going into

21   that building.

22           THE COURT:  And why would he respond to it?

23           MR. KLUMB:  Why would he?

24           THE COURT:  Um-hum.

25           MR. KLUMB:  It's his job to authorize the grant.

1    They are authorizing payments every year.  If they learn that

2    those grant payments are going to go into construction of the

3    building, he's going to respond, he's going to take some

4    action.

5            THE COURT:  All right.  Ms. Parham, have you got

6    something to say?

7            MS. PARHAM:  I don't believe he's qualified to

8    testify as to the key issue in the case.  He's not an expert

9    and the testimony has been that he wasn't even the Senior

10   Program Officer for the first two years of the grant; that he

11   came in later.  So he wasn't even the Senior Program Manager

12   for this grant except for the very last two years.  I mean, I

13   think he's just trying to render an opinion about what he

14   would have done had he known.  He can't even testify that he

15   was the officer for the entire time of the grant.

16           THE COURT:  I think there is a way you can establish

17   what you want to establish by way of materiality without him

18   at least indirectly testifying as to the appropriateness of

19   spending grant money on that building.  I think it's very

20   easy for you to do that.  You know, I haven't been in the

21   case that long, but it seems to me it's very easy to pose a

22   hypothetical to him that would establish materiality.

23           MR. KLUMB:  So just to be -- I don't want to step

24   out of bounds -- if I ask the witness a hypothetical question

25   about whether or not --

1          THE COURT:  You just think about it.  We'll be in

2     recess until 2:30, okay?

3          I mean, you know, you can describe this guy's job,

4     what he does.  You monitor the grants, what do you look for?

5     I mean, he can tell you.  If you find something that's, What

6     do you do?  I mean, it's just so easy to get to the

7     materiality without going such a direct route and actually

8     involving facts that are important in this case; that I just

9     think you can do it another way.

10          MR. KLUMB:  Yes, sir.  Thank you.

11          THE COURT:  I mean, very easily.

12          (Thereupon, there was a lunch recess.)

13          (Thereupon, the jury returned to the courtroom.)

14          THE COURT:  All right, sir.

15          MR. KLUMB:  Thank you, Your Honor.

16   Q. Mr. Fato, when we left off, we were on page 89 of the NIH

17     Grants Policy Statement, and we had just reviewed the section

18     on construction.  Just to bring us back, would you read the

19     first sentence in that block?

20   A. Sure.

21          THE COURT:  Is that document in evidence?

22          MR. KLUMB:  Yes, Your Honor.  That would be Exhibit

23     14.

24          MS. PARHAM:  It is.

25          MR. KLUMB:  Thank you.

1           THE COURT:  Okay.

2       A. "Allowable only when program legislation specifically

3       authorizes new construction, modernization, or major A&R, and

4       NIH specifically authorizes such costs in the NGA."

5       Q. Just to make sure we are on the same page, NGA stands for

6       what again, sir?

7       A. Stands for Notice of Grant Award.

8       Q. And what does A&R stand for?

9       A. Alterations & Renovations.

10      Q. Now I would like to direct your attention to page 6 of

11      the NIH Grants Policy Statement, Exhibit 14.  This is the

12      section of the policy guidelines that contains definitions;

13      is that right?

14      A. Yes.

15      Q. Okay.  Would you read for the jury, please -- I'm sorry

16      to make you the designated reader but you are going to do

17      some -- the definition of Alteration & Renovation, please.

18      A. "Work that changes the interior arrangements or other

19      physical characteristics of an existing facility or of

20      equipment so that it can be used more effectively for its

21      current designated purpose or adapted to an alternative use

22      to meet programmatic requirements."

23      Q. Thanks.  That's good enough.

24           Take a look, please, at the next page, page 7.

25      Would you read, please, the paragraph that defines "Capital

1    Expenditure" down to the parenthetical at the bottom?

2    A. I'm sorry.  You would like me to read the entire

3    paragraph?

4    Q. Let's just read the first sentence.

5    A. Okay.  "The cost of an asset (land, building, equipment),

6    including the cost to put it in place."

7    Q. Okay.  Thank you.

8        Now turn to the next page, page 8.  Would you read,

9    please, the entire definition for Consortium Agreement again.

10   This time without the parenthetical at the end.

11   A. "A formalized agreement whereby a research project is

12   carried out by the grantee and one or more other

13   organizations that are separate legal entities.  Under the

14   agreement, the grantee must perform a substantive role in the

15   conduct of the planned research, and not merely serve as a

16   conduit of funds to another party or parties."

17   Q. And then looking down the page a while, would you please

18   read the definition for Cooperative Agreement.

19   A. "A support mechanism used when there will be substantial

20   Federal scientific or programmatic involvement.  Substantial

21   involvement means that, after award, scientific or program

22   staff will assist, guide, coordinate and participate in

23   project activities."

24   Q. At the bottom of the page, would you read, please, the

25   definition for Direct Costs.

1        A. "Costs that can be specifically identified with a
2        particular project or activity."
3        Q. And now turn to page, if you would, please, to page 9.
4        Earlier I asked you what F&A stood for, you said Facilities &
5        Administrative costs.  Would you read that definition,
6        please?
7        A. "Costs that are incurred by a grantee for common or joint
8        objectives and cannot be identified specifically with a
9        particular project or program.  These costs are also known as
10       'indirect costs'."
11       Q. And please turn the page.  The definition of For-Profit
12       Organization.  Would you read that, please?
13       A. "An organization, institution, corporation or other legal
14       entity that is organized or operated for the profit or
15       financial benefit of its shareholders or other owners.  Such
16       organizations are also referred to as commercial
17       organizations."
18       Q. Would you read the definition of Grantee, please?  Just
19       the first sentence.
20       A. "The organization or individual awarded a grant or
21       cooperative agreement by NIH that is responsible and
22       accountable for the use of funds provided and for the
23       performance of the grant-supported project or activity."
24       Q. Turn the page to page 11.  Would you read the definition,
25       please, of Key Personnel?

1    A. "The PI and other individuals who contribute to the

2    scientific development or execution of a project in a

3    substantive, measurable way, whether or not they receive

4    salaries or compensation under the grant."

5         Do you want me to continue?

6    Q. Please.

7    A. "Typically these individuals have doctoral or other

8    professional degrees, although individuals at the masters of

9    baccalaureate level may be considered key personnel if their

10   involvement meets this definition.  Consultants also may be

11   considered key personnel if they meet this definition.  'Zero

12   percent' effort or 'as needed' is not an acceptable level of

13   involvement for key personnel."

14   Q. Thank you.  Now, those definitions under involvements

15   continue.  And I direct your attention to page 106 of Exhibit

16   14, the Grants Policy Statement -- oh, I'm sorry.  Could we

17   go to 93, please?

18        Let's go to 106.  And would you read for us, please,

19   the section on Capital Expenditures?

20   A. "Capital expenditures for land or buildings require NIH

21   prior approval.  In addition, real property acquired with NIH

22   grant funds may not be conveyed, transferred, assigned,

23   mortgaged, leased or in any other manner encumbered by the

24   grantee without written prior approval of the NIH awarding

25   office or its successor organization."

1    Q. And then I direct your attention, please, to page 133 of

2    Exhibit 14, the section entitled "record retention and

3    access."  If you would, please, just kindly read the first

4    sentence.

5    A. "Grantees generally must retain financial and

6    programmatic records, supporting documents, statistical

7    records and all other records that are required by the term

8    of a grant or may reasonably be considered pertinent to a

9    grant for a period of three years from the date of the annual

10   FSR" -- "from the annual FSR submitted."

11   Q. I don't think we bumped into that before.  What does FSR

12   stand for?

13   A. FSR stands for Financial Status Report.

14   Q. And then finally, turn to page 238 and read the section

15   where it says "The Facilities and Administrative Costs or

16   Indirect Costs."

17   A. "F&A costs are allowable under awards to for-profit

18   organizations."

19   Q. And then underneath that it says "profit or fee."  Would

20   you please read that paragraph?

21   A. "Except for grants awarded under the FPIR STTR program

22   under an NIH grant, no profit or fee will be provided to a

23   for-profit organization whether as a grantee or a consortium

24   participant.  A profit or fee under a grant is not a cost,

25   but it's an amount in excess of actual allowable, direct and

1    F&A costs.  In accordance with normal commercial practice, a

2    profit fee may be paid to a contractor under an NIH grant

3    providing routine goods and services to the grantee."

4     Q. The grant that we have been looking at as embodied in the

5    grant application in Exhibit 1 and Exhibit 2, the Notice of

6    Grant Award, did that include a profit or fee to the grantee

7    GenPhar?

8     A. No.

9     Q. Having previously shown it to counsel, I'm now showing

10    you what's been marked for identification as Government

11    Exhibits 17, 18 and 19.  Would you take a look at those,

12    please, and review them.  Tell me if you recognize them; and

13    if so, what are they.

14     A. These are Notice of Grant Awards.

15     Q. For what grant?

16     A. The GenPhar.  Would you like me to give the grant number?

17     Q. Is it the same grant number that we've seen previously?

18     A. Yes, it is.

19     Q. Okay.

20          MR. KLUMB:   At this time, Your Honor, then I would

21    offer into evidence Government Exhibits 17, 18 and 19.

22          MS. PARHAM:   No objection.

23          (Thereupon, Government Exhibit Numbers 17-19 were

24    received in evidence.)

25     Q. And I'm sorry, let me give you one more.  Having

1    previously shown it to counsel, I'll show you what's been

2    marked for identification as Government Exhibit 20.  What's

3    that?

4     A. This looks to be the NOA or Notice of Award for the final

5    year of the grant.

6     Q. Okay.  So these are the annual Notice of Grant Awards

7    that cover the entire tenure of the award we have been

8    looking at?

9     A. Yes.

10    Q. Okay.

11          MR. KLUMB:   At this time I would offer Government

12    Exhibit 20 into evidence.

13          MS. PARHAM:   No objection.

14          THE COURT:  17, 18, 19, 20 Government's exhibits

15    without objection.

16          (Thereupon, Government Exhibit Numbers 17-20 were

17    received in evidence.)

18    Q. Would you do me a favor and just look at 17, 18, 19 and

19    20 and tell us whether or not under the terms and conditions

20    each one of them incorporates the NIH Grants Policy Statement

21    that we have just been going through?

22    A. Yes.  They all do.

23    Q. Okay.  Thank you.  Having shown it to counsel, I'll now

24    show you what's been marked for identification as Government

25    Exhibit 2.  Take a look at that document, please, tell us

1    whether you recognize and what do you recognize it to be?

2     A. This is a Progress Report for the second year of the

3    GenPhar application that we have been discussing.

4     Q. And how can you tell it's the second year?

5     A. Is this up or not?

6     Q. No.  Right now I'm just -- have you take a look at it.

7     A. NIH assigns grant numbers.  And at the end of the grant

8    number, there is -- there is a year.  And this says -02.  So

9    I know it's the second year of grants.

10     Q. Okay.  Does it bear a signature and a date?

11     A. Yes, it does.

12     Q. What's the date?

13     A. June 25th, 2007.

14     Q. All right.

15          MR. KLUMB:  At this time, Your Honor, I would offer

16    into evidence Government Exhibit 2.

17          MS. PARHAM:  I'm sorry, I didn't hear that.

18          MR. KLUMB:  I offer Exhibit 2.

19          MS. PARHAM:  No objection.

20          THE COURT:  Yes, sir.

21          MR. KLUMB:  Thank you, Your Honor.

22          (Thereupon, Government Exhibit Number 2 was received

23    in evidence.)

24     Q. Let's just make sure that we've got our timeframes right.

25    The first year of the grant, according to Government Exhibit

1    15, which is the first Notice of Grant Award, is what?

2    What's the timeframe?

3     A. The period is 9-30 2006, 8-31, 2007.

4     Q. And Government Exhibit 2 is the Progress Report for what

5    time period?

6     A. This is a Progress Report for the following year, for 9-1

7    2007 to 8-31 2008.  So this gives progress on what was done

8    in year 1.

9     Q. Okay.  So it's the report that follows the first year and

10    precedes the second year.  Do I understand that --

11     A. Precedes the award, yes.

12     Q. Okay.  Now if you would, please, sir, let's take a look

13    at page 1, not the cover page, but the first page of the

14    Progress Report itself, so that we get an idea about what

15    these things look like.  First of all, again, whose signature

16    is on this document?

17     A. Item 13 has Jan W.

18     Q. Thank you.  And who is identified as the principal

19    investigator?

20     A. John Y. Dong.

21     Q. Okay.  Thank you.  Now let's turn to page 2, the top part

22    of the page where it's entitled "Detailed Budget for Next

23    Budget Period, Direct Costs Only," and under personnel.  So

24    the last time we saw one of these it had 12 months written

25    all the way down in the Months Devoted to Project column.

 1    How is this one different?

 2     A. This one people have various months devoted to the

 3    project.

 4     Q. And is this report that we are looking at right now, is

 5    this a projection of personnel costs or a statement on the

 6    personnel costs from the previous year?

 7     A. This is going to be a projection for the costs for the

 8    upcoming year to be awarded.

 9     Q. And then again, like the grant application itself, there

10    are different locations on this form for other information

11    such as equipment, consortium costs and the like?

12     A. Correct.

13     Q. And what consortium cost is identified in this particular

14    document?

15     A. There -- it looks to be about 600 -- $6,900 -- $606,900.

16     Q. And that's the same figure that we saw previously in the

17    grant application itself, Exhibit 1?

18     A. Yes.

19     Q. Thank you.  Now, is there somewhere on this form where

20    the grantee is supposed to report the actual time spent by

21    personnel from the previous grant period?

22     A. There is a form that is in the PHS 2590 that should be

23    included in here.

24     Q. Okay.  And why don't you find it for us.  If it's there,

25    tell us what page it's on.

1    A. It's page 9.  It's called the "Key Personnel Report."

2    Q. Let's go to that.  Okay.  Now, on the column "Months

3    Devoted to Project," do you see that?

4    A. Yes.

5    Q. How many months is devoted to project by David H. Holman,

6    Ph.D.?

7    A. 7.2 months.

8    Q. And Jan W.?

9    A. Jan W., 7.2 months.

10    Q. Do you happen to know the math on that?  7.2 months is

11    what percentage of a year?

12    A. 60 percent.

13    Q. 60?  Thank you.

14         Now if we could go back to Government Exhibit 1,

15    page 5.  Now, the Key Personnel Report that we just left on

16    Exhibit 2 had four people listed on it.  This one has --

17    well, it looks like seven or more.  Is that an issue?

18    A. The Government Exhibit 1 is a projection and it shows

19    what they project who is going to be working on the grant.

20    And there is a difference here on the key personnel report

21    and it shows who actually worked on the grant.  That would

22    raise -- I would have some questions about personnel.

23         A JUROR:  I'm sorry, I'm a bit confused.  I don't

24    know if I'm allowed to ask a question.  Is this -- this, what

25    we are looking at now, was this what was supposed to happen

1    versus what was reported was before --

2            THE COURT:  Let's just -- let's just --

3            A JUROR:  I'm sorry.

4            THE COURT:  Go ahead.

5            MR. KLUMB:    Thank you, Your Honor.

6    Q. Okay.  Let's -- let me show you what's been marked for

7    identification as Government Exhibit 6.  Having shown it to

8    counsel.  Do you recognize that document?

9    A. I do.

10   Q. What do you recognize it to be?

11   A. It looks like an e-mail, e-mail correspondence from a

12   specialist in my office, or previously in my office, to Jan

13   W.

14   Q. What is that specialist's name?

15   A. Kimberly Belk.

16   Q. And that's page 1 of the document?

17   A. Oh, I'm sorry, that's page 2, or the second page.  It's

18   listed as page 1 on the bottom, but it's the second page of

19   the document.

20   Q. Got it.  That is an e-mail from and to and what date?

21   A. August 29th, 2007.  And it's from Kimberly Belk to, it

22   looks like John Dong at MUSC and Jan W. at GenPhar.

23   Q. And do you know whether or not Kimberly Belk had previous

24   involvement in the administration of this particular grant?

25   A. She did, yes.

1       Q. And was this -- these series of documents in the file

2    that you inherited, I think you said in 2008?

3       A. Yes.

4           MR. KLUMB:    At this time then, Your Honor, I would

5    offer into evidence Government Exhibit 6.

6           MS. PARHAM:    We object, Your Honor.  He's not any

7    of the individuals listed in that e-mail, and so I think they

8    need someone else to verify it.

9           THE COURT:  Let me see the exhibit.  I'm not sure I

10   know what's in it.

11          MR. KLUMB:    Would you like the witness's copy, Your

12   Honor?

13          THE COURT:  Say what?

14          MR. KLUMB:    Would you like the witness's, the

15   original exhibit or --

16          THE COURT:  Yeah.  I want a copy of it, yeah.  I

17   have never seen it.  I need to know what it is.

18          What's your objection?

19          MS. PARHAM:    Your Honor, he said that he found it

20   in his file, but he's none of the individuals listed in the

21   e-mail.  So I think they need some individual that either

22   sent or received the e-mail to say that they sent or received

23   it.

24          THE COURT:  Well, first of all, it's hearsay.  It's

25   obviously hearsay.  It's not some statement he made; it's

1    some statement that somebody whose got the longest last name

2    I've ever seen in my life made.  And it's a correspondence

3    between that person and Kimberly Belk.  And I think you first

4    need to get around the hearsay rule.

5              MR. KLUMB:  I'm offering it under the business

6    records exception.

7              THE COURT:  Say what?

8              MR. KLUMB:  I'm offering it under the business

9    records exception.

10             THE COURT:  Well, you have to lay a foundation for

11   that.  You just don't call it a business record.  There are

12   certain things that you have to bring out to establish that

13   it does fall within that category, and it's an exception to

14   the hearsay rule as a result thereof.

15             MR. KLUMB:  Okay.

16             THE COURT:  I mean, it's just not that simple.  Let

17   me look at it further.

18             (Pause in proceedings.)

19             MR. KLUMB:  Your Honor, if it please the Court?

20   Your concern is well taken, and I'll --

21             THE COURT:  Just a minute.

22             MR. KLUMB:  Okay.

23             (Pause in proceedings.)

24             THE COURT:  Okay.  Go ahead.

25        Q. Earlier when we discussed how it is that people in your

1    office build a file, we mentioned the types of documents that

2    are obtained in a file in the ordinary course of its

3    business.

4    A. Yes.

5    Q. And again, what type of documents would those include?

6    A. E-mail correspondence, official documents, mail

7    correspondence, notes to file about a phone call.

8    Q. And these are phone calls or e-mails with the grantee or

9    its representatives?

10    A. Correct.

11    Q. Okay.  And in particular, would it be your habit and

12    routine practice and that of your colleagues to include

13    correspondence that places further questions to the grantee

14    based upon the issues raised by the Progress Report?

15    A. Yes.

16    Q. Okay.  Now, let's just break this document down and

17    identify a little better.  The first page of the exhibit, the

18    one with the exhibit sticker on it -- I'm sorry -- the first

19    page of the exhibit, without getting into its content, is an

20    e-mail from whom to whom on what date?

21    A. First page is an an e-mail from Jan W. to Kimberly Belk,

22    cc'ing John Dong and Patricia Repik, who is an NIH Program

23    Officer, October 29th, 2007.

24    Q. Page 2 of the exhibit is, what?  Again, without giving us

25    content, just the to and from and the date?

1      A. Page 2 is an e-mail from Kimberly Belk to John Dong,

2    Patricia Repik and Jan W. on August 29th, 2007 at 11:25.

3              THE COURT:  Do you have that personal knowledge or

4    are you just reading from the documents?

5              THE WITNESS:  I'm reading from the documents.

6              THE COURT:  You don't have any personal knowledge?

7              THE WITNESS:  I had -- they are in my official file.

8              THE COURT:  Say what now?

9              THE WITNESS:  These are kept in the official file.

10             THE COURT:  I know.  But he was asking you certain

11   dates.  He asked you what the content was.  You answered that

12   question based upon what you read from the exhibit here

13   today, right?

14             THE WITNESS:  Correct.

15             THE COURT:  Not through any personal knowledge?

16             THE WITNESS:  Correct.

17             THE COURT:  Have you ever seen this before?

18             THE WITNESS:  Yes, I have.

19             THE COURT:  In getting ready for this trial?

20             THE WITNESS:  Um, yes.

21             THE COURT:  Otherwise --

22             THE WITNESS:  Um, they -- I would have had to have

23   seen them when I reviewed the official file when I picked it

24   up in year 3.

25             THE COURT:  You do 150 of those a year, you say?

1          THE WITNESS:  That's an estimate.  Yes.

2          THE COURT:  Okay.  All right.  Go ahead.

3     Q. And again, just describe the third page, please.  Without

4     giving us the content, just describe what it looks like.

5     A. The third page is -- it looks like a Key Personnel Report

6     from a PHS 2590.

7          MR. KLUMB:   At this time, Your Honor, I would offer

8     the exhibit into evidence under 803(6).

9          MS. PARHAM:   I again would object that it's not

10    properly authenticated.  It's in his file but he's not one of

11    the people that's a party to the e-mail.  So we don't know

12    who sent it.

13         MR. KLUMB:   The business records exception requires

14    testimony with a person with knowledge; not necessarily a

15    person creating a record.

16         THE COURT:  Well, it generally requires a custodian

17    or some suitable person, and I think he falls within the

18    suitable person category.

19         But you mentioned the personal knowledge, and I

20    don't know that that base has been touched.  That's the key

21    to business records exception to the hearsay rule is you can

22    assume that the person who made the entry had knowledge and

23    had the intent to make a truthful entry, and that's what

24    gives you the credibility that you would normally get with

25    non-hearsay evidence.  And you haven't touched on the

1    knowledge of the person making this entry.  You are talking

2    about his knowledge, but you don't talk about any other.

3              MR. KLUMB:    Thank you, Your Honor.  Then my

4    alternative grounds for offering that would be as a statement

5    of a party because GenPhar is a party to this action.  And

6    the e-mail purports to be from Jan Woraratanadharm under the

7    business manager for GenPhar who has signed all of the

8    applications that we've discussed so far.

9              THE COURT:  Well, I didn't know that.  I mean, I --

10   her name Jan has been used here, it's used as Jan, and the

11   last name is W O R A R A T A N A D H A R M, and she is an

12   employee of the defendant; is that correct?

13             MR. KLUMB:    Yes, she was identified.  And what's

14   been admitted as Government Exhibit 1 as the business manager

15   who signed the grant application, and Exhibit 2 the --

16             THE COURT:  What about that, Ms. Parham, any

17   question about that?

18             MS. PARHAM:    No, sir.  She was working at GenPhar,

19   but it's still not properly authenticated.

20             THE COURT:  That's not what I asked you.  I asked

21   you if you had any question about what he said her

22   relationship with the defendant corporation was.

23             MS. PARHAM:    I don't.

24             THE COURT:  What about that?

25             MR. DICKSON:    I have a question about that

1    relationship.

2              THE COURT:  Let me glance at it.

3              Let me go back just one minute.  Obviously if she is

4    an employee of the defendant and not an employee of the

5    Federal Government -- and I thought she was an employee of

6    the Federal Government -- then it couldn't be a business

7    record of the Federal Government.  I mean, an employee of the

8    defendant can't create a business record for the Federal

9    Government.  And so I think that that identification of her

10   in that category would take it out of the area of being the

11   Government's business record.  But let me look at it further

12   and see if it's admissible as a statement by the defendant

13   Jan.

14              (Pause in proceedings.)

15              THE COURT:  The present objection I have on the

16   table is a proper foundation has not been laid for it.  The

17   only foundation that's been laid for this Government's

18   Exhibit 6 is the testimony of this witness to the effect that

19   he found it in the file at the National Institutes of Health.

20   And I don't think that's sufficient foundation to introduce

21   it as a statement by the defendant; and therefore, on that

22   ground at this time -- I'm not saying it's not subject to

23   being admitted, I'm not saying you can't tie it up at some

24   later date -- but based upon the record at the present time,

25   I don't think you've done that, and I sustain the objection

1    on the grounds it is hearsay and hasn't been shown to be an

2    exception to the hearsay rule.  And secondly, a proper

3    foundation for it has not been laid.

4            MR. KLUMB:   Okay, Your Honor.

5            THE COURT:  And ladies and gentlemen, I hope you

6    understand what we are talking about.  But hearsay is a

7    statement that someone makes on the witness stand to the

8    effect that somebody else said something.  In other words,

9    I'm on the stand and I'm sworn, Aunt Suzy said John shot Joe,

10   that's hearsay.  Aunt Suzy has got to testify to that.  And

11   so it's a very important evidentiary exception in our case.

12           Now, there are certain exceptions to that.  If Aunt

13   Suzy says something that's not intended to be accepted for

14   its truth, in other words, John shot Joe, she made that

15   statement and intended that it established that John did

16   shoot Joe.  There are some statements that can be made that

17   are not offered for their truth.  There are statements that

18   based on their own self and the fact that they were made have

19   certain value to the jury.  But if it's offered for its

20   truth, which most statements are, it's hearsay, and this is

21   hearsay.  And therefore, I sustained the objection until they

22   can get around that rule, if they choose to do so, and if

23   they ultimately do, okay?

24           You may proceed.

25           MR. KLUMB:  Just to make sure we don't lose track of

1    the paper, Mr. Fato, could I have that back?  And does the

2    Court still have the copy of Exhibit 23?

3              THE COURT:  Say what, sir?

4              MR. KLUMB:   Do you still have the -- does the Court

5    still have the copy of Government Exhibit 23?

6              THE COURT:  Exhibit 6?

7              MR. KLUMB:   I'm sorry.  Yes, sir.

8              THE COURT:  I have it right here.

9    Q. Okay.  I'm going to show you what's been marked for

10   identification, Mr. Fato, as Government Exhibit 23.  We are

11   not going to be offering it into evidence at this time, but I

12   would just like to ask you to look at it, tell me if you

13   recognize it.

14   A. This is an e-mail from Jan to Kimberly Belk.

15   Q. An e-mail thread, several e-mails stacked together?

16   A. Yes.

17   Q. Where did that come from?  Do you recognize it?

18             THE COURT:  Until this document is in evidence, it

19   can't be published in whole or in part, and that's what you

20   are doing.

21             MR. KLUMB:   Understood, Your Honor.

22             THE COURT:  Say what?

23             MR. KLUMB:   Understood.

24             THE COURT:  Well, you can't do that.

25             MR. KLUMB:   I understand that now.

1      Q. Where did it come from?

2           THE COURT:  If he knows of his own personal

3      knowledge, but all he's doing is reading the document and

4      answering the questions.

5           MR. KLUMB:   Your Honor, I took the Court's

6      objection to heart.  I'm not going to offer it; I'm going to

7      wait until we get another --

8           THE COURT:  That doesn't make any difference what

9      you took to heart.  We are worried about what you are doing

10     right now.

11          Go ahead.

12     Q. Do you know where that document, the pieces of paper came

13     from?

14     A. Yes.

15     Q. Where?

16     A. The official file.

17     Q. Okay.  Thank you.  Okay.  Let's take a look, please, at

18     Government Exhibits 3 and 4.

19          THE CLERK:  Would you repeat those numbers, please?

20          MR. KLUMB:   3 and 4.

21     Q. Having shown them to counsel, I'll now show them to you,

22     Mr. Fato.  Take a look at them and tell me whether or not you

23     recognize them.

24     A. These are the Progress Reports for the GenPhar

25     application that we have been discussing for the years 3 and

1  grant.

2           MR. KLUMB:   At this time Your Honor, I would offer

3  into evidence Government Exhibits 3 and 4.

4           MS. PARHAM:   No objection.

5           (Thereupon, Government Exhibit Numbers 3 and 4 were

6  received in evidence.)

7  Q. And let's start with Exhibit 3 and go to the first page

8  of the exhibit entitled "Grant to Progress Report."

9  A. Okay.

10  Q. And does this one bear a signature, as well?  Mr. Fato,

11  does this one have a signature on it, too?

12  A. Yes, it does.

13  Q. And whose?

14  A. Jan W.

15  Q. And the date?

16  A. June 30th, 2008.

17  Q. Now turn it over to the next page -- I'm sorry, two pages

18  later, page 3.  And just so that it's clear:  On these

19  Progress Reports, when we see in the upper left-hand corner

20  of this table, "Detailed budget for next budget period direct

21  costs only," is that a projection or a historical statement?

22  A. This is a projection.

23  Q. And later in the same exhibit will we find a statement

24  about the previous year's time and how it was expended?

25  A. Yes.

1      Q. Okay.  What page is that?

2      A. Page 13, the "Senior Key Personnel Report."

3      Q. And where -- where would we find in that table the time

4      supposedly spent in the previous year by the key personnel?

5      A. On the right side.  "Months Devoted to Project."

6      Q. All right.  And for the next Progress Report, Exhibit 4,

7      does that also have the projected hours for the next year and

8      the actual hours for the previous?  Let's look at it and

9      confirm it for us, if you would.

10      A. Yes, it has both.

11             MS. PARHAM:  Your Honor, we have a matter of law to

12      take up with the Court on this exhibit.

13             THE COURT:  I'm sorry.  What did you offer into

14      evidence?

15             MR. KLUMB:  No, I didn't, Your Honor.

16             THE COURT:  Say what?

17             MR. KLUMB:  I did not offer it into evidence.

18      Counsel indicated she has a matter of law that she would like

19      to take up with the Court.

20             THE COURT:  Does it have to do with the questioning

21      of this witness?

22             MS. PARHAM:  No, sir, it has to do with that

23      exhibit that I objected to.

24             THE COURT:  When he offers it, I'll hear your

25      objection and we'll rule.

1              MS. PARHAM:    Yes, sir.

2     Q. Let me ask you this, Mr. Fato:  During the period of time

3     that you worked on this grant, was the grant that we have

4     been discussing, started with Exhibit 1, was that the only

5     form of funding extended by the National Institutes of Health

6     to GenPhar?

7     A. No.

8     Q. How many others were there?

9              THE COURT:  Now, are these involved in this

10    particular case?

11             MS. PARHAM:    No, sir, they are not.

12             THE COURT:  It's my understanding that the

13    Government brought this prosecution and they contend that the

14    defendants -- I'm not sure which defendants should be in that

15    statement, but I'll say defendants just to be on the safe

16    side -- procured certain grants from the Government which

17    caused them to receive money from the Government, and somehow

18    or another they didn't spend that money the way they should

19    have and that constituted a crime, okay?

20             Now, I don't know why other grants that don't have

21    anything to do with this prosecution are admissible.  Now,

22    there are all kind of ways they could be admissible,

23    knowledge and all kind of things like that, but I don't know

24    about that.  And until I hear about it, I can't let them in

25    evidence because we've got enough to worry about worrying

1    about this case, not loading the wagon down with stuff that

2    doesn't have anything to do with this case, okay?

3            MR. KLUMB:   I understand.  If I can briefly

4    respond, Your Honor?  This is a different type of funding

5    vehicle.  And I wanted to introduce it for the purpose of

6    showing that representatives of GenPhar, the corporate

7    defendant, understood the difference.

8            THE COURT:  Well, you can get him to identify it and

9    mark it for identification, and maybe sometime when we take a

10   break or something, or I learn more about the case later on,

11   I can see where that's relevant, but I really can't see it

12   now.

13           MR. KLUMB:   Okay.  I'll have him do that.  Thank

14   you.

15           THE COURT:  And it also looks like it has a good

16   potential for confusing the issues.

17           MR. KLUMB:   Very well.

18    Q. Let me just show you for identification purposes what's

19   been marked as Government Exhibit 24.  Again, without getting

20   into its substance, can you tell us what type of document it

21   is?

22    A. This looks like the new form of a grant, the FS 424.

23    Q. And that particular document, where did it come from?

24   Where did the pieces of paper come from?

25    A. They would have come from the official file kept at NIH.

1    Q. And this is a grant application that is different than

2    the one that we have been addressing in Exhibit 1; is that

3    correct?

4         THE COURT:  Now, let's go back and identify his

5    knowledge of this document.  He says it looks like it came

6    from somewhere.  Now, I just don't want to get any deeper in

7    this if he doesn't have some knowledge.  What he's doing is

8    reading the document and looking at it and saying, you know,

9    This came from such and such.  I can go down to Judge Blatt's

10   office and they can hand me a document, I think I can look at

11   it and tell them where it came from, but that doesn't mean I

12   had any knowledge before I walked in that office.

13        So, I mean, have you ever seen that before today?

14        THE WITNESS:  Actually I have, yes.

15        THE COURT:  Just to get ready for trial?

16        THE WITNESS:  No, I issued this.

17        THE COURT:  Huh?

18        THE WITNESS:  I awarded this grant.

19        THE COURT:  So you are familiar with it?

20        THE WITNESS:  Yes.

21        THE COURT:  Well, why did you say it looks like it's

22   a certain type document when you know what it is?

23        THE WITNESS:  That's probably just my ignorance on

24   the stand here.

25        THE COURT:  Okay.  Well, you don't sound too

94

1    ignorant to me.  Maybe I'm the one who is ignorant, but

2    anyway, go ahead.

3            MR. KLUMB:  Given the Court's ruling, I'm satisfied

4    that it's authenticated and we'll take it up later.  I'm not

5    going to --

6            THE COURT:  It suits me to take it up later because

7    I need to hear your argument.  Even if he lays an adequate

8    foundation, then I gather Ms. Parham's objection is based on

9    relevance or whatever, then I'm not going to let it in until

10   that objection is satisfied.  And right now I can't satisfy

11   it because the record doesn't permit me to do it.  But since

12   he did the exhibit, he did this grant himself, then I think

13   that he should be able to identify it because he is not going

14   to be on the stand all week, is he?

15           MR. KLUMB:  No.  With any luck, I'll be turning him

16   over for cross-examination in 10 minutes or so.

17           THE COURT:  Okay.  I think the best thing to do is

18   to get him to identify this as something that he was involved

19   in, and the extent to which you need to get, you know, and

20   the fact that it came out of the file, or whatever, then

21   we'll move on.

22   Q. Just for the record, would you describe the exhibit,

23   please?

24   A. Um, this is -- it's the new format for -- it's the SF

25   424.  It replaced the PHS 398 that we were looking at

1    previously.  It's an application for a small business grant.

2     Q. And a grant that you were personally involved with?

3     A. Yes.

4     Q. Okay.  Now, let me show you what's been marked for

5    identification as Exhibits 30 and 31.  Again, I'm not going

6    to offer them, I'm just going to do the same thing with

7    these.  And tell us if you recognize them, what they are.

8     A. The first exhibit you handed me is an E SAP report, which

9    is a Streamlined Annual Progress Report.

10     Q. That's Exhibit 30?

11     A. Correct.

12     Q. And for the same grant that you've just described?

13     A. Yes.

14     Q. And Exhibit 31.

15     A. It's an Annual Progress Report for year 2 of the same

16    grant I just described earlier.

17     Q. During the period of time that you administered the

18    grants?

19     A. Yes.

20     Q. The grant.  Sorry.

21     A. Yes.

22     Q. Thank you.  Why don't you give me back 30, 31 and 24.

23    Thank you.

24          Now, during the period of time that you administered

25    the grant that was embodied in Exhibit 1, the application --

1      so we are back to the first grant.

2       A. Okay.

3       Q. During the period of time that you administered that, did

4      you make any site visits to the premises of GenPhar?

5       A. No, I did not.

6       Q. At any time during your administration of the grant, did

7      any representative of GenPhar tell you that they were

8      building a building?

9       A. No.

10      Q. During that same time period, did any representative of

11     GenPhar ask you any questions about the permissibility of

12     using grant funds for new construction?

13      A. No.

14      Q. During the period of time that you administered the

15     grant, did you have discussions with GenPhar personnel at

16     all?

17      A. I can't recall specifically.  There well may be an e-mail

18     in the file where I have had discussions regarding the

19     Progress Report for year 3.

20      Q. But other than that limited contact?

21      A. Correct.

22      Q. As a matter of habit and routine practice, do you have

23     discussions with grant recipients about various issues about

24     the grant?

25      A. Yes.

1    Q. Either through telephone or an e-mail?

2    A. Yes.

3    Q. During the period of time that you administered the

4    grant, did you have any discussions with representatives of

5    GenPhar about the permissibility of using grant funds for

6    lobbying?

7    A. No.

8    Q. Did anyone from GenPhar ask you whether that was

9    permissible?

10   A. No.

11   Q. During the period of time that you administered the

12   grant, did you have any discussions with representatives of

13   GenPhar about whether or not if they were able to reduce

14   their consortium costs, as identified in the grant

15   application, whether they could keep and use the funds saved

16   for non-grant-related purposes?

17   A. No.

18   Q. No one asked you that question?

19   A. No one.

20         MR. KLUMB:   May I have a moment, Your Honor?

21         (Pause in proceedings.)

22   Q. Having shown them to counsel, I'm now going to show you

23   what's been marked for identification as Government's

24   Exhibits 21 and 22.  And I'm not going to be offering them

25   for reasons previously discussed, but if you would just take

1    a look at them and tell me whether or not you recognize them

2    and what you recognize them to be.

3    A. These are Notice of Grant Awards for small business

4    location for years 1 and 2.

5    Q. For GenPhar?

6    A. Yes.

7    Q. And where did the pieces of paper come from?

8    A. These are generated by NIH.  These are the --

9    Q. Retained in your official files?

10    A. Yes.

11    Q. Then let me show you what's been marked, finally, as

12    Government Exhibit 32.  Having previously shown it to

13    counsel, do you recognize that document?

14    A. This is a Final Progress Report.

15    Q. For which grant and what grant recipient?

16    A. The grant recipient is GenPhar, and it's for the

17    cooperative agreement that we discussed earlier today.

18            MR. KLUMB:  At this time I would offer Government

19    Exhibit 32.

20            MS. PARHAM:   No objection.

21            (Thereupon, Government Exhibit Number 32 was

22    received in evidence.)

23            MR. KLUMB:  And that's all the questions I have at

24    this time.

25            THE COURT:  Okay.  Cross-examination.

1           MS. PARHAM:   Thank you, Your Honor.

2           MS. PARHAM:   May I approach the witness, Your Honor?

3                         CROSS-EXAMINATION

4    BY MS. PARHAM:

5     Q. Government's Exhibit 1, the Marburg NIH grant

6    application, can you look through there and see where you see

7    my client's signature?

8     A. I don't see it.

9     Q. In fact, the only person who signed Government's Exhibit

10   1 is Jan Woraratanadharm, correct?  On page 1?

11    A. Correct.

12    Q. And likewise, on Government's Exhibits 2, 3 and 4, these

13   are the Progress Reports submitted to the NIH.  Whose

14   signature is on all of those?

15    A. These are the Notice of Awards.

16    Q. Oh, excuse me.  Let me show you Government's Exhibit

17   Number 2.  Whose signature is submitted on that grant

18   Progress Report?

19    A. This is Jan W.

20    Q. Woraratanadharm?

21    A. Yes.

22    Q. Is my client's signature on there?

23    A. No.

24    Q. Is there also a cover letter that's accompanied that's

25   the last page of that report?

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1       A. Yes.

2       Q. Who signed the letter on behalf of GenPhar?

3       A. Jan W., or Woraratanadharm.

4       Q. Okay.  Is that the same on Government's Exhibit 3?  Is it

5       her signature on the second page?

6       A. Yes.

7       Q. And then the cover letter at the very end, is it also her

8       signature?

9       A. Yes.

10      Q. And again, on Government's Exhibit 4, the Final Progress

11      Report, who signed it?

12      A. Jan Woraratanadharm.

13      Q. Is my client's signature on that Progress Report?

14      A. No.

15      Q. All right.  Now, in that Marburg grant application, it's

16      an application and its projected costs, correct?

17      A. Yes.

18      Q. And that's Government's Exhibit 1, correct?

19      A. Yes.  I'll take your word.  I've got a bunch of exhibits

20      up here.  Yes.

21      Q. And so this is a research facility's projection of what

22      they are going to spend, if they do, in fact, get the grant?

23      A. Yes.

24      Q. But there is nothing carved in stone because they don't

25      know if they are going to get this grant and they don't know

1    how technology and research is going to change, correct?

2     A. Right.

3     Q. All right.  And it's not uncommon for different research

4    agencies to submit multiple grant applications at the same

5    time; isn't that right?

6     A. Multiple grant applications involving --

7     Q. Research?

8     A. -- different studies?

9     Q. Correct.

10     A. Correct.  Yes.

11     Q. And they do that and they often use the same science in

12    these applications because they don't know which ones they

13    are going to get; isn't that right?

14     A. There should be different studies.  There may be some

15    similar science in some of the grants, but it shouldn't be

16    the same science in all of the grants or the exact same

17    application.

18     Q. Right.  But they -- they don't know which ones they are

19    going to get when they apply?

20     A. Correct.

21     Q. And you said this goes through an intensive peer review

22    cycle and these involve scientists, renowned scientists in

23    the United States, that look at these applications and

24    determine which ones they are going to grant?

25     A. Yes.

Q. All right.  How many scientists are on each Peer Review

Committee?

A. I'm not exactly sure of the number on the Peer Review

Committee.  If I had to guess, it would probably be about 15.

Q. All right.  And then they rank them or give them some

numerical value, I believe you said 1 to 5.  And the ones

that have the highest number, are those usually the ones that

are awarded?

A. Correct.

Q. And for each grant, what would you say is the average

number of applications?

A. For each grant?

Q. I mean, for like NIH Marburg, I mean, how many applicants

would have tried to get this grant or would have been

reviewed by the peer review experts?

A. That I don't have an answer for.  I'm not sure.

Q. Do you have any idea of what percentage are granted --

A. Um --

Q. -- of those who review?

A. No, I don't know off the top of my head.  No.

Q. But certainly Dr. Dong and GenPhar and his wife and the

scientists there made it through that peer review process,

which is why you decided to -- your agency awarded this

grant?

A. Yes.

1    Q. And so once the grant is awarded, I believe you said it

2    has different managers that are associated with it; is that

3    right?

4    A. Yes.

5    Q. All right.  And so there is a Grants Management Officer?

6    A. Correct.

7    Q. And who was that on this grant, the NIH Marburg grant

8    that is the subject of Government's Exhibit 1?

9    A. Um, for the very first year of the grant?

10    Q. I want to know who was for every year.

11    A. Well, the Grants Management Officer for year 1 was Donna

12    Sullivan.

13    Q. Okay.  And for year 2?

14    A. Year 2 I'm not 100 percent sure who the Grants Management

15    Officer was.

16    Q. Okay.

17    A. Year 3, that would be me, Michael Fato.

18    Q. Okay.  And year 4, Leslie Boggs?

19    A. Leslie Boggs.

20    Q. And what are the responsibilities of the Grants Manager

21    Officer on each of those years?

22    A. The Grants Management Officer does the final review and

23    signs off an award and issues the Notice of Award which

24    actually obligates the funds.

25    Q. All right.  Now, are any of you scientists?

1      A. No.

2      Q. All right.  And then with regard to each grant, you have

3      a Grants Management Specialist; is that right?

4      A. Yes.

5      Q. And who was that on the four years of this grant?

6      A. I can tell you year 1 was Don Mitchum, and year two, I'm

7      not 100 percent sure, but I think it's Mary Ann Anderson,

8      year 3 I was the Grants Management Specialist and Grants

9      Management Officer.

10     Q. So you served both roles in year 3?

11     A. Yes.

12     Q. All right.

13     A. And year 4, I believe it was Leslie Boggs, as well, for

14     both.

15     Q. So she, too, served both roles?

16     A. Yes.

17     Q. And in each of these grants you have a program official;

18     is that right?

19     A. Yes.

20     Q. And who was that on the four years of this grant?

21     A. Um, looking back at the records in year 1, it was Pat

22     Repik, and I'm not 100 percent sure in year 2, but I believe

23     it's Pat Repik, and year 3 and 4 was Pat Repik.

24     Q. All right.  And what's the role of the program official

25     with regard to one of these grants?

1    A. They review the scientific aspects of the grant.

2    Q. And they are scientists?

3    A. They are.

4    Q. And their job is to read the science, make sure it makes

5    sense and --

6    A. Yes.

7    Q. -- and that it's accurate?

8    A. Correct.

9    Q. And that there has been progress made?

10    A. Correct.

11    Q. And then with each of these grants, do you also have a

12    Scientific Review Administrator?

13    A. A Scientific Review Administrator is in the initial

14    review.  So that's in the very beginning of the award.

15    That's one of the peer review -- the first review of the

16    grant there is a Scientific Review Administrator.

17    Q. So they don't continue throughout the life of the grant;

18    it's just at the beginning?

19    A. Correct.  For the review only.

20    Q. All right.  Now, would Patricia help -- would she speak

21    to other scientists while she's reviewing this science or

22    would she just make that determination on her own?

23    A. I'm not 100 percent sure.  I imagine she would, just as I

24    would speak with other Grants Management Specialists if I

25    have questions.

1    Q. So when the Government asked you if anyone from GenPhar

2    ever called you related to that list they gave you at the end

3    about a building and all that, all you can testify to is that

4    they -- you didn't talk to them in those years, that year

5    that you were the Grant Management Officer and the Management

6    Specialist?

7    A. Correct.  In looking back at the file, I didn't see

8    anything when I did my review.

9    Q. But you don't know if any of these other people spoke to

10   anyone from that business on the telephone or anything like

11   that, do you?

12   A. Correct.

13   Q. So you can just speak for your 3; not years 1, 2 and 4?

14   A. I also did a revision to the grant year 2.  I think you

15   were just asking for the initial awards.  In year 2 I revised

16   the awards, so I was partial.

17   Q. Okay.  I believe the Government was -- you were

18   explaining the difference between a UO1 grant and some other

19   grants.  And you said that a grant does not change, but a UO1

20   can change because it changes with science or -- explain

21   that.  I might not have followed you.

22   A. So basically a UO1 grant is a cooperative agreement and

23   our programs have input and say into that grant.  So the

24   goals are the milestones may change, depending if the

25   principal investigator agrees.

1    Q. So that's not unusual for the goals and the milestones

2    and all that to change through the progress of a grant?

3    A. The goals and milestones, correct, but not the scope of

4    the grant.

5    Q. Now, the agency, GenPhar in this case, would have had

6    re-budgeting authority with this grant, correct?

7    A. Yes.

8    Q. And re-budgeting authority, would you explain to the jury

9    what that means?

10    A. Sure.  Re-budgeting authority is when they submitted a

11    projected budget to us, and for one reason or another they

12    didn't spend those funds and they want to re-budget them to

13    another category of need in the grant, keeping the scope of

14    the grant the same.

15    Q. And an agency can re-budget up to 25 percent without

16    getting your permission, correct?

17    A. Correct.  Yes.

18    Q. And that's 25 percent of the entire grant award per year?

19    A. Correct.

20    Q. Now, facility administration costs.  I believe you

21    testified that that's basically synonymous with indirect

22    costs, correct?

23    A. Yes.

24    Q. And direct costs would be personnel, salary and --

25    A. I'm sorry.  Did you say it's synonymous with indirect

1   costs?

2   Q. Yes.  Indirect costs.

3   A. Yeah, yeah, yeah.

4   Q. And so direct costs would be those things that you spend

5   on personnel, supplies, that type of stuff?

6   A. Correct.

7   Q. Contract labor would also be direct costs, correct?

8   A. Correct.

9   Q. And equipment?

10   A. Correct.

11   Q. And indirect costs are also called facilities and

12   administration costs?

13   A. Yes.

14   Q. The things you need to make your business run?

15   A. Yes.

16   Q. And who determines what the percentage of indirect cost

17   is going to be in a grant?

18   A. There is negotiation.  The office name is -- I'm losing

19   it right now, but I can give you the contact at that office.

20   There is a separate office with NIH that negotiate the

21   facilities administrative rate.

22   Q. And that's also subject to change from the grant

23   application to the different notice of awards, correct?

24   A. Actually, it's not supposed to.  It's supposed to stay

25   the same for the life of the grant, facilities administrative

1    cost.

2     Q. Let's talk about that for a minute.

3         MS. PARHAM:  If you would pull up Government's

4    Exhibit 1, page 48.

5         THE COURT:  Who are you asking to do that?

6         MS. PARHAM:   The Government agreed to pull up their

7    prompt.  We talked about it at a break.

8         THE COURT:  I mean, who is doing it?

9         MS. PARHAM:   The Government is going to pull up

10   their exhibit on the TV screen so everybody can see it.

11         Sorry.  Page 48.  I'm sorry.  Thanks.  That's it,

12   49.  Yeah, that's right.

13    Q. So for example, in this -- this is the grant application

14   for the NIH Marburg grant.  Is that what this is?

15    A. Yes, it is.

16    Q. Okay.  And zooming out a little bit, please, it's down

17   there at the bottom, that's a 35 percent facilities and

18   administration cost per year.  And those are the line items

19   to the right of that?

20    A. Yes.

21    Q. All right.  And if you could go to Government Exhibit 18,

22   page 2.

23    Q. Let me draw your attention to the grant award for year 2.

24   The facilities and administration cost in year 2 is

25   significantly higher than in the application.  It's $217 and

1       $112 dollars; isn't that correct?

2        A. Yes, I see 217 in year 2, yes.

3        Q. And then turning to page 4 of that same exhibit.  And

4       actually, on the last page of this, as well as the last pages

5       of all the other grant awards, you basically do a synopsis of

6       the cost of each year.  And included in that cost is the

7       facilities and administration rate, which is at the bottom.

8       And what was the facilities and administration rate for years

9       2, 3 and 4 with regard to this NIH Marburg grant?

10       A. 76 percent.

11       Q. The facilities and administration grant went from 35 in

12      the application, and what was actually awarded by your agency

13      was 76 percent?

14       A. I believe in year 1 it was different than 76 percent, but

15      yes, there was awarded in year 2 of 76 percent.

16       Q. And year 3 and year 4?

17       A. I would have to look, but I believe so.  I'm not sure.  I

18      have to look at each record.

19       Q. Okay.  We can do that.  It's Government's Exhibit 19.

20              MS. PARHAM:  May I approach the witness? It might be

21      faster.

22       Q. Let me just show you Government's Exhibits 19 and 20.

23      And that's the year 3 and year 4.

24       A. Okay.

25       Q. Was that also 76 percent in those?

1       A. Yes, in both.

2       Q. All right.  And so facilities and administration costs or

3       indirect costs are costs that are necessary for the research

4       and for the goal of the grant outside of personnel and

5       supplies and equipment?

6       A. They are necessary to actually do the grant.  Like I gave

7       the example earlier, utilities and stuff.

8       Q. And those costs, that's an entirely different rule than

9       what you testified earlier about that agencies can redirect

10      up to 25 percent between different categories without getting

11      your approval?

12      A. I'm sorry.  Say that again.

13      Q. You testified earlier that agencies can also re-budget up

14      to 25 percent of the grant without getting your approval.

15      A. Oh, correct, yes.

16      Q. Now, the NIH policy statement that the Government showed

17      you, I believe it was their Exhibit 14, it has a date on it

18      of December 1st, 2003.  You mentioned in your direct

19      testimony that that wasn't the current version.  Do you know

20      when the next revision was after 2003?

21      A. Um, I don't know the dates, but I know there has been a

22      couple of revisions since.

23      Q. I guess what I'm wondering, then, is how do we know that

24      that applied for these grant years?  These grant years were

25      7, 8, 9 and 10, 2007, 2008, 2009 and 2010, so do you know

1    whether this policy had been revised before the grant award

2    and the grant application in this case?

3    A. No.  As far as I know, this was -- this was the grant

4    policy statement in effect at the time of that award.

5    Q. At the time of the award.  But what about the years of

6    the grant, do you know if it was revised at any time during

7    the pendency of the grant?

8    A. I believe the next revision was 2010.

9    Q. Okay.  Are you sure about that?

10    A. No.  That was, I think 2010, 2013 are ringing bells when

11    they were revised, but I don't -- without looking at the

12    date.

13    Q. Okay.  In Government's Exhibit Number 1 on page 5, I

14    believe you testified on direct that those numbers might have

15    stood out to you for some reason if you had been reviewing

16    this grant application.

17    A. I think that was in comparison to the key personnel

18    report in year 2.

19    Q. Was it not on this exhibit, a different one?

20    A. It was comparing this one with the Key Personnel Report

21    in the Progress Report of year 2.

22    Q. Okay.  But let me ask you this before we move on from

23    this:  Do you have any idea who wrote those percentages?  Was

24    it your agency that wrote those or did it come to you like

25    that?

1    A. More than likely it was our agency that wrote it.  That's

2    the way we used the documents.  We used to hand write on them

3    back then.

4    Q. But again, this application is merely a projection, so

5    it's not unusual for personnel to change when people do

6    Progress Reports, correct?

7    A. Correct.

8    Q. On -- now, these milestones, they are based on science;

9    isn't that right?

10    A. Yes.

11    Q. And the milestones for purposes of this grant look like

12    they are tied to grant years.  So in other words, Milestone 1

13    looks like it parallels grant year 1 and so forth.  Milestone

14    2 parallels grant year 2; is that right?

15    A. I believe that's what it looked like when I looked at it

16    earlier, yes.

17    Q. And did your agency ever believe or determine in your --

18    while you were -- that the science was not being met with

19    regard to this grant?

20    A. Um, if the science wasn't being met, that would have been

21    identified by the program officer.

22    Q. Was it in this case?

23    A. In year 3 when I processed it or throughout the life

24    cycle of the grant?

25    Q. Throughout the life cycle of the grant.

```
 1      A. Throughout the life cycle of the grant, I didn't see any
 2      identification of it not being met.
 3      Q. So there was no complaints with regard to my client's
 4      agency's science or anything, the science that was being
 5      done?
 6      A. No, I didn't see anything.
 7      Q. Or the milestones that were being achieved?
 8      A. No.
 9      Q. I mean, as far as you know, through your agency and your
10      documentation, GenPhar and the scientists achieved their
11      scientific milestones?
12      A. Correct.
13      Q. And if they hadn't achieved their scientific milestones
14      or you had noticed something was wrong, you have an
15      administrative process that you go through, correct?
16      A. We would, yes.
17      Q. All right.  And tell us a little bit about that process.
18      A. The renegotiation of the milestones?
19      Q. Well, not only that -- well, that's one, that's -- if
20      somebody is not meeting their milestones, they can be
21      renegotiated?
22      A. Correct.
23      Q. If you will explain to the jury what that is.
24      A. That's a programmatic issue, it's a scientific issue,
25      it's where the NIH scientist or program officer would
```

1    renegotiate the milestones if they are not being met, and

2    they would have direct discussions with the banking

3    institution and the principal investigator to renegotiate

4    that.  And I would see a document, a complete document from

5    the institution of those milestones.

6    Q. And in fact, in addition to the re-budgeting of the

7    milestones, your policy statement on page 128, I believe,

8    discusses -- well, let's go to this monitoring.  If you

9    could, if you could read that paragraph for me, please.  Page

10   128 of your policy statement.

11   A. Sure.  "Grantees are responsible for managing the

12   day-to-day operations of grant-supported activities using

13   their established controls and policies as long as they are

14   consistent with NIH requirements."

15           Do you want me to read the entire --

16   Q. Yes, uh-huh.  Thank you.

17   A. "However, to fill their role in regard to stewardship of

18   federal funds, NIH awarding offices monitor their grants to

19   identify potential problems and areas where technical

20   assistance might be necessary.  This active monitoring is

21   accomplished through a review of reports and correspondence

22   from the grantee, audit reports, site visits, and other

23   information available to NIH.  The names and telephone

24   numbers of the individuals responsible for monitoring the

25   programmatic and business management aspects of a project or

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1  activity will be provided to the grantee at the time of

2  award."

3  Q. What are site visits?

4  A. Site visits can vary.  Some site visits are going just to

5  see what's going on, to see what research is being done.

6  Other site visits are more along the line of audits where we

7  actually look at some recordkeeping and see how they are

8  keeping their books.

9  Q. And how common are site visits and audits?

10  A. Domestic site visits are pretty rare.  The funding to

11  have us travel to different locations isn't there, so it's

12  been pretty rare, unless there is a flag or a red flag has

13  been raised.

14  Q. All right.  Was there any site visit or audit with regard

15  to this grant?

16  A. Not an internal NIH audit, no.

17  Q. Was there any allegation that the science was not

18  performed with regard to this grant?

19  A. No.  I didn't see anything in the file.

20  Q. In fact, are you aware that my client, Dr. Dong, is a

21  peer review expert for NIH grants?  Did you know that?

22  A. No.

23  Q. Did you know whether he has served in that capacity even

24  recently?

25  A. Um, no.

1    Q. All right.  Is there any regulation in this policy manual

2    about where the monies are supposed to be kept?

3    A. Um, the money, there is part payment system with NIH.

4    It's issued in the payment management.  And then they

5    withdraw -- they withdraw the funds as needed and are

6    expected to spend them within three business days.  Is that

7    the part you are referring to?

8    Q. I was wondering -- I saw that.  Is there anything else

9    with regard -- any other instruction about monies, where they

10   are being kept or what kind of bank accounts or anything like

11   that that you are aware of?

12   A. The interest that is gained on any of these drawdowns are

13   supposed to be returned to NIH or HHS if they earn over $250.

14   But other than that, I'm not a grantee, so that's all I know

15   is what's in the policy statement.

16   Q. But you don't know of any policies that require grant

17   monies to be kept separate from other monies or anything like

18   that?

19   A. The grant funds, they should be able to be identified for

20   the specific grant.

21   Q. Correct.

22   A. So that's internal recordkeeping.

23   Q. Correct.  But not about specific bank accounts?

24   A. If that's -- I mean, they could.  They don't have to.

25   That's internal recordkeeping.

1     Q. And you said yourself, I believe on direct examination,

2     that you have not read yourself the entire thing,

3     Government's 14, cover to cover?

4     A. Correct.

5               MS. PARHAM:   That's all I have, Your Honor.

6               THE COURT:  Any redirect?  I'm sorry.

7               MR. DICKSON:   That's all right, Your Honor.  I'm

8     just sitting over here quietly.

9               THE COURT:  Go ahead.

10                        CROSS-EXAMINATION

11    BY MR. DICKSON:

12     Q. Let me just ask a couple of questions, Mr. Fato.  Did I

13    understand you to say that you never went to GenPhar

14    personally?

15     A. Correct.

16     Q. Okay.  Did you ever meet Dr. Dong personally before

17    seeing him in court today?

18     A. No.

19     Q. Okay.  Did you have any personal contact with anybody,

20    any employees or agents of GenPhar personally?

21     A. E-mails.  E-mails, I'm sure.

22     Q. E-mails, okay.  And that would be Jan W.?

23     A. Um, I can't say for sure.  But during the course of a

24    review for an Annual Progress Report, e-mails are more than

25    likely sent out along with the Notice of Award.

1    Q. That would be the normal process?

2    A. Correct.

3    Q. Okay.  But you don't have any independent recollection of

4    that happening in this case?

5    A. No, I don't.

6    Q. And did I understand you to say that during the course of

7    the research, the method of the grants could change not the

8    purpose of the grant, but exactly what you were doing for

9    each milestone?

10   A. Yes.

11   Q. Okay.

12         MR. DICKSON:   That's all I have, Your Honor.

13         THE COURT:  Any further cross?

14         MS. PARHAM:   No, sir.

15         THE COURT:  Any redirect?

16         MR. KLUMB:   Yes, Your Honor.

17   Q. I would like to cover just three subjects with you,

18   Mr. Fato.

19         First of all, Ms. Parham just covered with you the

20   way payment was supposed to occur, and I think you may have

21   been cut a little short.  Would you describe what the policy

22   statements and the rules applicable to payment, how that

23   works?

24   A. The grant is authorized by Notice of Grant Award, and it

25   goes into Payment Management System.  The Payment Management

1    System is basically a bank with the grantee or the

2    institution.  They now drawdown funds and are expected to use

3    those funds within three business days.  If they don't use

4    those funds and they put them in a bank, any interest gained

5    on that over $250 we would expect to be returned to Health

6    and Human Services.

7     Q. And then she asked you whether or not they would require

8    to take those funds and put them into a separate bank

9    account.  And I believe you said they could, but they have to

10    separately account for them.  What do you mean by that?

11    A. They just basically have to account that the funds we

12    give them for that specific grant are being spent for that

13    grant.  So it can be -- they could have their own internal

14    records on how they are going to do that.  What we are

15    looking for is that grant funds are spent on this grant, and

16    however they identify that, they identify that.

17    Q. So if they draw down $100,000 in their accounting

18    records, they can tell us or you, I guess, where those funds

19    were spent?

20    A. They -- I would expect that, yes.

21    Q. Okay.  Now let's talk a little bit about the 25 percent

22    rule that Ms. Parham raised with you.

23        First of all, could you take Government Exhibit 2,

24    please.  Will that have a budget for it in year 2 of the

25    grant?

1    A. Okay.  I'm sorry.  What was your question?

2    Q. Do you have Government Exhibit 2 in front of you?

3    A. I do.

4    Q. Let's take a look at page 2.  And what is that, again?

5    We have been over it before.

6    A. This is a proposed budget for year 2 of the grant.

7    Q. Okay.  Now let's take a look at Ms. Parham's 25 percent

8    rule.  The total amount of the grant from that year is how

9    much?

10   A. $900,000.  $900,000.

11   Q. So 25 percent of a million would be what?

12   A. About 25,000.  Yeah.  I'm sorry.  Sorry.

13   Q. 250,000?

14   A. Yeah.

15   Q. So it's somewhere less than 250,000, right?

16   A. Correct.

17   Q. And your testimony was is that if that money wasn't spent

18   as originally designated, it could be re-budgeted?

19   A. Correct.

20   Q. Any limitations on what that money is used for?

21   A. It would have to remain the original scope of the grant

22   itself.  So whatever the grant was submitted for, in this

23   case it looks to be a Marburg vaccine grant, it would have to

24   be towards helping that Marburg vaccine.

25   Q. How about work on an E-Bola vaccine, could it be used for

1    that?

2     A. I don't believe so.

3     Q. How about for use in constructing a building, could it be

4    used for that?

5     A. No.

6     Q. Now let's take a look at -- assume again that it's

7    roughly a million dollars for that second year.  Is the

8    figure $606,900 more or less than 25 percent?

9     A. It's more.

10     Q. Did anyone from GenPhar ever come to you and ask whether

11    that could be re-purposed or re-budgeted?

12         MS. PARHAM:   Objection, Your Honor.  I don't

13    believe he was the Program Manager of that year.

14         THE COURT:  My understanding is that this 25 percent

15    rule that you call Ms. Parham's rule, was gone into by you

16    with this witness on direct examination.  I don't recall it

17    exactly, but when Ms. Parham started asking a question, the

18    first thing she said was you have testified on direct

19    examination about the 25 percent rule, and then she began

20    asking about it.  So I think it was gone into in your case.

21    And though the objection comes pretty late, I think that it's

22    not new matter that she brought out; and therefore, it's not

23    something that you can go into on recross.

24         Now, secondarily, to some extent, I would say maybe

25    10 questions, maybe a dozen, the record will reflect the

1    number, you asked this witness on direct examination things

2    that the defendant did or did not do.  Did they ever come to

3    you and talk to you about this?  Did they ever come to you

4    and talk to you about that?  Did they ever come to you and

5    talk about -- but I think conversations between this witness

6    and the defendants were gone into by you on direct

7    examination in detail, to the point where I started to stop

8    you because I didn't think there was any end to it.

9           But anyway, that's not new matter.  You can't go

10   into it.  So I sustain the objection to it on that ground, as

11   well.

12          MR. KLUMB:    Thank you, Your Honor.

13    Q. Let me then move to the third subject.

14          You indicated on cross-examination that equipment

15   costs were an example of -- was it direct or indirect costs?

16    A. Direct.

17    Q. Now, can equipment in a company be used for both

18   grant-related and non-grant-related purposes?

19    A. I believe they can be used for both.  I can't confirm

20   that 100 percent, but if they have the piece of equipment and

21   it's not being used for grant purposes and it's free, it's

22   available to be used for non-grant purposes, other studies

23   within their organization.

24    Q. Okay.  So again, if equipment is purchased and has a dual

25   purpose for grant and non-grant-related purposes, is that a

1    direct cost?

2     A. That would be a direct cost.

3     Q. For the grant?

4     A. Correct.  If they are allocating that grant at time of

5    purchase, that it's going towards this grant.  So I'm

6    interpreting your question as after it's purchased, can it be

7    used for another grant or another purpose?

8     Q. Okay.  If someone purchases equipment, say a microscope,

9    before the grant is granted, and it has multiple purposes,

10   what is the -- what is that cost?  How does that come into

11   play?

12    A. I would expect to see a portion of that on this grant;

13   not the entire purchase of a microscope.  If that microscope

14   is going to be used and they know it's going to be used for

15   other purposes, I would expect to see a portion of that

16   microscope.

17            MR. KLUMB:   Okay.  Thank you.  That's all I have.

18            THE COURT:  Any further cross-examination?

19                      RECROSS-EXAMINATION

20   BY MS. PARHAM:

21    Q. So if someone bought something before the grant and it

22   was purchased thinking they were going to use it on this, you

23   would expect to see some of that cost allocated from this

24   grant to it?

25    A. That would have to be outlined in the grant itself.

1    Typically we don't see that.  We see what's listed in the

2    facilities and what they have available to them at the time

3    of award that goes into the review.

4     Q. But could be done?

5     A. It could be.

6            THE COURT:  Okay.  Thank you very much.  You are

7    excused.

8                    *****     *****     *****

9

10   I certify that the foregoing is a correct transcript from the

11   record of proceedings in the above-titled matter.

12

13

14

15   ---------------------------

16

17   Amy C. Diaz, RPR, CRR              November 25, 2014

18   S/  Amy Diaz

19

20

21

22

23

24

25